766 So.2d 860 (1998)
Kenneth Glenn THOMAS[*]
v.
STATE.
CR-93-0823.
Court of Criminal Appeals of Alabama.
September 4, 1998.
Rehearing Denied October 23, 1998.
*870 William F. Burton, Washington, D.C.; Kevin M. Doyle, Birmingham, for appellant.
Bill Pryor, atty. gen., and Beth Jackson Hughes, asst. atty. gen., for appellee.
PATTERSON, Retired Appellate Judge.
Kenneth Glenn Thomas appeals from the circuit court's denial of his Rule 32, Ala.R.Crim.P., petition, as amended,[1] in which he contested the validity of his conviction for capital murder and sentence of death and also his convictions for first-degree arson, first-degree robbery, and first-degree sexual abuse, for which he received consecutive sentences of life imprisonment without the possibility of parole. Those convictions and sentences were affirmed by this court, see Thomas v. State, 539 So.2d 375 (Ala.Cr.App.1988); the Alabama Supreme Court affirmed this court's judgment, 539 So.2d 399 (Ala.1988). The United States Supreme Court denied Thomas's petition for certiorari review, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). The circuit court denied Thomas's Rule 32 petition after holding an evidentiary hearing and issuing an "Opinion and Findings of Fact."[2] Thomas did not testify at the Rule 32 proceedings.
The allegations asserted in Thomas's petition must be reviewed in the context of the evidence presented at trial. We quote, with several insertions, the rendition of the facts that appears in the opinion of this court on the direct appeal of Thomas's convictions and sentences, 539 So.2d at 377-80.
"Kenneth Glenn Thomas was charged in a four-count indictment with intentional murder [of 82-year-old Flossie McLemore] during the course of a burglary (in violation of § 13A-5-40(a)(4), Code of Alabama 1975), arson in the first degree (in violation of § 13A-7-41, Code of Alabama 1975), robbery in the first degree (in violation of § 13A-8-41, Code of Alabama 1975), and sexual abuse in the first degree (in violation of § 13A-6-66, Code of Alabama 1975). The jury found this appellant guilty on all four counts of the indictment and unanimously recommended death as punishment for the capital offense of burglary/murder. The trial judge sentenced the appellant to death for the capital offense and to life imprisonment without parole on the robbery, arson, and sexual abuse verdicts as judgments of conviction.

*871 "At approximately 2:00 a.m. on December 15, 1984, Veronica Grizzard was driving down East Street in Athens, Alabama, with two of her friends. As Grizzard passed the Athens Middle School, she noticed smoke coming from a house across the street from this school. Grizzard went to a neighboring house and awakened one Jerry Stephens. Stephen's wife telephoned the Athens Fire Department.
"Stephens then went to the burning house which was located at 521 East Street and threw rocks through the windows in an attempt to arouse the occupant of the house, Flossie McLemore. The front and back doors were too hot to open.
"At this time, the fire department arrived. The firemen began fighting the fire at the front of the house. After a few minutes, one of the firemen, Jerry Day, was able to enter the house. He found the body of Flossie McLemore lying on her back in the middle bedroom of the house.
"The victim was naked except that her green nightgown was pulled up around her chest. Her legs were spread in an unnatural position, with one leg in the hallway and the other around the corner of the door into the bedroom. The coroner was called to the scene and the house was secured.
"The firemen noticed the house was in shambles and they noticed blood all over the house. The kitchen stove and oven were on and the oven door was open. There were cloth items on the oven door and some burning paper inside the oven in a frying pan. However, the firemen stated that the oven was not the cause of the house fire. The living room was the most heavily damaged part of the house.
"Several Athens police officers came to the scene shortly after the firemen arrived. One of the officers noticed a red Chevrolet parked in the parking lot of the Athens Middle School.
"When the officers walked up to the car, one of them saw a man lying down on the front seat of the car. At this point, the man raised up and one of the officers recognized the man as this appellant. The appellant had blood all over his chest and pants [the pants were heavily saturated with wet blood and he was not wearing a shirt], and he smelled of alcohol.
"At this point, the appellant became belligerent and began cursing. He was asked to get out of the car and he was placed under arrest for public intoxication. One of the police officers `patted down' the appellant, and he found a rusty knife and some blood-soaked bills in the appellant's pants pocket.
"The appellant then jumped back in the car and locked the doors. The appellant was persuaded to exit the car and one of the policemen found a knife on the front seat of this car. The knife had some blood and hairs on it.
"The appellant kept insisting to the police officers that he hadn't done anything. He said that he had blood on him because he had been in a fight that night and had cut someone `real bad' at 31 Blue Spot in Ardmore, Tennessee.
"The appellant was then handcuffed and taken to the police station. It took several officers to put him in the police car.
"An autopsy was performed on the body of the victim by Dr. Joseph Embry. The autopsy revealed numerous wounds, bruises, and abrasions to the body of the victim. Embry found numerous post-mortem wounds to the victim's neck, chest, abdomen and pubic area.
"Embry also found the existence of several ante-mortem wounds. There was a deep tear in the back wall of the vagina which extended to the area between the vagina and the rectum. Embry found several other tears to the vagina and rectum and numerous cuts to the buttocks area. Embry stated that the wounds to the vagina and rectum were inflicted with a blunt instrument using considerable force and were indicative *872 of sexual abuse. Embry also stated that some of the stab wounds and cuts were consistent with having been made by a knife. [The wounds were consistent with having been made by the knife seized from the driver's seat of Thomas's car].
"The victim also sustained several broken ribs. However, Embry stated that none of the above described injuries were life-threatening. Embry testified that the victim died as a result of asphyxiation caused by a hand or similar instrument applied with force. There were bruises and tears inside the mouth as well as marked hemorrhaging.
"After the appellant was placed in jail, his clothes were confiscated. There was blood all over his body, including his pubic area. The appellant had a cut to his hand between his third and fourth fingers.
"On the morning of December 15, 1984, officers from the Athens Police Department, along with John Kimbrough of the Department of Forensic Sciences, began collecting evidence. Spots of blood were found leading from the doorstep of the victim's house through the yard and across the street to the point where the appellant's car had been parked. A blood-soaked Kleenex was found in the street.
"The appellant and the victim both were type `O' in the ABO blood type system. However, in the PGM system, the appellant is `type one' and the victim was `type two one.'
"The spots of blood leading from the house to the appellant's car were consistent with the appellant's blood type as was the blood found on the Kleenex. A cloth found inside the appellant's car had bloodstains consistent with the appellant's and the victim's blood types.
"The officers found what appeared to be screwdriver marks on the window facing the front bedroom at the victim's house. There was blood on the inside wall of this window. In this bedroom, the mattress was shoved to the side of the bed and the contents of the dresser drawers were scattered on the floor. A pillowcase was found under some insulation on the floor. The pillowcase contained some money and jewelry and a car key. The key was to the ignition of the appellant's car. A bloodstained shirt was also found in this bedroom.
"A hair found on this shirt was consistent with the defendant's hair. The appellant was identified as having worn this shirt earlier on the night in question.
"The rest of the house was similarly in shambles. Every drawer, closet, and cabinet had been opened and the contents of each strewn about. Bloodstains were found all over the house, but only a few could be typed due to the heat from the fire. Two of the bloodstains were consistent with the appellant's blood type.
"A check with a bloody fingerprint on it was found in the storage room of the victim's house. It matched the known left thumbprint of this appellant.
"Two of the fibers from the knife found inside the appellant's car were similar to fibers from the victim's nightgown and a blanket on her bed. Hair fragments from the knife were consistent with the head and pubic hair of the victim. Trace fibers from the appellant's jeans were consistent with the victim's nightgown. A hair consistent with the victim's was also found on the appellant's jeans. [Fibers found on the soles of Thomas's shoes were similar to the fibers in the carpet in the victim's bedroom.]
"Brenda Presnell testified that she was following a red Chevrolet on the night of December 14, 1984, at approximately 11:45 on her way home from work. The car pulled into the parking lot of the Athens Middle School, and the person in the car had curly hair similar to the appellant's.
"Penny Corum stated that she was driving home on the night of December 14, 1984, near midnight. She stopped at *873 the corner of East Street and Forrest Avenue and noticed a man crossing the street from the Athens Middle School parking lot. As she turned the corner, she saw the man in the victim's front yard. She identified this man as the appellant.
"The appellant presented numerous witnesses who testified as to the appellant's unfortunate childhood. The appellant's father, who was a big influence on the appellant, was an alcoholic and he spent many years in prison. The father died a few weeks before this murder. During his childhood, the appellant was moved from foster home to foster home.
"The defense also introduced evidence that the appellant was borderline mentally retarded and a paranoid schizophrenic. They also introduced testimony from a psychologist who believed the appellant had suffered brain damage from the overuse of drugs.
"The appellant testified in his behalf. He stated that his father was a role model for him and that he was with his father when he would strip cars and set fires. The appellant also testified that he had used various types of drugs from 1978 until 1983.
"The appellant's testimony concerning the night in question was similar to the statement he gave the police. He stated that he went to work on December 14, 1984, and smoked marijuana throughout the day. That night, he went to a party and smoked pot and drank beer and whiskey. When he left the party, he went to 31 Blue Spot in Ardmore, Tennessee. He beat a guy in cards and this person cut him on his hand as he was leaving the club.
"The appellant then returned to Athens. His car went dead in front of the Athens Middle School. [The appellant's car started when the officer used the key found in the victim's bedroom.] The appellant got out of his car and began walking home through the victim's yard to his house which was located on the next block.
"The appellant noticed the front door to the victim's house was open, and he went inside. He saw the victim lying on the floor and he `freaked out.' The next thing he remembered was waking up in his car.
"The State presented two witnesses on rebuttal who testified that they had evaluated the appellant and found him to be competent to stand trial. These witnesses were on the lunacy commission, which examined this appellant."
In reviewing the allegations of this petition and the circuit court's findings, we find helpful a more detailed synopsis of Thomas's testimony in regard to the crimes than is found in the original opinion. Thomas explained:
"[W]hen I turned up yonder to go [to his mother's] home down by the middle school ... right there at the track, as I was approaching that hill, my car just went dead. Good Lord knows I'm telling the truth. It's done that one or two times going to work. I just coasted down there to the parking lot, you know. I put it up in park and got my key and put it in my pocket. I was going to go down there to get my brother to help me get it to the house, you know. Besides walking down the roadthe city police is bad to go up and down through there all the time any way. Besides going down the road, I walked through [the victim's] yard.... [W]hen I walked across the yard, I looked up, and her front door was standing open. I don't know why I went in the house. Something told me to go in that house. I might have seen a shadow or something, but I went in there. Stuff was scattered, and I looked down, and there laid the poor lady. She had blood on her. Then I freaked out. I never seen nothing like that before. The next thing I know, the police was knocking on my car window. I raised up, and you know, I guess they was shining a flashlight. I can't remember. I rolled down my window. They opened the door. The only *874 thing I remember was that I said, `I'm trying to help.' They said, `You ain't trying to help nobody, man.' I felt pain where they put handcuffs behind my back and handcuffed me. I woke up the next morning in the city jail. I was wanting to get out because I had to go to work. All they was supposed to have me for was being drunk. Later on, up in the morning, they said, `I'm going to charge you for murder.' I didn't even know who I was supposed to have killed."
(R. 1728-29.) When asked to describe specifically where the victim was when he saw her, he testified,
"She was [lying] in the middle of the house close to the kitchen. She was in a door. I guess it was a bedroom door. She was [lying] at the door. Half of her was in it and half of her was out of it, best I can remember. I broke down when I seen that. That was the awfulest thing to see. You know, she was just [lying] there. I remember that one leg was out and one was up."
(R. 1729.) He also remembered that he saw a Bible on a table, so he turned to the Twenty-third Psalm and read it to her. He also remembered that he knelt on one knee and put his head next to hers to see if she was still alive, but he did not hear anything and that then "he just freaked out." (R. 1730.) He admitted that the knife seized from his car was his. He guessed that his knife must have dropped out of his back pocket onto the car seat; that he must have dropped his car key in the victim's house when he looked for it in his pocket; and that the blood that covered him was blood from his finger, which, he said, had been cut by the cardplayer at the "beer joint" in Tennessee and he had got it on him by rubbing his finger up and down his pants leg. He could not explain why his fingerprint was on one of the victim's checks. He adamantly denied that he was stealing anything from the victim.
On cross-examination, Thomas could not explain how his shirt had gotten in one of the victim's bedrooms; why he was looking for his car key even though he said that his car would probably not have started; or why he did not go home after leaving the victim's house. He guessed that he got fibers from her nightgown on his pants when he knelt down to check her heartbeat. He further testified that if his knife was on the seat of his car it must have fallen from his pocket onto the seat while he was in Tennessee, and it was not in his pocket when he went in the house. When asked if he went from room to room, he testified,
"I don't remember if I done it because I was trying to find my way back to the front door. It's hard on me this right here, you know. My mind goes and comes. It gets mixed up. I've been like that for a long time. Drugs done it to me. I don't know. If I did it, it was because I was trying to find my way to the front door."
Thomas further declared, "I don't feel guilty about this because I know I hadn't done nothing but drunk [sic].... I'm sorry it happened." (R. 1751.) When asked if his lawyer was correct in saying that Thomas did not know whether he committed the crimes, he replied, "If I did do it, I sure don't remember doing it. I don't know if I did or didn't. I don't believe I could do nothing like that.... I never did do it.... I know I didn't." (R. 1751-52.)

CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
In collaterally contesting his convictions and sentences in this Rule 32 petition, Thomas has asserted numerous allegations of ineffective assistance of trial counsel.
"Ineffective assistance of counsel claims are judged according to the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on an ineffectiveness claim, the petitioner must establish both that his counsel's performance was deficient and that he was prejudiced as a result of the deficiency. *875 Strickland, 466 U.S. at 687, 104 S.Ct. 2052.... The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under `prevailing professional norms,' was `reasonable considering all the circumstances.' 466 U.S. at 688, 104 S.Ct. 2052....
"Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall `outside the wide range of professionally competent assistance.' 466 U.S. at 690, 104 S.Ct. 2052.... Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that `there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' 466 U.S. at 694, 104 S.Ct. 2052...."
"In Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180... (1993), the United States Supreme Court held that ... [t]o show prejudice, a defendant must show that counsel's errors were so serious that they rendered the defendant's trial unfair or unreliable, not merely that the outcome would have been different. Unfairness or unreliability does not result unless counsel's ineffectiveness deprives the defendant of a substantive or procedural right to which the law entitles him at the time the ineffective assistance of counsel claim is being reviewed. Lockhart, 506 U.S. at 372, 113 S.Ct. 838.... Unlike the performance component of Strickland, the prejudice component is not determined under the law existing at the time of the trial. Lockhart, 506 U.S. at 372, 113 S.Ct. 838."
Daniels v. State, 650 So.2d 544, 552, 565 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693, 104 S.Ct. 2052. "`[I]n a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."'" Daniels, 650 So.2d at 568 (quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992) (citation omitted), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993)).
"Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Thus, "we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs." Id.
In reviewing the circuit court's findings, we have adhered to the following observations:
"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act, or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant *876 must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). See also Kimmelman v. Morrison, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (Strickland imposes a "highly demanding" standard upon the petitioner to prove "gross incompetence").
Particularly because of the nature of Thomas's brieffor the most part, a maze of one insignificant allegation after another, without any meaningful discussion of law or facts[3]we have repeatedly been mindful of the following in our review of the circuit court's denial of Thomas's petition:
"`"[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made."' Stringfellow v. State, 485 So.2d 1238, 1243 (Ala.Cr.App.1986). `Even though there were several instances where counsel could have objected, "that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel." Ex parte Lawley, 512 So.2d 1370, 1373 (Ala.1987).' O'Neil v. State, 605 So.2d 1247, 1250 (Ala.Cr.App.1992). As this Court observed in Graham v. State, 593 So.2d 162, 166 (Ala.Cr.App.1991):
"`The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards.'"
Daniels, 650 So.2d at 555. The Sixth Amendment does not require counsel to raise "every conceivable objection." Griffin v. Wainwright, 760 F.2d 1505, 1513 (11th Cir.1985), aff'd in pertinent part, vacated on another ground, 476 U.S. 1123, 106 S.Ct. 1992, 90 L.Ed.2d 672 (1986).
As to claims of ineffective appellate counsel, an appellant has a clear right to effective assistance of counsel on first appeal. Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). However, appellate counsel has no constitutional obligation to raise every nonfrivolous issue. Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The United States Supreme Court has recognized that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. at 751-52, 103 S.Ct. 3308. Such a winnowing process "far from being evidence of incompetence, is the hallmark of effective advocacy." Smith v. Murray, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal. Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993), cert. denied, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993). One claiming ineffective appellate counsel must show prejudice, i.e., the reasonable probability that, but for counsel's errors, the petitioner would have prevailed on appeal. Miller v. Keeney, 882 F.2d 1428, 1434 and n. 9 (9th Cir.1989).
*877 Strickland requires that the appellant allege "specific acts or omissions" by counsel. 466 U.S. at 690, 104 S.Ct. 2052. The Rule 32 petitioner also has the burden of pleading specificity.
"The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."
Ala.R.Crim.P. 32.6(b). See also Ex parte Clisby, 501 So.2d 483, 487 (Ala.1986) ("[m]ere conclusions of law with regard to the merits of certain issues not raised on direct appeal are not sufficient to invoke the right to an evidentiary hearing on the question of counsel's failure to raise those issues"). The petitioner must also plead and prove "by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3. Conclusory, vague, or speculative allegations not supported by specifics do not warrant relief.

TRIAL AND APPELLATE COUNSEL IN THIS CASE
Only one of three attorneys who represented Thomas at trialJerry Barksdale (who with another attorney also represented Thomas on direct appeal)testified at the Rule 32 evidentiary hearing. He testified that he and two other attorneys (Jim Moffatt, who had practiced four to five years, and Bill Owens, a public defender) represented Thomas at trial; that he had practiced law since 1967, focusing mainly on trial work; that he was appointed to represent Thomas in 1985 as lead counsel; and that this case is the only capital case he has tried. When asked how many hours he put into preparation, he testified that this case was primarily the only work that he did for the year preceding the trial; that in that year, his income was about $40,000, while in the preceding year, he had earned $150,000; and that he gave 100% effort to save Thomas's life.
In detailing his preparation for the trial, Barksdale testified that he received from the Southern Poverty Law Center the most updated literature available on defending a defendant accused of a capital offense and received also advice from one of its attorneys; that he attended the National College of Criminal Defense for two weeks and had gone to "all their workshops that they had across the country ranging from jury selection to opening statements and closing arguments, cross examination and so on" (Rule 32 R. 174; see also Rule 32 R. 165) and talked with other attorneys who had defended high profile cases; and that he had attended a seminar on death penalty cases in Atlanta and that he studied all the speakers' literature.
Barksdale further explained that he set about trying to build a case on the issue of mental competency and a defense of not guilty by reason of mental disease or defect; that he had attended a National College of Criminal Defense workshop on mental incompetency in criminal cases that was conducted by some of the leading defense attorneys in the nation, along with psychiatrists, who had successfully defended murder cases with the defense of mental incompetency; that he followed the College's guidelines, "the most up-to-date literature available at that time" (Rule 32 R. 137); that he read Coping with Psychiatric Testimony, on how to cross-examine a psychiatrist; that he studied continuing education tapes of a mock cross-examination of a psychiatrist; and that his request for funds for a mental evaluation of Thomas was granted. He further stated that he "set about to get to know" Thomas (Rule 32 R. 135); that he collected every record that had ever been generated about Thomas, e.g., all school records, all medical records, all records of the Department of Human Resources from the agency's first contact with Thomas's family, and the records from the prison system; that he talked with Thomas's family, with a foster parent from each of the homes in which Thomas had resided, with Carol Bynum *878 (the social worker who had handled Thomas's case for years), and with Ted Swann (the minister of the church that Thomas had been accused of setting on fire); and that he felt that he had talked to every person who had had contact with Thomas on the night of the crimes from the time he had left home until he was arrested.
In discussing his opinion of the case, Barksdale testified that although he knew that jurors are skeptical of an insanity defense, by bringing into issue Thomas's alleged insanity, not only was he attempting to establish the defense of insanity, he was making relevant all aspects of Thomas's past and present. By doing so, he put information before the jury to humanize Thomas in an attempt, not to secure an acquittal, but to have Thomas's life spared.
However, Barksdale testified that he had serious hope of prevailing on the insanity defense on the evidence that state experts before the crimes and an independent psychologist after the crimes had diagnosed Thomas as a paranoid schizophrenic. He also testified that he had concluded that the evidence of Thomas's mental deficiency and of his background was of substantially greater value at the guilt phase rather than solely at the sentencing phase.
Barksdale also explained that he tried to establish, aside from the issue regarding Thomas's alleged mental disabilities, a factual basis that Thomas did not commit the crimes. In his attempt to develop the alibi that Thomas had been at a beer joint in Tennessee, he personally talked with someone at every "beer joint" within a 15-mile radius of the area Thomas claimed to have gone (in search of the alibi witness described by Thomas). He explained, "I've got a lot of clients [who] hang around places like that ..., and I talked to all these people, every level and every strata of society that might know who this [alibi witness] was." (Rule 32 R. 157.) Barksdale further testified that he even asked the police chief, who knew everyone in the area, to help locate the person described by Thomas and that the chief made three telephone calls in the effort.
Barksdale explained that when the alibi defense did not materialize, he tried to shift the blame for the crimes away from Thomas. In defense counsels' investigation, they thoroughly investigated everyone who might have been at the victim's house or at Thomas's house the night of the crimes to try to blame someone else; they obtained all the police records; and they searched the forensic records with "a fine-tooth comb." (Rule 32 R. 142).
Barksdale explained his philosophy about making objections at trial. He believed that if something objectionable could affect the outcome of the trial, the attorney should object, but objecting to minor things only calls attention to the problem and tends to hurt the case.
Barksdale also testified that he could not remember what he and the two other defense attorneys specifically talked about in regard to their strategy in the sentencing phase.
Finally, Barksdale testified,
"I hired another lawyer, Tom Guthrie, who worked for me for five years, to be primarily responsible for helping me with the appeal. I paid him out of my own pocket and he worked primarily on doing nothing but Kenny's appeal.... [H]e and I worked on this thing together. He worked on it full-time doing research, and then I was there with him supervising and talking about it, going over it, and going through the transcript to write the brief."
(Rule 32 R. 148.) Barksdale also testified that the two selected the issues that they wanted to assert on appeal. He could not remember if there were points that he thought were possible error that he decided not to advance on appeal. He could not recall due to the passage of time whether he decided to leave some claims out, but he testified that in general, he argued the strongest points.

*879 I.
In Issue I of his brief to this court, Thomas asserts that his trial counsel were ineffective at Thomas's competency hearing and that but for counsel's ineffectiveness, Thomas would have been found incompetent to stand trial.
The transcript of the competency hearing is before us as Defendant's Exhibit 19 of the Rule 32 proceedings. In the competency hearing, defense counsel presented, as a witness, Harold Lee Schut, who for most of the 10 months prior to the hearing was incarcerated in the same county jail cellblock as Thomas. He testified that Thomas acted as if he had his dog with him at the jail and that Thomas talked to this dog "all the time" (Defendant's Exhibit 19, R. 6, Rule 32 proceedings). He said that when the jail guard did a head count, Thomas would occasionally tell the officer to count his dog. Schut also testified that Thomas would "be sitting there quiet, watching the TV, and then all of a sudden, he'[d] start acting like ... sort of ... all crazysingingthink he's a rock star." (Defendant's Exhibit 19, R. 6, Rule 32 proceedings.) He further stated that Thomas would react unusually to normal situations, e.g., if someone said something wrong to him after he awakened in the morning, he would "come[] unglued"; or if someone bothered him while he was watching television, he would get "a little upset" (Defendant's Exhibit 19, R. 7, Rule 32 proceedings). He also said that once in a while, Thomas would bark and howl like a dog. Schut stated that he saw Thomas react violently to people twice. Once when an inmate told Thomas to shut up even though he was being quiet, Thomas hit him with a dustpan and a fight ensued. On cross-examination, Schut testified that the inmate Thomas had fought could not get along with anyone. He also testified that he never reported Thomas's behavior to the jailer or to the sheriff.
James Moffatt, one of Thomas's appointed trial attorneys, testified that, during his conversation with Thomas on the day before the competency hearing, Thomas was not serious and would not concentrate; that he flitted from one topic to another; and that he talked about his dog, named Dolly, visiting him in his jail cell "off and on, all the time" and yet also said that the dog had been killed three to five years before. (Defendant's Exhibit 19, R. 28, Rule 32 proceedings.) Moffatt testified that he had no doubt that Thomas believes that he sees the dog.
In addition to the above testimony at the competency hearing, defense counsel also introduced the "hospital records, clinical records, nursing records, medication records, and all psychological records on Kenneth Thomas while he was at the Taylor Hardin Secure Medical Facility from February 28, 1985 to May 2, 1985," along with a summary of the specific pages defense counsel wanted the trial court to direct its attention to. (Defendant's Exhibit 19, R. 32, Rule 32 proceedings.) Defense counsel also introduced a medical report from Dr. Lynn Boyer.
In support of its argument that Thomas was competent, the prosecution relied on the opinion of mental health experts at the Taylor Hardin Secure Mental Health Facility, who observed Thomas from February 28, 1985, to May 2, 1985. Each expert expressed the opinion that Thomas was mentally competent to stand trial (and that he was not insane at the time of the crimes). The lunacy commission report (in Rule 32 Defendant's Exhibit 16) states that Thomas underwent a comprehensive examination that included three examinations by three psychiatrists, a social history study, a physical examination, a psychological examination (including psychometric testing), and observation on a 24-hour-a-day basis. Each examiner noted that Thomas provided a coherent description of his behavior during the time of the alleged offenses. Two examiners specifically noted that Thomas was fully aware of the charges against him and of the possible consequences if he was found guilty and that Thomas appeared able to cooperate with his attorneys. One psychiatrist *880 specifically noted that he detected no signs of psychosis and that Thomas's references to an imaginary dog probably indicated malingering. The report further noted,
"In contacts with Psychology personnel, Mr. Thomas has consistently presented as a nonpsychotic individual cognizant of his legal situation. He has demonstrated a good understanding of the role and responsibilities of important court personnel during interviews.... Psychometric testing in the form of the Wechsler Adult Intelligence Scale-Revised indicated that Mr. Thomas attained a Verbal IQ of 70, Performance IQ of 74, and a Full Scale IQ score of 71. Such scores indicate intellectual functioning within the borderline range of intellect."
In presenting his allegation of counsel's ineffectiveness in regard to Thomas's competency hearing, Thomas argues that counsel were ineffective "through various act[s] and omissions, including but not limited to those enumerated infra." (Brief, p. 9.) In his argument supporting his allegation of ineffectiveness, he alleges that counsel failed to conduct an adequate investigation and discovery; failed to secure expert assistance to attack the methodology and findings of the prosecution's experts, which Thomas argues was ineffectiveness per se; and failed to develop an adequate evidentiary presentation, "including expert testimony, which was available to counsel to support the contention that Mr. Thomas was not competent to stand trial due to his incompetence, mental retardation, and mental illness" (Brief, p. 10). As we set forth in our introduction, Strickland and Ala.R.Crim.P. 32.3 require that an ineffective counsel claim be based on specific acts or omissions, and Rule 32.6(b) requires that the claim be supported by "full disclosure of the factual basis" for the claim. Thus, we limit our consideration of this issue to the specific facts Thomas relies upon to advance the general allegations above. See Gillard v. State, 486 So.2d 1323 (Ala.Cr.App.1986) (the parties, not the court, formulate the issues).
Thomas, in attempting to support his claim of ineffective counsel, relies solely on the findings of two experts who testified in the guilt phase in support of Thomas's defense of not guilty by reason of mental disease or defect. He asserts that he had been examined by Raymond Lee and Dr. Charles Brown, clinical psychologists for the Alabama Department of Corrections, approximately seven months before the crimes: Lee, in May 1984, and Dr. Brown, in April through June 1984. He further asserts that their reports were available to defense counsel at the time of the competency hearing. Lee's report is actually designated "Psychological Interview/Data Entry Form," which Lee filled out when he interviewed Thomas. Thomas relies on the following information noted by Lee on the form: that Thomas had inappropriate affect, was paranoid personality type, had a two-year history of "poly drug abuse," and most likely, was a paranoid schizophrenic in partial remission and that the examiner suspected psychosis. Thomas also relies upon the testimony by Dr. Brown in the guilt phase that Thomas was "suffering from a mental disorder of some severity" (R. 1533) and possibly from paranoid schizophrenia and/or drug-induced organic brain syndrome. Thomas argues that counsel neither made any effort to collect this information nor presented it in the competency hearing and that had counsel secured expert assistance to attack the findings of the prosecution's experts and to establish that Thomas was incompetent, there is a reasonable probability that Thomas would have been declared incompetent.
In its order denying Thomas's Rule 32 petition, the circuit court made the following findings regarding Thomas's complaint that trial counsel were ineffective for their failure to adequately investigate and discover allegedly favorable evidence, to develop an adequate evidentiary presentation of such evidence, and to secure expert assistance to assist trial counsel:

*881 "These three areas are without merit, in that this Court finds trial counsel sought all available information with regards to Thomas's competency to stand trial to include, but not limited to, records from Taylor Hardin Secure Medical Facility, Department of Pensions & Securities (now Department of Human Resources) records, and independent psychological examination. All of this information was put before this Court during the course of the competency hearing as well as during the trial of this matter before the jury. Thomas's claim of failure to secure expert assistance is without merit as Thomas was afforded expert assistance during the course of this trial.
"Therefore, this Court does find that all allegations of ineffective assistance of counsel during the course of the competency hearing, both preparation and presentation, before this Court are without merit."
(Rule 32 C.R. 737-38.) The records before us do not clarify whether the trial court had the records of Lee and Dr. Brown at the time of its ruling on Thomas's competency. Even assuming that the trial court did not have that information before it when it found Thomas competent to stand trial,[4] the circuit court in its order based its rejection of Thomas's ineffective-assistance claims on its consideration of all the evidence, regardless of the stage at which it was introduced. The trial court's continuous consideration of all pertinent information, even that introduced after the competency hearing, was proper. See Drope v. Missouri, 420 U.S. 162, 181, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial"). In effect, the court found that Thomas was not prejudiced, even if the information was considered by the trial court on the issue of competency after its ruling at the competency hearing. In other words, the trial court considered Thomas to be competent throughout the trial.
Thomas's argument fails because it is based wholly on the judgments of Lee and Dr. Brown that Thomas was mentally ill. Thomas simply assumes that evidence of mental problems automatically indicates incompetency. However, the law is clear that "[p]roof of the incompetency of an accused to stand trial involves more than simply showing that the accused has mental problems or psychological difficulties." Bailey v. State, 421 So.2d 1364, 1366 (Ala.Cr.App.1982).
"`A distinction must be made between mental illness and mental incompetency to stand trial, and the fact that a defendant is mentally ill does not necessarily mean that he is legally incompetent to stand trial. Thus, not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence of defendant's mental unfitness must indicate a present inability to assist counsel or understand the charges.'"
Cowan v. State, 579 So.2d 13, 15 (Ala.Cr. App.1990) (quoting 22A C.J.S. Criminal Law § 550 (1989) (footnotes omitted)). See Lackey v. State, 615 So.2d 145, 154 (Ala.Cr.App.1992) (quoting the above, in holding that the jury had objective reason to reject an expert's opinion that the appellant was incompetent to stand trial because *882 that opinion appeared to be based wholly on her judgment that he was mentally ill). See also Eddmonds v. Peters, 93 F.3d 1307 (7th Cir.1996) (finding that an ineffectiveness claim failed the prejudice prong, the court noted that the issue is not mental illness, but the ability to assist per Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)), cert. denied, 520 U.S. 1172, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997); Lee v. Alabama, 406 F.2d 466, 471-72 (5th Cir.1968) ("one may be suffering from a mental disease which is at the root of antisocial action and simultaneously have a rational and factual understanding of court proceedings and be able to consult with a lawyer on a reasonably rational basis"), cert. denied, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969); Committee Comments to Rule 11.1 (as amended effective October 1, 1996), Ala. R.Crim.P. ("Although some States require that the defendant's mental incompetence be attributable to a `mental disease or defect,' the majority view is that the mere presence of a mental disorder, whatever its severity, is not a sufficient basis for a finding of incompetency to stand trial.").
Furthermore, Thomas has failed to present any evidence that Lee or Dr. Brown had any opinion on the question whether Thomas was competent to stand trial. The court had sufficient reason to discount their observations: neither was asked to give and neither gave an opinion as to whether Thomas was competent. Cf. Bailey v. State, 421 So.2d at 1366 (where there was no specific testimony as to whether defendant was competent, defendant failed to carry the burden of persuasion on a hearing of a motion for a competency evaluation).
In addition, there is no showing that either Lee or Dr. Brown administered the "Competency to Stand Trial Assessment Instrument," a test to aid in determining if a defendant is capable of participating in legal proceedings. However, this test was administered to Thomas at Taylor Hardin and was considered in the lunacy commission's assessment of Thomas. (It is included in Rule 32 Defendant's Exhibit 16.) The examiner administering this test found that Thomas had the capacity to appreciate the charges against him and the range and nature of possible penalties; to appraise the likely outcome, the available legal defenses, and the roles of judge, prosecutor, defense counsel, jury, and witnesses; to relate to an attorney; to plan legal strategy; and to realistically challenge prosecution witnesses. The examiner also indicated that Thomas's degree of incapacity to understand court procedure was "mild" to "none"; that his incapacity to disclose to his attorney pertinent facts about the offenses was "mild" to "moderate"; and that his incapacity to testify relevantly was "mild." The examiner graded the categories "self-defeating v. self-serving motivation" and "unmanageable behavior" as mild. Finally, the examiner noted that Thomas explained that plea bargaining was for a "lesser sentence," and that to plea bargain, "you have to plead guilty."
Additional reasons the trial court, in its consideration of Thomas's competency, could have discounted the observations of Lee Thomas now relies upon are: Lee does not remember interviewing Thomas; Lee testified that neither the interview nor the form he filled out was designed to arrive at a diagnosis of an inmate; by his own admission, the sole purpose of his interview of Thomas and the tests administered was to make a recommendation as to Thomas's prison custody classification, not to arrive at a diagnosis; the interview probably lasted 20 minutes and, by his records, was his only interview with Thomas; he testified the form reflects merely his "impressions"; and he admitted that these impressions were based solely on Thomas's representations, not any background history or any prior records of any type, but that if making a valid diagnosis, he would need a social history of Thomas.
The observations by Dr. Brown that Thomas relies on in his ineffective counsel argument can be further discounted in the context of the question of Thomas's competency *883 because they were based on only eight sessions with Thomas, with each session lasting only 20 to 30 minutes; because, as Dr. Brown testified, "Often what happens with a schizophrenic is that [he] may go for a long, long time functioning well in the world and thinking fairly clearly" (R. 1543), then for a few days or weeks, be floridly psychotic and then go back into remission; because he is not aware of having had for his consideration any prior medical, criminal, or school records; and because, he testified, he did not do a formal psychological evaluation or testing on Thomas.
In considering Thomas's argument, we find it significant that Thomas failed to question his trial counsel about his alleged lack of ability to consult with counsel and his alleged inability to understand the proceedings against him. Alexander v. Dugger, 841 F.2d 371, 375 (11th Cir.1988) (ineffectiveness claim based on failure to show the defendant's incompetency are deficient when the defendant does not show examples of the defendant's inability to consult or to understand).
We find the following, stated in Lackey v. State, 615 So.2d 145, 155 (Ala. Cr.App.1992), in the court's review of a jury's verdict finding the appellant competent to stand trial, applicable:
"We note that a trial judge has an independent, `ongoing, and continuing duty to prevent the trial of an accused who is unable to assist in his defense.' Gothard v. State, 452 So.2d 889, 893 (Ala.Cr.App.1984), cert. stricken, 450 So.2d 479 (Ala.1984). The trial court was not alerted during the remainder of the trial to the appellant's lack of understanding or inability to assist his attorney. There is nothing in the trial transcript to indicate that the appellant did not consult with his lawyer and assist in his defense at trial. The appellant's own testimony ... indicates that he was lucid and able to aid in that defense."
In fact, in this case, the trial court, during trial, made specific findings that are relevant to the question now before us. In its ruling on Thomas's motion to suppress his extrajudicial statements, the court made the following factual findings in regard to Thomas's competency to waive his Miranda rights:
"In the tape [of his December 16 statement, Thomas] is able to articulate ideas. He is able to disagree with the interviewer. He expresses an understanding and knowledge of the difference between right and wrong. Based upon the statement, it appears he shows capacity. Obviously, a person does not have to be of any particular race or intelligence in order to give a statement. Obviously, if a person cannot understand what someone else is saying, then they can not give a statement. In this interview, he responds to the questions in a manner which indicates that he understands it. He is able to disagree and articulate ideas and express his knowledge of right and wrong.... [H]e expressed the ability to make or have the capacity to make a meaningful waiver. I did not find that the statement is by a person who is so mentally retarded ... that he lacks the capacity to make a statement."
(R. 1373-74.) Moreover, "a trial judge, who has the opportunity to observe and to listen to an appellant, is better situated than is this court to determine the appellant's competency to stand trial." M.D. v. State, 701 So.2d 58, 64 (Ala.Cr.App.1997).
Based on the foregoing, we hold that the circuit court was correct in ruling that the evidence supported a finding that Thomas was competent to stand trial. Accordingly, Thomas's trial counsel were not ineffective in failing to present the findings or "impressions" of Lee and Dr. Brown. See, e.g., Lytle v. State, 453 So.2d 1342 (Ala.Cr. App.1984) (trial court's finding that defendant was competent was neither arbitrary nor unsupported by the evidence, despite evidence of his past medical diagnoses, which included different types of schizophrenia, antisocial personality disorder, paranoid personality disorder, and a neurotic *884 disorder, and also despite evidence of current erratic behavior, including talking to people who were not there and to walls, where the trial court also had before it the expert opinion of the psychiatrist who examined the defendant that he was competent to stand trial and that the defendant may well have been faking his insanity).
We find it appropriate here to address Issue VI of Thomas's brief (Brief, p. 48), that he was incompetent at the time of his trial because of the effects of his mental disorders on his allegedly already impaired mental condition, i.e., mental retardation and organic brain damage. This is the extent of his factual support, of this argument to this court and to the circuit court. (See Post-Hearing Brief, Rule 32 C.R. 665, wherein he asserted the underlying substantive issue.) Our review of this issue is procedurally barred because the issue of Thomas's competency was put before the trial court. Rule 32.2(a)(2). As discussed supra, Thomas was thoroughly examined at Taylor Hardin, and the trial court conducted a pretrial competency hearing and presumably monitored Thomas's competency throughout the guilt and sentencing phases. Our review is further procedurally barred because the issue could have been, but was not, argued on appeal. Rule 32.2(a)(5).
In Issue II(o)F. of Thomas's brief (see Amended Petition, Rule 32 R. 529),[5] Thomas contends that trial counsel were ineffective for failing to raise the argument that Thomas was incompetent to stand trial. This contention is without merit because counsel did assert the issue.
Thomas's contention, in Issue IV of his brief,[6] that his appellate counsel were ineffective for failing to raise on direct appeal the argument that Thomas was incompetent to stand trial is without merit. We assume that the general factual assertions that Thomas relies on to support the underlying substantive issue raised in Issue VI of his briefthat Thomas suffered from mental retardation, mental disorders, and organic brain damagelikewise support his Issue IV argument that appellate counsel were ineffective for failing to raise the substantive issue. After considering the general "facts" offered by Thomas mental retardation, mental disorders, and organic brain damagealong with our preceding discussion, we conclude that Thomas has failed to meet his burden of proof under Strickland and Rule 32.3.
Thomas also contends, in Issue I of his brief by incorporation of Issue V of his brief, and also in Issue II(o)E., that his trial counsel were ineffective for their failure to object to the competency hearing on the ground that it was constitutionally inadequate and its result inherently unreliable because, he argues, "the defense did not have the opportunity to cross-examine *885 the State's witnesses, who in effect testified through the unchallenged admission of their notes and records, to offer its own expert testimony, or to otherwise adequately present evidence on behalf of Mr. Thomas or to challenge the State's evidence." (Issue V, Brief, p. 47, wherein Thomas raises the underlying substantive issue.) Given the nonspecific nature of the assertions that counsel were ineffective, we decline to address the failure to offer an expert or to otherwise adequately present evidence. We have already addressed the only specific allegations pertinent to these general allegations: the observations or "impressions" of Lee and Dr. Brown.
In regard to Thomas's allegation that trial counsel were ineffective for failing to object to the lack of opportunity to cross-examine the prosecution's experts, we assume that he is referring to a violation of his Sixth Amendment right to confrontation. However, he has supplied no authority for the proposition that this right extends to a competency hearing. In fact, there is authority to the contrary. 23 C.J.S. Criminal Law § 1117 (1989) (citing People v. Williams, 123 Mich.App. 752, 333 N.W.2d 577 (1983)). Accord Sangster v. State, 70 Md.App. 456, 464-68, 521 A.2d 811, 815-17 (1987), aff'd, 312 Md. 560, 541 A.2d 637 (1988); Villarreal v. State, 860 S.W.2d 529 (Tex.App.1993).
"`Theoretically, there appears to be a distinction between the right to confront witnesses where the report of alienists[[7]] deals with the defendant's sanity at the time of the crime and where it deals with his sanity at the time of the examination or trial.
"`In the former case, the constitutional guarantee is obviously applicable, since the result of the examination may have a direct bearing on the question of the defendant's guilt or innocence.
"`There is more doubt, however, as to the constitutional right to confront the experts in the latter case, since their report has no bearing on the defendant's guilt or innocence, but is generally regarded as only intended as an aid to the court in determining whether the trial should proceed.'"
Jackson v. State, 640 So.2d 1025, 1046 (Ala.Cr.App.1992) (quoting Annotation: Criminal Lawpsychiatric examination, 32 A.L.R.2d 434 453 (1953)), aff'd, 672 So.2d 810 (Ala.1995), cert. denied, 517 U.S. 1247, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996). But see United States v. Hamilton, 107 F.3d 499, 504 (7th Cir.1997) ("it is unclear whether the Confrontation Clause applies to pretrial competency hearings"), cert. denied, 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997).[8] Even assuming, arguendo, that Thomas had a due process right to cross-examine the authors of the Taylor Hardin report, see People v. Williams, 123 Mich.App. at 759-60, 333 N.W.2d at 581, Thomas has failed to meet his burden of establishing that counsel were ineffective for failing to object to the lack of opportunity to cross-examine. Thomas has failed to demonstrate a reasonable probability that cross-examination would have changed the result of the hearing. Cf. Magwood v. Smith, 791 F.2d 1438, 1445 (11th Cir.1986) (trial counsel's failure to obtain a bench warrant to secure the appearance of a member of the lunacy commission at trial or to subpoena the other two members did not constitute ineffective assistance, where the member's deposition and the commission's report were introduced). Thomas has not specified any way that defense counsel could have challenged *886 the prosecution's evidence of competency.
Based on the foregoing, we find that appellate counsel were not ineffective in failing to raise the question of the constitutional adequacy of the competency hearing.
We further note that the underlying substantive issue, as asserted in Issue V whether the competency hearing was constitutionally inadequate and its results inherently unreliable because the defense allegedly did not have the opportunity to cross-examine any prosecution witnesses, to offer its own expert, or to otherwise adequately present evidenceis procedurally barred. It could have been, but was not, asserted at trial or on appeal. Rule 32.2(a)(3) and (5).

II.
Thomas contends, in Issue II of his brief, that his counsel at trial were ineffective; that the guilt phase cannot be relied upon as having produced a just result; and that there is a reasonable probability that, but for counsel's alleged ineffectiveness, Thomas would have been found not guilty or not guilty by reason of mental disease or defect. The circuit court, in its order, rejected Thomas's claim that guilty verdicts would not have been returned had trial counsel been effective. (Rule 32 C.R. 738.) Thomas makes the following allegations:[9]
(a) "Counsel failed to conduct an adequate and timely investigation of the facts of the case, including but not limited to counsel's failure to investigate whether Mr. Thomas's brother, Billy Ray Thomas was the perpetrator of, or was otherwise involved in the commission of the offenses for which Appellant was charged, convicted, and sentenced to death." (Brief, p. 14.)
This statement is the extent of Thomas's argument and factual support. (See Rule 32 C.R. 521, 644.)
In finding this claim to be without merit, the circuit court noted that trial counsel had spent numerous hours preparing and investigating the facts of this case. The circuit court also noted the following:
"Thomas alleges trial counsel failed to investigate the possibility of Billy Thomas being the perpetrator of this crime. It is clear from the record of the trial, as well as the record from the hearing on the Rule 32 petition, that this was fully investigated upon trial counsel's receipt of this information. Trial counsel testified at the hearing on the Rule 32 petition that upon hearing of this alleged information that he immediately met with this witness in an effort to ascertain the validity of the information. Further, it is obvious from the record of the trial of this matter, that this information was put before the Court and the jury at the first available opportunity."
(Rule 32 C.R. 739.)
The circuit court is referring to the information provided by Patricia Carter, who came forward after the jury returned guilty verdicts. The trial transcript shows that, after a late afternoon break following Thomas's testimony, defense counsel rested, noting that it was possible that the defense would call a witness the next morning. Counsel explained to the court that a reporter from the Athens News Courier notified him during the break that the reporter had received an anonymous telephone call from a woman who claimed Thomas had not killed Mrs. McLemore, that she was not a typical crank caller, and that she set up an appointment to meet with the reporter, defense attorneys, and law enforcement at 8:00 p.m. that evening to disclose who killed the victim. (R. 1757, 1819.) The following morning, after the prosecution called rebuttal witnesses and then rested, defense counsel informed the court that the anonymous caller did not appear at the designated time and place, but that she had telephoned another reporter and that, according to that reporter, *887 she indicated that she knew a lot about the case and about Thomas's family, that she was too terrified to come forward, that Billy had killed the victim, and that Billy was not going to come forward because he was confident that his brother would be found insane or would "get off" some other way. (R. 1821.) According to defense counsel, the reporter was led to believe that the caller was a former girlfriend of Billy's. At this conference, the prosecutor stated, "[T]here's no evidence before the Court and no evidence in the possession of police agencies or the prosecutor indicating that this Billy Thomas had anything to do with this case at all." (R. 1822.) Thereafter, the jury heard closing arguments and the court's instructions, and that same day the jury returned guilty verdicts.
The following day at the sentencing phase, the first witness to testify was defense witness Patricia Carter. (At the Rule 32 hearing, Barksdale explained her appearance: on the evening the jury returned its guilty verdicts, he received a telephone call from an anonymous caller (who turned out to be Carter) who claimed to have knowledge of another person in the victim's house at the time of the killing, and after some reassurance that she would be safe, she consented to testify.) She testified at the sentencing phase that she was the anonymous caller; that she had lived with Billy and Thomas's father before his death; that she had met Thomas, Billy, a sister, and their mother once or twice; that she had not come forward before because she had moved away for about six months and also because she was afraid of Billy; that, in the week before her court appearance, she had notified the newspaper and the sheriff's office of her information; and that she had also notified one of Thomas's defense attorneys after reading his name in the newspaper the night before her testimony. She further testified that, on August 31, 1985, Billy told her that he had killed Mrs. McLemore and that "before he would let [Thomas] take the electric chair, he would tell the truth." (R. 1943.) She further testified, "He said [Thomas] was innocent and the truth would come out before he would be convicted." (R. 1943.)
It is clear from both the trial transcript and the Rule 32 hearing transcript that, despite diligent preparation and investigation, defense counsel were not aware of the identity of the anonymous caller until after the jury returned its verdicts of guilty. They were not aware of even her existence until around 3:00 p.m. the day before the verdicts, and the only information that they had pertaining to the identity of this woman was learned around 8:00 p.m. the evening before the verdicts were returned. At that time, they were told that the caller might be one of Billy's former girlfriends. (We surmise that this information was false: she was their father's companion.) They were also told that she had indicated she knew a lot about the case and about the Thomas family. This information, which was gained only hours before the next day's proceedings, was basically useless in any attempt to identify the caller and to find her in time to have her testify in the guilt phase. Defense counsel also did not learn until her call around 8:00 p.m. that evening before the verdicts that she would identify Billy as the killer. Because even the possibility of the existence of this witness did not come to defense counsel's attention until late in the trial, their discovery of this possible evidence was too late to trigger a responsibility to further investigate Billy's possible involvement before trial.
However, Barksdale admitted in the Rule 32 hearing that the possibility of Billy's being in the victim's house was brought to his attention at an unspecified time by Thomas and Billy's mother, Annie Ratliff. He explained,
"Well, as I recall, Mrs. [Ratliff], when I was interviewing her, described some behavior that she witnessed of one of her older sons, Billy, and I believe she testified to all of that at the trial. I can't remember what all she said, but I felt like based on what she said that *888 there was a possibility that he had been up there."
(Rule 32 R. 142.)
Mrs. Ratliff was not asked any questions in the Rule 32 hearing as to what she might have told defense counsel in their investigation or when. We can only surmise from her trial testimony what she might have disclosed to counsel. She testified that on the night of the crimes she watched television with Billy until she went to bed at 11:00 p.m.; that Billy assured her that he was going to bed soon because he had to go to work the next day; that he was drinking; that between 1:30 a.m. and 2:00 a.m., she heard the front door slam; that she called out, "Kenneth, is that you coming home, son?" (R. 1514); that she could not discern who it was, but he answered, "uh-huh" (R. 1514); that that person stayed in the bathroom about 10 minutes, and she heard the commode flush, but did not hear running water; and about 2:00 a.m. when she heard sirens, she went into Billy's room and asked him what had happened. She was not allowed to testify as to what Billy's response was to her question. She further testified that about 6:30 a.m. Billy went to the scene and came back to her house, fell on the floor, and "went to patting his hands on the floor" (R. 1516). She was not allowed to testify before the jury as to what Billy was saying when he did this. However, outside the jury's presence, defense counsel made an offer of proof that she would testify that Billy said, "Mom, I did not know Kenneth was going up there." (R. 1517.)
Barksdale was not specifically asked if he investigated Billy as a result of any information he received from Mrs. Ratliff. He did testify at the Rule 32 hearing that defense counsel exhausted the investigation into Thomas's alleged alibi witness; that counsel thoroughly investigated everyone who might have come and gone from the victim's house the night of the crimes; and that counsel searched all police records and also forensic records with "a fine-tooth comb." (Rule 32 R. 142).
Without more specific argument that would undermine this testimony, we can conclude only that the evidence before the circuit court supports its finding that defense counsel's investigation was thorough. We note that Thomas has presented no evidence that he had told his trial counsel that his brother was possibly at the scene. Thomas has further failed to allege what more counsel could have done in pursuit of the theory that his brother was involved.
Moreover, Thomas has failed to establish that any further investigation of Mrs. Ratliff's information would have produced more credible evidence that would have rendered Thomas's trial unfair or undermined confidence in the proceedings. He has failed to show what information would have been produced by further investigation. See United States v. Lewis, 786 F.2d 1278, 1283 (5th Cir.1986) (allegation of a failure to investigate is deficient if it fails to show what the additional investigation would have uncovered).
Any argument that counsel should have discovered Carter's existence in time for her to testify in the guilt phase is too speculative. For example, she most likely would not have been anyone Thomas or a family member would have suggested defense counsel seek out and interview because she had rarely been around members of Thomas's family and her only contact with the family was through Thomas's father, who had died before the crimes here were committed. Moreover, the record supports the inference that she had moved and stayed away for approximately six months preceding the trial.
Even had Carter been discovered and called to testify before the jury in the guilt phase, her testimony pertaining to Billy's confession would have been inadmissible under the traditional rule in Alabama. See Flowers v. State, 586 So.2d 978, 985-87 (Ala.Cr.App.1991), cert. denied, 596 So.2d 954 (Ala.1991), cert. denied, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). See also Thomas, 539 So.2d at 395, discussing *889 the inadmissibility of Mrs. Ratliff's proposed testimony of Billy's hearsay statement (citing Houston v. State, 208 Ala. 660, 663, 95 So. 145 (1923) (a defendant's disproving his guilt by proving the guilt of some other person must be by legal evidence, not by the testimony of a witness who heard another confess); Charles W. Gamble, McElroy's Alabama Evidence, §§ 48.01(1) and (4) (5th ed.1996)).
Furthermore, there is no indication that her testimony would have exonerated Thomas. See Flowers (testimony concerning the confession of another was properly excluded because it did not prove that someone else committed the crime; it proved only that the defendant may not have committed the crime alone); Thomas, 539 So.2d at 395 (evidence of another's guilt is admissible only if it is inconsistent with the guilt of the accused). Although Billy allegedly proclaimed to Carter that Thomas was innocent and that it was he who killed Mrs. McLemore, such a proclamation alone is not sufficient. Under the facts before the jury, it is incredible to believe that Thomas did not participate in the crimes. The record is replete with powerful physical and circumstantial evidence that Thomas either committed the crimes or was a participant. We can only conclude, based on the lack of any evidence to the contrary, that any evidence of Billy's involvement would merely place another participant at the scene. We also point out that, by recommending death after hearing Carter's testimony, the jury obviously either found Carter's testimony to lack credibility or determined that Thomas's participation was sufficient to warrant the death penalty. It follows that had her testimony been given at trial, the result would probably not have been different.
Accordingly, we find that Thomas failed to satisfy either prong of Strickland.
(b) "Trial counsel inadequately researched, prepared and argued motions, including but not limited to a motion for change of venue." (Brief, p. 14.)
Thomas failed to allege in his petition, as amended, or to prove any specific deficiency of trial counsel in this regard, i.e., he failed to show any additional research, preparation, or argument that defense counsel could have made regarding any particular motion.[10] A review of a claim of ineffective counsel is not triggered until "a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. It is only then that "the court must determine whether those acts or omissions fall `outside the wide range of professionally competent assistance.'" Id. In rejecting this general claim, the circuit court listed the 40 written motions that defense counsel filed and noted that it found the motions to be "well written, fact specific, and detailed." (Rule 32 C.R. 743.) The court's ruling is proper. Thomas's claim is too undeveloped to require any further analysis. Conclusory allegations not supported by specifics do not warrant relief.
(c) "Trial counsel failed to move for the suppression of any of the tangible evidence illegally obtained by the State, and failed to object to the introduction of that illegally obtained tangible evidence at trial." (Brief, p. 14.)
We note that this one sentence is Thomas's complete argument in brief to this court. Thomas was no more specific in his petition or in his post-hearing brief. (Rule *890 32 C.R. 521, 645.) We concur with the following findings of the circuit court: "The record of this matter is clear, that Thomas's trial counsel did in fact object and move to suppress a multitude of the State's evidence during the course of the trial" (Rule 32 C.R. 744); that the attorneys made all efforts necessary to ensure that no illegally obtained evidence was introduced into evidence; and that Thomas suffered no prejudice. The court also pointed out trial counsel's testimony at the evidentiary hearing that it was the defense team's tactic to object in the presence of the jury only when the evidence offered would be detrimental to Thomas. The court further noted that this court, upon its independent review of the trial on direct appeal, found no plain error. See Thomas, 539 So.2d at 396.
(d) Counsel failed to conduct an effective voir dire of the jury venire.
Thomas used the following as examples of ineffective voir dire: (1) failing to identify those veniremembers who would automatically sentence Thomas to death, if convicted; (2) failing to question the veniremembers about their willingness to consider the broad range of mitigating evidence available to the defense; (3) failing to discover whether veniremembers harbored serious misconceptions, preconceptions, or fears about the possibility of escape, despite the fact that some of the veniremembers raised this issue during the voir dire. Thomas cites no supporting legal authority for this argument. The Rule 32 court found this claim to be without merit, finding that defense counsel conducted an extensive voir dire. The following observations are applicable here:
"[T]he appellant has not shown any evidence of bias, that he was prejudiced by trial counsel's allegedly insufficient voir dire examination of potential jurors, and that there is a reasonable probability that the result of the trial would have been different if counsel had conducted additional voir dire. Strickland, supra. Again, he has made bare allegations and drawn legal conclusions that are not supported by facts. Rule 32.6(b), Ala. R.Crim.P. Therefore, he has not satisfied his burden of proof under Strickland."
Davis v. State, 720 So.2d 1006 (Ala.Crim. App.1998).
Moreover, in regard to Thomas's first allegation of counsel's shortcoming in conducting voir dire, his assertion is factually incorrect. Defense counsel posed the following question to all veniremembers: "[D]oes anyone here believe the death penalty ought to be imposed any time there's a murder?" (R. 157.) Getting no response, defense counsel stated, "All right. I take it from no hands that all of you see circumstances in which the death penalty should not be imposed." Discussion from several veniremembers ensued.
In regard to Thomas's insistence that counsel should have asked the veniremembers about their willingness to consider the broad range of mitigating evidence available to the defense, we note that Thomas has failed to specify any possible mitigating evidence upon which the question should have been predicated. Again, his claim fails for lack of specificity. Moreover, we point out that defense counsel's initial questioning of the veniremembers as a group revealed those veniremembers who knew, in any degree, anyone who was retarded; who were very close to anyone who had psychological problems; who had taken psychology courses in college; and who, among those having taken college psychology courses, had taken an interest in psychology. Then, on individual voir dire of all of the veniremembers, defense counsel thoroughly explored the veniremembers' experiences with anyone who was mentally retarded or mentally ill and explored their views on mental illness, on mental retardation, on the possibilities of remission of a mental illness and temporary insanity, on the benefits of treatment by mental health *891 professionals, and on the insanity defense and on the punishment of a person for a crime committed while suffering from a mental disease or defect, particularly an awful capital crime. This questioning certainly indicated each member's willingness or lack thereof to consider any possible mitigating evidence relating to Thomas's mental capacity and mental health.
In regard to Thomas's third area of concerncounsel's failure to discover whether veniremembers harbored serious misconceptions, preconceptions, or fears about the possibility of escapecounsel did not ask any question that would have elicited a specific response.
Thomas cites two instances where he claims veniremembers voiced concern about the possibility of escape: R. 624 and R. 635-36. However, we find that the veniremember's responses reflected on R. 635-36 cannot reasonably be interpreted to pertain to the possibility of escape. While observing that "too many times [convicted criminals] get out," immediately thereafter, the veniremember more specifically said, "If the punishment is that they are sentenced to life, they shouldn't get out in ten years." We note that Thomas's challenge for cause of this veniremember was granted.
In regard to the other record citation, the transcript shows that veniremember V.W. gave the following response on individual voir dire examination to defense counsel's inquiry into his views on capital punishment:
"My determination of capital punishment is that when a person has gone through what we have to go through today where he's really found guilty, I'm for capital punishment. There's nobody that can say that they can have an escape-proof prison where a person can't get out. If a man is found guilty, he should have the death sentence. I don't think he should ever have it done where he would have a chance to escape and commit this crime on someone else."
(R. 624.) This remark was preceded by this veniremember's repeated assurance, in individual voir dire examination, that he would put aside any personal views and follow the law as instructed by the court. This veniremember sat as a juror.
We disagree with Thomas's assertion that trial counsel were put on notice that the veniremembers' feelings regarding the potential for escape was a possible subject for bias that warranted inquiry on voir dire. The two responses Thomas cited do not indicate such a concern about the possibility of escape as would prejudice the veniremembers.
Whether to conduct voir dire on a particular subject is, in most instances, a strategic decision. It is sound trial strategy not to ask a particular question on voir dire that might inject an unwanted issue into the case. See, e.g., Spencer v. Murray, 18 F.3d 229, 234 (4th Cir.1994). Paradoxically, Thomas takes a position inconsistent with the position he takes in Issue XXV(d) (Brief, p. 93). In the present issue, he argues that defense counsel should have questioned the venire on any bias created by the risk of escape. Although such questioning would have explicitly raised in the minds of the veniremembers the possibility of escape versus no possible escape in the event of execution, Thomas argues in the subsequent issue that defense counsel were ineffective in failing to object to the prosecutor's remark in sentencing closing argument that escape is always a possibility if the sentence of life imprisonment without parole is imposed. In the present issue, trial counsel made a sound strategic decision to avoid injecting the issue of the possibility of escape. The need for such questioning was not outweighed by defense counsel's desire that the issue of escape not be injected. Moreover, we defer to and rely on the circuit court's finding because it presided over Thomas's trial and is a better *892 judge of the demeanor and responses of the veniremembers.
(e) "Trial counsel failed to investigate, challenge, and adequately cross-examine critical prosecution witnesses, including but not limited to the State's forensic pathologist, Joseph Embry, the State's forensic microanalyst, John Kilbourne, the State's fingerprint expert, Carol Curlee, and the State's forensic serologist, Roger Morrison, whose testimony had to be challenged to protect Mr. Thomas's interests and rights. Moreover, trial counsel failed to challenge the competence and relevance of the testimony offered by some of the State's witnesses, including but not limited to the decedent's daughter ..., witnesses Kathy Guess Pylant and Addie Siniard, and Drs. Huggins and Hardin, members of the State's Lunacy Commission." (Brief, pp. 15-16.)
Again, this statement is Thomas's entire argument in his brief to this court, and again, Thomas was no more specific in his petition or post-hearing brief. (Rule 32 C.R. 522, 645-46.) This claim lacks any specificity whatsoever. As noted supra, a review of a claim of ineffective counsel is not triggered until the petitioner has identified specific acts or omissions. Strickland. See, e.g., Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir.1993) (claims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result). We find it appropriate to concur with the following findings by the Rule 32 court, without further analysis: "This Court having heard all the testimony at the trial of this matter, and reviewing the transcript of this trial ... finds affirmatively that Thomas's trial counsel effectively cross-examined each and every prosecution witness and took all legal and ethical steps necessary to discredit said testimony." (Rule 32 C.R. 745.)
(f) "Trial counsel failed to adequately present a defense strategy at the guilt/innocence phase of the trial, failed to adequately prepare Mr. Thomas to testify, and otherwise failed to present an effective defense." (Rule 32 C.R. 522.)
This one sentence was Thomas's entire argument in his petition. In his argument in his post-hearing brief filed in the circuit court and in his appellate brief, Thomas argues only that it was particularly ineffective for counsel to put him on the witness stand because, he argues, he is mentally retarded and mentally ill and was "an uncontrollable `loose cannon.'" (Rule 32. C.R. 646, Brief, p. 16.) We concur with the Rule 32 court's finding that defense counsel "vigorously" pursued two strategies of defense: to prove that Thomas did not commit the crimes and to prove that Thomas was not guilty by reason of mental disease or defect. (Rule 32 C.R. 746.) Particularly because the lower court witnessed Thomas's demeanor and heard his testimony, we defer to its opinion that Thomas was clearly prepared for his testimony. Moreover, we note that defense counsel testified as follows at the Rule 32 hearing:
"[I]f you are defending on the theory that you are incompetent, then what better way to demonstrate to the jury than let the person get up and do that, and that's what he did. He talked about seeing people in flying saucers and he talked about the number and amount of drugs that he had taken over his lifetime. We went through all of that."
(Rule 32 R. 146.) He noted moreover the necessity of putting Thomas on the stand because he had no other witness to explain why Thomas was found sitting in his car immediately after the crimes, across the street from the crime scene, covered in blood.
(g) "Trial counsel failed to deliver a reasonably effective opening statement." (Brief, p. 16.)
This again is Thomas's entire argument in brief, and again, Thomas was no more *893 specific in his petition or post-hearing brief. (Rule 32 C.R. 522, 646.) This argument identifies no specific act or omission that rendered counsel's opening statement not "reasonably effective." Without any specific facts to support this argument, we must concur with the Rule 32 court's findings, as follows, without further analysis: "The Court having heard the opening statement of trial counsel, and after a review of the record, does hereby find this claim to be meritless and [it] is duly rejected by this Court." (Rule 32 C.R. 746-47.) (h) "Trial counsel failed to present opposing expert testimony on critical questions of forensic pathology, serology, microanalysis, and fingerprints, and failed to obtain adequate expert assistance to establish Mr. Thomas' incompetency, mental retardation, and mental illness." (Brief, p. 17.)
The substantive question of whether Thomas's court-appointed psychologist, Dr. James Crowder, provided adequate assistance is raised in Issue XX (Brief, pp. 82-84), and the claim of ineffective trial counsel in this regard is argued in Issues II(k) (Brief, pp. 17-26). We choose to address this particular allegation in Part II(k), infra. Otherwise, the abovequoted statement is Thomas's entire argument in brief, and we note again that Thomas was no more specific in his petition or post-hearing brief. (Rule 32 C.R. 523, 646-47.) This ground lacks any specificity whatsoever. A claim of failure to call witnesses is deficient if it does not show what the witnesses would have testified to and how that testimony might have changed the outcome. See, e.g., United States v. Berry, 814 F.2d 1406, 1409 (9th Cir.1987). Without any specific facts that could have been introduced by proposed defense experts to impeach state expert testimony or any proof of inaccuracy in the testimony of the state's experts, we concur with the following findings of the Rule 32 court, without any more specificity or analysis: "[T]he Court finds on those issues where expert testimony would have been [of] assistance, trial counsel did put forth expert testimony with regard to petitioner's competency and alleged mental retardation. On the other issues this Court finds that expert testimony would not have been necessary...." (Rule 32 C.R. 747.)
(i) Counsel failed to object to certain opening comments by the prosecutor during the guilt phase.
In so arguing, Thomas refers to the comments specifically enumerated in Issue XIX of his brief to this court in which he asserts the merits of the underlying substantive issuewhether the prosecutor's argument during the opening statements was improper and created a prejudicial atmosphere, denying Thomas due process and a fair trial. (Brief, pp. 70-71.) Review of the underlying substantive issue is precluded because the issue could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
We turn to the ineffective counsel argument. Thomas contends that certain opening comments by the prosecutor suggested to the jurors that they should consider the indictment as evidence of Thomas's guilt and violated his right to a fair trial by attacking the presumption of innocence. He cites no legal authority in support of his claim. The contested comments are emphasized in the following extract:
"What brings us here this morning?... It could be said that the grand jury of January 1985 has brought us together. The grand jury, back in January, over a year ago, heard testimony about a case involving the brutal slaying of Mrs. Flossie McLemore, and those 18 citizens on the grand jury, after hearing the evidence, returned an indictment against this man right here (indicating), this defendant. Now, an indictment, you should know from the very beginning and you should understand, is not a finding of guilt. All an indictment is is a finding by a grand jury that the crime has been committed, and that there's some likelihood that the person indicted committed it. By no means is it a finding of guilt, but, at the same time, when *894 the grand jury hears a case and deliberates there are several things that they can do. They can decide to not charge an individual, that is, to not return an indictment against the defendant. They could have done it in this case, or they can decide to indict an individual ... with a particular crime. In this case, the grand jury decided this man was to be indicted, and that's what they did. Now, a grand jury hearing, you should know, is not like a trial. It's not like a trial you are having here today that you all are a part of. The grand jury hearing is a closed hearing. It's not closed because there's something to hide, but it's closed to protect the safety of the members of the grand jury. It's closed to protect the safety of witnesses that testify before the grand jury. It's closed to prevent suspects whom, if they learn that they are subject of the grand jury investigationit would prevent them from fleeing the state. As I said, the grand jury has, basically, two things to do. [It is] to decide whether or not a crime has been committed here in Limestone County, Alabama, and then, second of all, decide whether or not the person being suggested by the police that there is a likelihood that that person committed the crime. The defense lawyers quite often like to say the indictment is not very important. They wad it up and throw it in the garbage can. I'm not going to say that to you because I think it is important. I think it's very important to this defendant here seated this morning. I think it was important to the grand jury back in January of last year, and I think it's important to us because it is what has brought us together here this morning."
(R. 697-99.) (Emphasis added.) Thereafter, the prosecutor read the four counts of the indictment, which he commented was "part of this case."
In determining whether trial counsel were ineffective in failing to object to the above emphasized comments, we start with the following premise:
"An argument to the jury concerning the fact that an indictment had been returned in the case after a hearing of the evidence by the grand jury, and that the grand jury must have believed accused guilty, has been held improper. However, a remark or argument relating to prior determination of the facts by the grand jury in indicting accused has been held not to injure substantial rights of accused."
23A C.J.S. Criminal Law § 1269 (1989). See also Breedlove v. State, 439 So.2d 1326, 1327 (Ala.Cr.App.1983), cert. denied, 466 U.S. 904, 104 S.Ct. 1680, 80 L.Ed.2d 155 (1984) (quoting the above, from former § 1104).
The prosecutor's comments under scrutiny here were made very early in his opening statement. Immediately before that opening statement, the trial court gave the jury preliminary instructions, which included the following: "It is the duty of the jury to take the evidence as it comes to you and decide from the evidence what the true facts are. You and you alone are the sole judges of the facts in this case." (R. 690.) In addition, the trial court stated:
"As members of the jury, you have taken an oath to try this case on the evidence as it comes to you and on the law of the state as I give it to you. That is your duty to try it on the facts as you determine them and the law as I give it to you. Now, the evidence, as I said, comes from the witness stand. Statements of the attorneys are not evidence. Their statements are intended to help you in understanding this case and help you in carrying out your duties. Their statements are not evidence. They fall into a different category from the evidence. Their statements are important and evidence is important, but they fall in different categories."
(R. 690-91.)
During his opening statement, the prosecutor also stated:

*895 "Now, there is another major issue as to whether or not this man, this defendant, is the perpetrator of these crimes. Proving the crimes alone, of course, is not enough to convict him. We must also prove that there is evidence linking him to the crime, and we must also prove that to obtain convictions beyond a reasonable doubt."
(R. 713.)
Defense counsel ended his opening remarks with the following:
"[The defendant] has been charged with capital murder, and the State must prove to you beyond a reasonable doubt and to a moral certainty that he had the intent, that he had the ability to form an intent to kill. [It] must prove to you beyond a reasonable doubt and to a moral certainty that Kenneth Thomas intentionally damaged that building by starting a fire or causing an explosion when another person is present, and that he knew that. If they fail to prove that, then that count goes out. They must prove to you beyond a reasonable doubt and to a moral certainty that Kenneth Thomas robbed Mrs. McLemore, and that he was armed with a deadly weapon or dangerous instrument that could cause serious physical injury to another. If they do not prove that, then that count goes out. They must prove to you beyond a reasonable doubt and to a moral certainty that there was sexual abuse. That is that he, Kenny Thomas, subjected another person to sexual contact by forcible compulsion or subjected another person to sexual contact. If they fail to prove that, then that count goes out. Now, Mr. Fry [the prosecutor] read to you the indictments from the grand jury, and I want to tell you that that has absolutely nothing to do with any evidence in this case. In the first instance, Kenny Thomas was not even given an opportunity to appear before the grand jury to tell his side. He had no attorney present. He could not ask any questions, present any evidence. He couldn't do anything. Nobody was there but the district attorney and the policemen that he wanted, to call. So, the indictment means absolutely nothing. That's just a way that a case is brought into court and nothing else. Their entire case is built on circumstantial evidence.... No matter how strong may be the circumstances, if they can be reconciled with the theory that the defendant is innocent, then the guilt of the accused is not shown. Every citizen brought into a court of law is presumed to be innocent, and we talked to you yesterday about that, and all of you agreed to that. You took a sacred oath to follow it. We have no duty to present any evidence, testify, to do anything. The presumption of innocence is like a shroud that cloaks every citizen accused, and that shroud goes with him and that presumption goes with him until all of it is torn away. The government has the duty of doing that. We have no burden to prove. The government has the burden of proof. They have to carry the ball. If it was a football game they got to carry it a 100 yards, not 99, and they have got to prove to each of you beyond a reasonable doubt and to a moral certainty of his guilt and these charges. The reason for this is so that no person who is innocent of the charge would be convicted."
(R. 757-60.) (Emphasis added.) We further note that during the defense's opening statement, the court reminded the jury that "opening statement is not evidence."
During the state's closing remarks of the guilt phase, the prosecutor stated, "We told you in the very beginning, and the Judge is going to tell you in a few minutes, what I have to prove is that he committed the crime beyond a reasonable doubt and to a moral certainty." (R. 1852.) During the defense's closing statement, counsel reminded the jury, "[The prosecutor] has a very strong burden that he has to prove beyond a reasonable doubt and to a moral certainty. Incredible burden. Something's that unique to our system that we *896 have to prove a man guilty...." (R. 1863-64.) In his rebuttal, the prosecutor stated, "Your verdict should be based on what the evidence was that came into the case, not something you have dreamed up or not something that's merely speculation or conjecture or not something someone has argued, but just what the evidence has been." (R. 1882.)
In the trial court's instructions to the jury in preparation for deliberation, the trial court said:
"The law says that each person who is indicted for an offense enters the trial of the case with a presumption of innocence so the defendant in coming before you in the trial of this case is presumed to be innocent of each charge against him. This presumption remains with him throughout the trial of the case and during your deliberations on the verdict, and it is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty. This presumption of innocence which is given to the defendant is a fact. It is not some idea. It's not some glossy-sounding phrase. It is a fact in the law and a fact in this case which must be considered along with all the other evidence in this case and is not to be disregarded by you in your deliberations and your consideration. The law says that the defendant does not have any burden of proof in this case.... The State of Alabama has the burden of proving guilt, and that's what the plea of not guilty means. It means that before the defendant can be convicted in this state, the State must overcome that presumption of innocence. It means that he has a clean slate with no evidence against him.... The State must overcome the presumption of innocence in this case by the evidence presented to you before there can be a conviction of any charge in this case. The State must prove the defendant's guilt by the legal standard that we refer to as beyond a reasonable doubt. The defendant is not required to prove his innocence in the case."
"It has been mentioned to you that the indictment in this case is not evidence against the defendant. It is merely the formal method the law prescribes by which an accused is brought to trial. It provides no proof. There is no presumption or inference that the defendant is guilty of the offense because there's an indictment in the case."
(R. 1891-93, 1895.) (Emphasis added.)
Given the specific circumstances before us, we hold that the circuit court correctly found that counsel were not ineffective in failing to object to the prosecutor's comments. We find support for this holding in State v. Boykins, 661 S.W.2d 699 (Tenn.Cr. App.1983). In Boykins, the prosecutor told the entire jury panel:
"You understand that the grand jury meets and that they find probable cause. If they find probable cause that a crime has been committed and that the Defendant has done it. In Raymond Boykins' case, they found probable cause"
Id. at 700-01. The prosecutor made these comments after defense counsel explained to the jury panel that the grand jury had heard only the prosecution's side, that neither the defendant nor his counsel have a right to be present at grand jury proceedings, that the indictments are not proof of any kind, and that the petit jury makes the ultimate decision in the case. In holding that the prosecutor's comments did not warrant a reversal, the court in Boykins explained:
"Defendant relies on the decision in State v. Onidas, 635 S.W.2d 516 (Tenn. 1982)[[11]] to sustain his position that the comments by the Assistant District Attorney General in this case require reversal. *897 We conclude that his reliance on Onidas is misplaced. In that case the State's counsel was allowed by the court to specifically tell the jury when a person is arrested he is taken before a City Court Judge to determine if there is probable cause that he is guilty of committing a crime before he is bound over to the action of the grand jury; that the grand jury had to determine a defendant was guilty of probable cause of committing a crime before he was indicted. The prospective jurors were not told that preliminary examination hearings before a committing magistrate such as the city court judge are often cursory in nature at which the defendant may or may not participate, or offer evidence. They were not told the grand jury proceedings are ex parte, and that a defendant has no opportunity to testify or to present evidence to that body.
". . . .
"... [After the comments noted above, no] further comment was made by either counsel on the matter. In the trial court's instructions to the jury [it] informed them that `the indictment in this case is a formal written accusation charging the defendant with a crime. It is not evidence against the defendant and does not create any inference of guilty.' The jury was also instructed to allow nothing but the law and the evidence to influence [it] in reaching a verdict. Based wholly on the facts of this case, in contrast to the circumstances in Onidas, we do not find that the remarks in question, `more probably than not affected the judgment,' or that they resulted in prejudice to the judicial process. T.R.A.P. Rule 36(b). This case was tried several months before the Supreme Court decision in Onidas came down. The Onidas opinion included this strong admonishment:
"`In Smith v. State, 205 Tenn. 502, 524-524, (sic) 327 S.W.2d 308, 318 (1959), cert. denied, 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 ... (1960), this Court made the following observation which we approve:
"`"A voir dire examination is for the purpose of advising counsel of the juror's qualification, interest, or bias, as a matter of fact, presupposing his statutory competence, that is, age, residency, etc. The subjacent purpose is to enable the exercise of one's peremptory challenges. [Citation omitted.] In this process it has been held, and it seems to us fairly so, that proper fields of inquiry include the juror's occupation, habits, acquaintanceships, associations and other factors, including his experiences, which will indicate his freedom from bias. [Citations omitted.]"
"`It is a perversion of the voir dire examination for counsel for either party to attempt to create bias and prejudice in the minds of the jurors.'
"We trust that counsel will heed this admonition and refrain from endeavoring to enlighten jurors with their knowledge of the law. Explanation of the law is the judge's responsibility and is far better left alone by counsel in their statements to the jury."
661 S.W.2d at 700-01. We note a further distinction between the facts before us and those in Onidas: the trial court in this case did not explicitly approve the prosecutor's comments as did the trial court in Onidas. (In Onidas, the court signified its approval when it overruled the defendant's objection after the prosecutor explained, "It's the law, Your Honor, I'm voir diring according to the law." 635 S.W.2d at 516.)
We find further support in United States v. Phillips, 914 F.2d 835, 844-45 (7th Cir.1990), wherein the court stated the following:
"The prosecutor's remark in his opening statement that the grand jury had indicted Phillips [for perjury] because it found that he had lied during his testimony was unquestionably improper. See United States v. Tucker, 820 F.2d 234, 237 (7th Cir.1987). Defense counsel did not object to the statement; therefore, *898 we may reverse only if the government's comment constituted plain error. [United States v.] Manos, 848 F.2d [1427,] 1437 [(7th Cir.1988)].... Although the prosecutor might have intended to describe the grand jury process, there was no reason for such an explanation and the clumsy manner in which it was done could have suggested to the jury that it should find Phillips guilty because the grand jury did. The district judge, however, instructed the jury prior to opening statements that the indictment simply described the charge against the defendant and was not evidence of guilt. Phillips's trial counsel also responded in his opening statement to the prosecutor's improper remark by explaining the differences between a grand and a petit jurymost pertinently the difference between a grand jury's finding of probable cause and a petit jury's finding of guilt. The defense's opportunity to rebut the prosecutor's improper remark is a factor militating against a finding of prosecutorial misconduct. See Darden v. Wainwright, 477 U.S. 168, 182-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 ... (1986). We are certain that Phillips was convicted as a result of the evidence produced at trial, and not because of the prosecutor's inappropriate rhetoric. We also do not believe that a miscarriage of justice resulted, although the prosecutor's unnecessary animadversions complicated an otherwise straightforward case."
914 F.2d 835 at 844-45.
In the present case, the jury was told (by defense counsel) that the grand jury proceedings are cursory: that Thomas was not given an opportunity to appear, to have his attorney present, to ask questions, or to present evidence. The jury was further informed that no one appeared before the grand jury except the prosecutor and the police officers selected by the prosecutor. Defense counsel explained that because the grand jury proceedings were by their nature cursory, the indictment was nothing more than the procedure by which an accused is brought to trial. The trial court reiterated this conclusion when it instructed the jury that the indictment is not evidence, that it provides no proof, that it raises no presumption of guilt, and that it is merely the formal method by which a defendant is brought to trial.
Moreover, the trial court repeatedly instructed the jurors that they had taken an oath to decide the case based only on the evidence from the witness stand and the law, that they were the sole determiners of the facts, and that the statements of the attorneys were not evidence. The trial court repeatedly instructed, and the attorneys reminded, the jury that the prosecution must prove guilt beyond a reasonable doubt. Defense counsel and the trial court reiterated that every defendant is presumed innocent. In fact, the trial court gave a thorough instruction on the presumption of innocence, as quoted supra.
When considering the contested comments in this case in conjunction with the comments and instructions by the trial court and also other argument by both counsel, we conclude that the jury was aware that the fact that an indictment had been returned by a grand jury was not evidence against Thomas and that the return of an indictment did not create any presumption or permit any inference of guilt. Therefore, Thomas cannot meet the Strickland requirement of prejudice. See, e.g., Daniels v. State, 650 So.2d 544, 558 (Ala.Cr.App.1994) (in finding counsel was not ineffective in failing to ask for a mistrial when prosecutor stated in closing, "[The appellant is] here because the Grand Jury charged him, because the evidence is here. If the evidence wasn't here, we'd already be gone. The case would be over," because the trial court's instruction to disregard the comments removed any need for such drastic action), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995).
This finding is buttressed by the United States Supreme Court's holding in Andres v. United States, 333 U.S. 740, 68 S.Ct. *899 880, 92 L.Ed. 1055 (1948). We find Andres applicable because the jury in Andres was given information regarding the grand jury process that is very similar to that given the jury in Thomas's trial. Although the information in Andres was conveyed by the trial court and the information here was relayed collectively by the prosecutor, defense counsel, and the trial court, this fact is all the more reason to rely on Andres: if the United States Supreme Court approves the information conveyed by the trial court, having "the tremendous weight of its office" behind its instructions, surely similar comments by the prosecutor would have less of an impact on the jury. In Andres, the jury had found the petitioner guilty of first-degree murder and he was sentenced to death; the Supreme Court reviewed the propriety of the following instructions by the trial court, although no objection or exception was made:[12]
"To the indictment which the grand jury returned against this defendant, this defendant entered a plea of not guilty. That is to say, he denied the charge stated in the indictment and placed himself upon his Country for the purpose of trial. The burden is upon the Government to show to your satisfaction, gentlemen, that this defendant is guilty beyond every reasonable doubt. This burden does not change at any time during the course of the trial. The defendant is presumed innocent of the charge stated in the indictment until he is proven guilty by the degree of proof to which I have previously referred. The presumption of innocence in favor of the defendant is not a mere formality to be disregarded by the jury at its pleasure. It is a substantive part of our criminal law. The presumption of innocence continues with the defendant throughout the trial until you are convinced by the evidence that he is guilty beyond a reasonable doubt.
"When the indictment was returned by the grand jury against this defendant, the defendant had had no opportunity to present his side of the case. The indictment was found by the grand jury upon evidence presented to it by the Government alone, and created in the minds of the grand jury a belief that it was probable that a crime had been committed and that this defendant probably committed that crime.

"Upon the evidence [which] it heard, the grand jury indicted this defendant, thereby indicating that it was probable that a crime had been committed, which should be disposed of in this court where both sides could be heard, and this is the stage which we have now reached."
"I advise you, gentlemen, that it is the indictment in this case which frames the issues of the case."
Id. at 744 n. 5, 68 S.Ct. 880 (emphasis in original). In addressing the propriety of these instructions, the Supreme Court stated that it did not consider the petitioner's argument to be of "sufficient doubt or importance to justify an extended discussion." Id. at 742, 68 S.Ct. 880. It stated only the following in regard to this issue:
"It is next contended that the trial was unfair because the instructions quoted [above] indicated to the jury that the indictment against the petitioner reflected a finding by the Grand Jury that he was probably guilty of the crime of murder in the first degree. Perhaps the italicized [emphasized] language in the charge, read out of context is misleading and it might have been better to omit it completely. However, when the language complained of is read in context, it seems to us that the petitioner had no real ground for complaint. No material error resulted from the words."
Id. at 744-45, 68 S.Ct. 880. See also United States v. Popow, 821 F.2d 483, 488 (8th Cir.1987) (the appellant's argument that the trial court's instructions to the jury *900 that grand jurors "just hear enough evidence to make the judgment that a crime has probably been committed and that the person to be charged has probably committed it" borders on the frivolous because the reference was generic, i.e., not specific to the grand jury that indicted the appellant and also because the court clearly admonished the jurors that the fact that an indictment had been returned by a grand jury was not evidence of any kind against an accused and that the return of an indictment did not create any presumption of guilt or permit any inference of guilt). Cf. Fiorella v. City of Birmingham, 35 Ala.App. 384, 388, 48 So.2d 761 (1950) (the appellant was not "probably injured in his substantial rights by reason" of the following statement by the trial court at the opening of the trial: "The matter before you comes by virtue of a law which allows any person convicted in the Recorder's Court to appeal his case into the Circuit Court, to be tried de novo, by a jury of his peers, and the matter before you, in short, a complaint by the City of Birmingham that ...."), cert. denied, 254 Ala. 515, 48 So.2d 768 (1950), cert. denied, 340 U.S. 942, 71 S.Ct. 506, 95 L.Ed. 680 (1951).
We have also considered Brown v. State, 690 So.2d 276, 297 (Miss.1996), 522 U.S. 849, 118 S.Ct. 136, 139 L.Ed.2d 85 (1997), a death penalty case, which the prosecutor stated to potential jurors, "I wish we weren't here today and so do you, but we are here and the Grand Jury in DeSoto County says that the reason we are here is because of what [the appellant] did on January 6, 1993. We need not lose sight of that." The court found that any error in the prosecutor's comments was cured when the trial court, in effect, granted the appellant's objection by explaining to the venire that "the function of a grand jury is a probable cause hearing" and that it was for the jury to determine whether a crime had been committed and whether the appellant had committed it and also allowed the prosecutor to correctly articulate the grand jury's function by stating,
"The grand jury's charge is simply an accusation. As the Court said, the indictment is not evidence. It should not be considered as evidence by you. You've got to decide for yourself based on what you hear in court whether the man's guilty or not. Pure and simple."
690 So.2d at 297.
In finding that Thomas has not met the prejudice prong of Strickland, we have considered the principles set out in Parker v. State, 549 So.2d 989, 990 (Ala.Cr.App. 1989). In that case, the court reviewed the propriety of the trial court's opening remark to the jury venire that "a grand jury was impaneled and they heard this case and they determined that in their opinion these acts had been done and that probably the defendant did it." (Emphasis in original.) The trial court then explained that the function of the trial jury was different from that of the grand jury, that the defendant is presumed innocent, and that the prosecution must prove beyond a reasonable doubt that the acts occurred and that the defendant committed them. After voir dire examination of the venire, defense counsel moved for a mistrial; the motion was denied. The trial court, in its attempt to cure any possible prejudice, instructed the jury that the prosecutor's burden of proof before the trial jury is much higher that the burden before the grand jury, and that the indictment is not evidence. However, the court further instructed,
"Of course, while the grand jury gets legal evidence, they are not bound to the strictness that you are going to be bound. All they have to do is make a determination that some act occurred and then they determine whether or not they have a probable cause to issue an indictment against a person."
549 So.2d at 991 (emphasis in original). After the Parker jury was empaneled, the court reiterated that the indictment is not evidence, that the defendant has a presumption of innocence that is not overcome until the prosecution proves beyond a reasonable doubt and to a moral certainty that the defendant is guilty, and that the *901 jury's decision comes only from the evidence, not from any action by the grand jury and not from anything the court or the attorneys say.
This court in Parker reversed the trial court's judgment. In so doing, the court stated:
"`The determination of the prejudicial character of improper conduct and comments of a trial judge in most cases depends on the issues, parties, and general circumstances of each case.' Thompson v. State, 503 So.2d 871, 879 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 ... (1987). However, in any case, the trial `court should "scrupulously refrain from injecting the tremendous weight of its office to influence the jury one way or the other." Bolton v. State, 23 Ala.App. 470, 127 So. 255 (1930).' McCovery v. State, 365 So.2d 358, 361 (Ala.Cr.App.1978). `Any court declaration prejudicing the accused in the minds of the jury is error necessitating a reversal whether the remarks are made before or after the jury is impaneled.' Gulledge v. State, 526 So.2d 654, 657 (Ala.Cr.App.1988).
"Here, while explaining to the jury venire the presumption of innocence with which appellant is clothed, the trial judge stripped away that presumption by disclosing to the venire the fact that, after hearing the evidence, the grand jury had already found that appellant probably committed the offense. The trial court further prejudiced appellant by affirmatively commenting that the grand jury had determined that the alleged offenses, in fact, had been done, especially in light of appellant's defense that none of the charged offenses occurred. These statements were misleading and created bias in the minds of the jurors against appellant's cause. See State v. Onidas, 635 S.W.2d 516 (Tenn.1982) (wherein the court held to be reversible error the prosecutor's comment that the judge of city court and the grand jury had already determined that there was probable cause to believe that the crime charged had been committed and that the defendant had committed it.)
"We agree with the state that the law is well settled that, when the `trial court promptly charges the jury to disregard improper remarks, there is a presumption against error and the prejudicial effects thereof are removed.' Haywood v. State, 501 So.2d 515, 519 (Ala.Cr.App. 1986). We also agree that the declaration of a mistrial is a matter within the sound discretion of the trial court. Id. However, assuming, arguendo, that this error could have been cured, we do not agree that the court's attempt, in this case, to eradicate the prejudicial effect through its `curative instructions' was sufficient. In its immediate instruction, the court reiterated and, thus, emphasized the prejudicial remark by again commenting, `All they have to do is make a determination that some act occurred and then they determine whether or not they have a probable cause to issue an indictment against a person.' Furthermore, the court alluded to the impression that the grand jury was not restricted to the same facts that the petit jury would hear. Cf. Ex parte Washington, 507 So.2d 1360, 1361 (Ala. 1986) (wherein the court held that the prosecutor's comment`there are certain things, because of our rules that we cannot present to you'was prejudicial error). This inference can be gathered from the trial court's comment `Of course, while the grand jury gets legal evidence, they are not bound to the strictness that you are going to be bound.' Moreover, we note that the trial court did not instruct the venire to disregard the comment under scrutiny. Finally, we do not have the assurance of the prejudice's eradication that arises from negative answers from a polling of the venire. See, e.g., Minor v. State, 402 So.2d 1121 (Ala.Cr.App.1981)."
549 So.2d at 992-93.
In distinguishing Parker from this case, we first note a glaring distinction: the comments in Parker had the weight of *902 judicial authority behind them, whereas the comments in this case were made by the prosecutor and were accompanied by the repeated admonition by the trial court that comments by the attorneys are not evidence and that the jury is under oath to decide the case based on only the evidence that comes from the witness stand. In other words, the trial court "`inject[ed] the tremendous weight of its office'" in this case by properly instructing the jury, thus curing any harm arising from the prosecutor's comments. Moreover, in Parker, the court was reviewing two blows to the defendant's case caused by the comments one, that the grand jury had determined that Parker had probably committed the acts and two, that the grand jury had determined that the offenses had in fact occurred, while Parker's defense was that none of the charged offenses had occurred. Here, that the crimes had occurred was basically uncontested. Furthermore, the court in Parker was concerned with the trial court's allusion to the impression that the grand jury was not restricted to the same facts that the petit jury would hear. We find no such allusion in the comments under review here.
We cannot emphasize enough that the prosecutor should not risk the reversal of a conviction by commenting on the functions of a grand jury. "We strongly condemn any statement by the prosecutor which conveys to the jury the impression that the grand jury would not have indicted the defendant if he had not been guilty." Breedlove v. State, 439 So.2d at 1327. The comments we are reviewing here are in terms that might not be permitted under different circumstances; in a different case, these comments might lead to an innocent person's being deprived of his liberty because he has been indicted. In other words, we intend that our holding be limited to the narrow facts before us and that no general rules with respect to prejudicial error be drawn from this case. "We trust that counsel will heed this admonition and refrain from endeavoring to enlighten jurors with their knowledge of the law. Explanation of the law is the judge's responsibility and is far better left alone by counsel in their statements to the jury."
661 S.W.2d at 700-01.
In Issue IV of his brief, by reference to Issue II(o), which refers us to the claim in Thomas's petition designated as S.60.(a) (Rule 32 C.R. 546-57), Thomas makes the conclusory argument that appellate counsel was ineffective for not asserting the impropriety of these comments by the prosecutor. We find that our analysis above is also dispositive of this claim.
The second set of the prosecutor's opening statement comments to which Thomas argues his counsel should have objected are "repeated improper, inflammatory, and highly prejudicial statements, declaring several times, for example, that the victim had been `slaughtered'" (Brief, p. 71). We address his general contention only in the context of the specific example argued. Thomas recites only two occasions in which the prosecutor described the victim's murder using the term "slaughter." In Hurst v. State, 356 So.2d 1224, 1236-37 (Ala.Cr.App.1978), the court, finding the prosecutor's argument "This man slaughtered him, this man slaughtered him" to be permissible, stated:
"There is no legal standard by which the prejudicial qualities of improper remarks of the District Attorney in a trial of a case can be judged, each case must be determined on its own merits. Binion v. State, [57 Ala.App. 234,] 327 So.2d 729 [(1975), cert. denied, 295 Ala. 391, 327 So.2d 732 (Ala.1976)]. Counsel for both the state and the defendant are allowed a wide latitude in drawing their deductions from evidence in argument to the jury. Summers v. State, ... 348 So.2d 1126 [(Ala.Cr.App.1977), cert. denied, 348 So.2d 1136 (Ala.1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978)].
See also Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997) (prosecutor was drawing reasonable inferences from the evidence by describing what transpired during the capital crime as a "horror"); Taylor v. *903 State, 666 So.2d 36, 65 (Ala.Cr.App.1994) (prosecutor's characterizations of the crime as a "massacre" and the crime scene as a "slaughterhouse" were not improper under the facts), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). We find likewise under the specific facts of this case.
In Issue IV of his brief, by reference to Issue II(o), which refers us to the claim in Thomas's petition designated as S.60.(b) (Rule 32 C.R. 547), Thomas makes the conclusory argument that appellate counsel was ineffective for not asserting the impropriety of these comments by the prosecutor. This claim is without merit. (j) "Trial counsel failed to object when several prosecution witnesses testified from notes on direct examination." (Brief, p. 17.)
This statement is Thomas's entire argument to this court. He makes no reference to any particular witness. However, in his assertion of the underlying substantive issue (Brief, Issue XIX(b), p. 72), he argues that "no foundation had been laid [establishing] that the witnesses either lacked a present recollection or that there was any other reason their testimony should have been exempt from the prohibition against the admission of hearsay evidence." (Brief, p. 72.) This represents his entire argument, with no citation to legal authority. However, he does refer us to two pages of the trial transcript: R. 1005 and 1171. We interpret these references as indicating that Thomas is contesting the use of notes by two witnesses: Officer Mark Dempsey, an Athens police officer who arrested Thomas at the scene, and John Kilbourne, criminalist II and chief forensic microscopist for the Alabama Department of Forensic Sciences.
"A witness may refer to a writing for the purpose of refreshing his recollection without first, as a condition precedent, having shown that it is necessary for the witness' recollection to be refreshed." Charles W. Gamble, McElroy's Alabama Evidence, § 116.02(6) (5th ed.1996) (foot-note omitted). See also Ex parte Slaton, 680 So.2d 909, 915 (Ala.1996) (quoting Walker v. State, 445 So.2d 955, 957 (Ala. Cr.App.1983), which quotes § 116.02(6) for the proposition that a witness may use a writing to refresh without first having shown that refreshment is necessary), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). We note that Kilbourne testified that his notes would help him refresh his recollection, but that he had independent recollection.
In regard to Thomas's allegation that no foundation was established to exempt the witnesses' testimony from the prohibition against the admission of hearsay evidence, it is the witness's testimony, under the doctrine of present recollection refreshed, not the writing, that becomes the evidence in the case. Gamble, supra, at § 116.01.
"The use of such a writing is not objectionable as hearsay because it is not offered to prove the truth of the matter asserted and is therefore definitionally nonhearsay.... Not only is the writing not offered to prove the truth of the matter asserted, it is not offered as evidence at all. It is the refreshed recollection of the witness, as stimulated and issuing in the form of oral testimony, that is the evidence."
Id. at § 116.01 n. 3.
Based on these principles, any argument that trial counsel were ineffective for failing to object to the witnesses' use of notes is without merit. (We note that in cross-examining both witnesses, Thomas's counsel requested to inspect each witness's report, and his requests were granted.)
In Issue IV in his brief, by reference to Issue II(o), which refers us to the claim in Thomas's petition designated as S.61.(b) (Rule 32 C.R. 548), Thomas argues that appellate counsel were ineffective for failing to argue on appeal that prosecution witnesses improperly used notes in their testimony (as argued in Issue XIX (Brief, p. 72)). This contention is without merit because the substantive issue is without merit. *904 (k) Counsel failed to fully investigate and to develop Thomas's defense of not guilty by reason of mental disease or defect, with the result that the guilt phase "cannot be relied upon as having produced a just result," Strickland, 466 U.S. at 686, 104 S.Ct. 2052, and that there is a reasonable probability that, but for counsel's deficient performance, Thomas would have been found not guilty or not guilty by reason of mental disease or defect.[13]
In his argument in support of this issue, Thomas contends that counsel made no effort to establish that Thomas suffered from organic brain damage; that they failed to introduce evidence, which he says was available, that Thomas was suffering from organic mental illness; and that they failed to secure the assistance of a competent mental health expert to offer testimony regarding his organic mental illness. Thomas argues that counsel were put on notice to further investigate the possibility that Thomas had organic mental illness because Dr. Brown and Dr. James Crowder, two clinical psychologists who testified on Thomas's behalf at trial, alluded to such a possibility. He concluded his argument by claiming, "Had the jury learned that Mr. Thomas was not only mentally retarded but suffered from organic brain damage and impulse control disorder, among other things, at the time of the crimes, there is a reasonable probability that the jury's verdict might have been different." (Brief, p. 25.)
In support of his assertion that counsel should have known or did know of the possibility that he suffered from organic brain damage, Thomas points to the following trial testimony from these two experts: Dr. Brown testified that he was of the opinion that when he examined Thomas in April and May 1984 (before the crimes), the Minnesota Multiphasic Personality Inventory test indicated the possibility that Thomas suffered from paranoid schizophrenia or drug-induced "organic brain syndrome," but that further testing was needed if he "wanted to know further." (R. 1549.) No further testing was done, Thomas argues. Moreover, Dr. Crowder, Thomas's court-appointed expert, testified that Thomas's performance in 1986 on the Trails A and B Test ("a screening test to determine the presence or absence of organic brain impairment or organic brain damage or organic brain syndrome" (R. 1638)) "put Mr. Thomas clearly in the brain damaged category" (R. 1639). Dr. Crowder further testified that Thomas's remote memory impairment might be the result of organic brain damage, but Dr. Crowder's diagnoses did not include a specific or definite diagnosis of organic brain damage. (Dr. Crowder diagnosed Thomas as being mildly mentally retarded, as having abused alcohol and drugs, as having antisocial personality disorder, and as having residual-type schizophrenia.)
Thomas, in his brief to this court, contends that evidence of a clear, certain diagnosis that Thomas suffered from an organic brain impairment was available and that that evidence should have been presented to the jury. In support of this assertion, Thomas points out that, at the Rule 32 proceeding, Dr. Terry Goldberg, a licensed clinical psychologist and chief of the neuropsychology unit at the National Institute of Mental Health, testified that Thomas "has brain damage that has impaired his cognitive capacity."[14] (Rule 32 R. 27.) Thomas also relies on Dr. *905 Goldberg's testimony in response to the question, "Do you have an opinion as to whether a neuropsychological battery should have been administered [before Thomas's trial]?" (Rule 32 R. 31.) Dr. Goldberg answered, "My feeling was that it would have been helpful to pin down the notion of organic brain syndrome." (Rule 32 R. 31.)[15]
Thomas further calls to our attention the testimony of Dr. Daniel Weinberger, a physician board-certified in both psychiatry and neurology and chief of the clinical brain disorders unit of the National Institute of Mental Health. He testified that Thomas suffered from both mild mental retardation and "some subtle form of brain damage or maldevelopment from very early in life" (Rule 32 R. 55); that Thomas's brain dysfunction goes beyond mental retardation; that "[p]eople who are mentally retarded and have brain damage have a fixed short fuse that they were fixed with from early in the development of their brain" (Rule 32 R. 59); that Thomas exhibited objective signs of brain damage that "can't possibly be faked" (Rule 32 R. 55); and that Thomas has a history of impulse control disorder, a diagnosis recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Revised.[16]
*906 In response to Thomas's argument that the magnitude of the testimony of these two Rule 32 expert witnesses from the National Institute of Mental Health has established the prejudice prong of Strickland so as to render Thomas's trial unfair or unreliable, we point out that the Rule 32 court had sufficient reason to discount their testimony or at least to give it less weight than the prosecution's experts. Although Dr. Goldberg testified that he had reviewed Thomas's prior medical records, he spent little time with Thomas. He testified that he interviewed Thomas twice in the week preceding Thomas's Rule 32 hearing, for a total of 3 hours and 15 minutes; that, during the first interview, he gave Thomas a series of neuropsychological tests; and that he was present when Dr. Weinberger interviewed him about two hours at the jail the day before the Rule 32 hearing. Dr. Goldberg further testified that he had never testified before in a criminal case; that Thomas was only the second criminal defendant that he had ever seen; that he was to be paid between $3,000 and $4,000 for his testimony; and that he had no special training in detection of malingering in criminal defendants or in the field of forensic psychology. Dr. Goldberg also testified that "organic brain syndrome" is not his final diagnosis; rather it is that Thomas suffers from "a form of cerebral dysfunction." (Rule 32 R. 32.) He explained that organic brain syndrome encompasses many conditions, including alcohol *907 intoxication. Then the following occurred:
"Q. Now, all of these tests that you gave Mr. Thomas show his current functioning, don't they?
"A. Correct.
"Q. You've made no effort whatsoever to extrapolate these tests back at the time of the trial, have you, sir?
"A. I wouldn't say the effort wasn't made. I don't think the effort was necessary."
(Rule 32 R. 37.) He further testified that although, at the time of the crimes, Thomas had brain damage that caused his mental retardation, that mental retardation did not cause him to murder the victim.
In regard to the evidence that could have reasonably diminished or negated the significance of Dr. Weinberger's testimony, we note that Dr. Weinberger had testified in only two other criminal cases, one of which was the John Hinkley[17] case, and in both, he testified for the defense. He also spent little time with Thomasabout two hours the day before the Rule 32 hearing although he did review the results of the tests administered by Dr. Goldberg; various medical, social service, and prison records; and court testimony and depositions. Weinberger also testified that he charges $300 per hour for his testimony. He admitted that it is possible to fake symptoms of impulse control disorder. He also admitted that Thomas's mental retardation did not "cause the murder" (Rule 32 R. 62). When asked whether Thomas's alleged organic brain syndrome caused Thomas to kill the victim, he answered, "I don't know why he did or did not butcher Mrs. McLemore." (Rule 32 R. 62.) Finally, he admitted that Thomas's impulse control disorder did not cause him to commit the crimes and that he could not say that, in this case, mental retardation or consumption of alcohol affected Thomas's impulse control.
In rebuttal of the testimony of Drs. Goldberg and Weinberger, the state presented the testimony of Dr. Joe Dixon, a clinical psychologist with Bryce Hospital, a faculty member of the University of Alabama, and a private psychologist. The Rule 32 court declared him to be an expert in forensic psychology. He testified that after interviewing Thomas for three hours in July 1992 for a clinical assessment and after reviewing Thomas's records from Taylor Hardin (where Thomas stayed for 63 days), Thomas's records from the Department of Corrections, and the interrogatories of the two defense experts, he concluded that Thomas suffers from borderline intellectual functioning (not the same as mental retardation), from a history of polysubstance abuse, and possibly from a mild case of antisocial personality disorder. He based his finding of borderline intellectual functioning on the facts that Thomas was able to function in society without supervision, that he could hold a job, that he could recall, etc. He determined Thomas's IQ to be borderline. He also explained that if only the neurological tests are considered, it was possible to have a false positive result. He further explained that Thomas had "an impulsive response set during testing," but that a certain degree of impulsiveness is associated with antisocial personality disorder.
In giving more weight to Dr. Dixon's testimony than to that of Dr. Goldberg and Dr. Weinberger, the circuit court noted that Thomas's witnesses were "hand-picked"; that in contrast to Thomas's witnesses' lack of experience in the criminal field, the state's expert "is an extremely experienced forensic psychologist, who has had extensive experience dealing with criminal defendants"; that the methodology of Thomas's two experts was questionable; and that "the bias of Thomas' experts in his favor, and against capital punishment, was evident from this Court's observations of their courtroom demeanor." (Rule 32 C.R. 735-36.)
*908 We emphasize that, even with his "handpicked" experts, Thomas failed to do in the Rule 32 proceedings what he contends his trial counsel should have done. Thomas argues that a properly qualified expert should have been produced who would "conclusively testify as to [his] organic brain damage and as to the effect it would have on his behavior." (Brief, p. 23; emphasis added.) However, a review of the evidence presented at the Rule 32 hearing leads us to the conclusion that Thomas's experts alluded to only one arguable effect of organic brain syndrome that would have had any impact on his defense: impulse control disorder. Dr. Goldberg testified merely that Thomas "has brain damage that has impaired his cognitive capacity," which is those "capacities to remember or learn new information, to solve problems, to analyze the world in spacial terms, to perceive the world accurately, and also to understand and express yourself through language." (Rule 32 R. 27.) Dr. Goldberg failed to explain how any impairment in any of these capacities could constitute a defense to the crimes committed. Only Dr. Weinberger testified that Thomas suffered from an impulse control disorder. However, even he admitted that this disorder did not cause Thomas to commit the crimes and that he did not know what caused Thomas to "butcher" the victim.
We find additional reason to hold that Thomas failed to establish fundamental unfairness or unreliability from defense counsel's alleged failure to further investigate Thomas's alleged organic brain damage and impulse control disorder and to put that evidence before the jury: the jury actually heard more testimony of the effects on organic brain syndrome than was presented at the Rule 32 hearing, and the jury also heard testimony that Thomas was impulsive. The record contains repeated discussion of organic brain syndrome and numerous references to Thomas's being impulsive.
For example, defense expert Lee testified that, on the Minnesota Multiphasic Personality Inventory administered to Thomas in May 1984, Thomas had high scores in the areas that "measure ... a person's predisposition to display characterological features of being very impulsive and having a low frustration tolerance." (R. 1450.) In addition, the following occurred during direct examination of Lee:
"Q. [Defense counsel:] Now, I'm going to ask you a hypothetical question. I want you to assume that Kenny Thomas started using pot in 1977 and then graduated to quaaludes and then began LSD... and purple micro dot, orange sunshine, chocolate mescaline, windowpane, goofies, red dragons, LSD 25, and paper acid. He then began shooting intravenously, crystal speed, cocaine, heroin, Dilaudids, orange sunshine, LSD, Seconal, morphine, something called D-E-M-O-N, Tuinals, Sinequans, Talwins, Valium, and sprinkled PCP or angel dust on marijuana and smoked them. In your opinion as a psychologist, would that affect a person's brain or mind?
"A. Given the use of those particular substances, it is highly likely that that would occur. It would also make it very difficult for a clinician to make a differential diagnosis between schizophrenia, as we have been discussing thus far, and the possibility of organic brain syndrome due to drug inducement or drug damage. We would probably refer to that as a drug-induced psychosis at that point, if the person were actively psychotic at that point.
"Q. Organic brain syndrome?
"A. Yes.
"Q. Now, tell us what you mean by that, sir.
"A. Organic brain syndrome would deal with deficits in meditation, the ability to think properly. It would deal in deficits as to comprehend the environment and make judgments. It would affect how they behave outwardly.
"Q. Now, when you speak of organic, are you talking about something actually wrong with the brain, itself?
"A. Yes, sir.

*909 "Q. Actual brain damage?
"A. Yes.
"Q. When you talk about a personality disorder, like, schizophrenia, that would be something that's non-organic, isn't that true, or is it?
"A. There's a possibility that the two could be in combination. In other words, you could actually have both things going on at the same time....
". . . .
"Q.... Now, is it possible for a person to have both organic brain damage from the use of drugs and superimposed or connected with that also be paranoid schizophrenic?
"A. It would be possible and sometimes does occur in that a person who might be experiencing schizophrenia may get involved in what might be referred to as the drug culture to try and escape some of the uncomfortableness of being schizophrenic. Now, they are trying to alter their own environment or their own feelings by introducing those drugs into their body as a method of escape."
(R. 1480-83.)
Defense expert Dr. Brown testified, in regard to heavy LSD use, "[I]t can create a long-term mental disorder even when the person is not indulging in the drug that could account for some of these symptoms here.... It can lead to sudden impulsive actions." (R. 1536.) In addition, during Brown's testimony, the following occurred:
"Q. [Defense counsel:] And you, on 5/16/84, did you make a notation that in your opinion he had a possibility of schizophrenia?
"A. Yes, I did. I put down drug-induced organic brain syndrome, but I'm sure that I meant when I wrote `testing suggests,' that means it's possible but I don't have enough information to say 100%.
"Q. We went through this with Dr. Lee this morning. I'll ask you to be very brief. What do you mean by organic brain syndrome?
"A. Well, organic brain syndrome is an impairment of the way you think or you understand or analyze the world. It is caused either by birth, you inherit that, or you may have it on the basis of drug use or on the basis of trauma to the head. It's often characterized by some of the things I have mentioned, such as, impatience, restlessness, and sometimes lapses of consciousness or even visual hallucinations or imagining things that aren't there. In many cases, it predisposes people to act without really knowing what they are doing. There are a lot of different things that could result from it."
(R. 1539-40.) He also stated that memory lapses are more common with organic brain syndrome than with schizophrenia. In discussing the effect of a stress, such as the death of a family member in triggering psychosis in a schizophrenic person, Brown testified as follows:
"Q. [Defense counsel:] What happens to a person when they are subjected to some kind [of] stress, and they trip off into psychosis? Do they have any control over what they are doing or what is going on?
"A. Well, I mean, in a sense, that is a philosophical question, but they certainly in some cases do not experience themselves as having control. They feel like, in some cases, they literally can't stop what they are doing. If you are in the room with somebody like this and you talk with the person, sometimes, not always, you can lead that person into learning to maintain control or get control, but it's often very difficult. Of course, with nobody around to do that, the person may experience themselves as acting compulsively. In some cases, they may feel like it's not them doing the action but somebody outside them is taking control."
(R. 1544-45.) Brown's direct examination concluded with the following:
"Q. Now, back in April and May of 1984 before we knew anything about this *910 case, what is your bottom line opinion on Kenny Thomas at that time, based upon your examinations?
"A. Well, diagnostically, I would say that he clearly had a major psychiatric disorder in partial remission. I could not distinguish with any certainty whether it was organically based on long-term drug use or whether it was paranoid schizophrenic. It was probably one of those two. If I wanted to know further, I would get further testing.
"Q. Dr. Brown, is there any way that any psychologists or any psychiatrists can say with any degree of medical certainty that a person either was or was not sane at a previous time, months earlier?
"A. When they haven't seen that person months earlier?
"Q. Yes.
"A. My own belief is that there is always uncertainty and there is more uncertainty when you have a long period of time. That's certainly my experience in the testing I've done when the Court order evaluation said I needed to. There's always uncertainty."
(R. 1548-49.) On cross-examination, the following also occurred:
"Q. Well, Doctor, in the absence of any real drug abuse, ... if you knew that this Defendant had not had that and had not been addicted to hard drugs, cocaine and heroin, and particularly, LSD or anything else they may have told you, if they could have ruled that out of the picture, is there any way you could have had the impression about organic brain damage or brain syndrome?
"A. Yes, I think so. You know, it could also have been due toit could have been from birth, or it could have been as a result of a trauma to the head. I think, based on the observations and the [Minnesota Multiphasic Personality Inventory] and discussions with other people, even without that report, I would have looked for either organic syndrome or schizophrenia, and probably, if he hadn't told me LSD, I would have certainly guessed it."
(R. 1554-55.)
In testifying for the defense at trial, Dr. Crowder stated that as a result of his first interview with Thomas on January 24, 1986, which lasted 90 minutes and included some testing, he suspected remote memory impairment, which, he says, could have been caused by "brain impairment or brain damage or organic [brain] syndrome ... [which] may be the result of a chronic condition that existed since birth or some traumatic injury to the brain since then... [o]r ingestion of drugs." (R. 1632.) During their session, Dr. Crowder administered the Wexler Adult Intelligence Scale, Revised ("WAIS"), which, in addition to measuring general intellectual ability, can give some signs about certain types of abnormal thought and certain kinds of organic brain impairment. The result of the WAIS was an IQ of 65, which places Thomas in the range of mild mental retardation and in the bottom one percent of individuals his age, i.e., his intellectual level is comparable to an 8- to 11-year-old. Dr. Crowder also administered the Rorschach test, which indicated that Thomas's contact with reality is marginal; that he does not see things in the way most normal people see them; that he was very depressed, agitated, and restless and had many fears; and that he was sometimes overcome with emotion and had inadequate control of his emotional expression. Dr. Crowder also administered the Trails A and B Test, which is a screening test "used to determine the presence or absence of organic brain impairment on the actual physical properties of the brain," with particular sensitivity to a person's ability to concentrate, to plan ahead, and to perform a relatively simple task in a short period. Results of the Trails A and B Test put Thomas clearly in the brain-damaged category. When asked his opinion as to the cause of this brain damage, Dr. Crowder testified that as early as 1968, there was concern that Thomas *911 might be neurologically impaired. He further noted that the Taylor Hardin report indicated that Thomas had possibly sustained brain damage as a result of his use of LSD. In making his evaluation, Dr. Crowder also considered Thomas's history, which includes a childhood of neglect and of possible abuse, numerous foster homes, stealing, and inexplicable running away; mental retardation; repeated self-infliction of injuries when he got nervous; several years of alcohol and drug abuse; and a mental breakdown and blatant psychosis when he was incarcerated. In making his evaluation, Crowder also spent 13 to 18 hours reviewing other documents and information and interviewed several people who were at the party Thomas attended the night before the crimes. In regard to the specific question of Thomas's sanity at the time of the crimes, Dr. Crowder concluded that although Thomas was intoxicated from ingesting marijuana, beer, and whiskey at the party, he showed no overt signs of any prominent psychotic symptoms, and that although Thomas intended to go home and go to sleep, "[h]e's an impulsive kind of person" and changed his mind.
On cross-examination of a state expert, the following occurred:
"Q. Did you have him examined by a neurologist?
"A. No, sir, I did not.
"Q. Isn't it true that people can have organic brain damage and that [it] can be detected by brain scans?
"A. Yes, sir, that's possible.
"Q. Would that be useful in determining that somebody had organic brain damage to have a brain scan run? Would that be useful in making a diagnosis of organic brain damage to do a brain scan?
"A. Many times organic brain damage is not detectable with the brain scan."
(R. 1785-86.)
As indicated by the testimony set out above, the possibility that Thomas suffers from organic brain syndrome and an impulse control disorder was clearly before the jury. We do not place any significance on the fact that the experts tended to vacillate between a diagnosis of schizophrenia and of organic brain syndrome or that they did not categorize Thomas as having an impulse control disorder. The experts testified at trial that it is difficult to make a differential diagnosis between schizophrenia and organic brain syndrome caused by drug damage. See also Williams v. State, 710 So.2d 1276, 1308 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), in which the court quoted United States v. Freeman, 804 F.2d 1574, 1576-77 (11th Cir.1986), in observing that a primary reason the insanity definition in the federal insanity defense statute was altered, after the acquittal of John Hinkley, was that "psychiatrists themselves are unable to agree upon the meaning of `an irresistible impulse.'" It is significant that the experts went beyond the label of a diagnosis and explained to the jury the effects of Thomas's alleged mental diseasesomething that Thomas's Rule 32 experts did not do as thoroughly. In our opinion, the relevant issue was how his mental condition might have affected his behavior at the time of the crimes. It is clear from the trial testimony that this was also the attitude upon which defense counsel based his trial strategy.
In addition to the clear reasons noted above for the rejection of the expert testimony presented on Thomas's behalf at the Rule 32 hearing and in addition to the cumulative nature of the evidence Thomas claims the jury should have heard, there is yet another reason to hold that Thomas has failed to prove that the jury's lack of opportunity to hear this evidence undermined the fairness of the trial or its reliability: the state's evidence at trial that Thomas was not suffering from a mental disease or defect at the time of the crimes was strong.
Dr. Norman Huggins, a psychiatrist in private practice, the medical director of *912 the University of Alabama in Birmingham substance abuse clinic, a staff psychiatrist for the Veterans Administration drug abuse program, and a psychiatric consultant for Bryce Hospital, testified that he was a member of the lunacy commission (consisting of three psychiatrists) that evaluated Thomas at Taylor Hardin to determine his competency to stand trial and his mental state at the time of the crimes. In making those determinations, he reviewed medical records compiled while Thomas was at Taylor Hardin, including the staffs daily evaluations and observations. He said that during their interview on March 17, 1985, Thomas interacted and related to him appropriately: Thomas maintained direct eye contact; he was polite, cooperative, and well mannered; he exhibited a normal range of motor activity, i.e., he had no unusual gestures or mannerisms; and he responded to his environment in the same manner as a normal person would. However his behavior was inappropriate in one regard: his mood was unusually cheerful in relationship to what he was thinking and saying.
Huggins testified that he made the following comments in his report:
"[He] ... is unable to detect any physical or mental disorder which could have been present during the time of the alleged offense. [Thomas] admits to having no mental problems on the day of the alleged offense. He admits to drinking alcohol and smoking marijuana on the day of the alleged offense, but has frequently used these substances in the past. He appeared to have been mentally intact at the time of the alleged offense, as demonstrated by his efforts to avoid police detection by walking away from the street."
(R. 1768-69.) In testifying that he found it very important that Thomas had attempted to avoid the police to avoid being arrested for public intoxication, he explained:
"A. Generally, ... if a person has used marijuana or alcohol, these drugs can potentially impair the ability to concentrate and think. As he told his story, I was specifically trying to determine the consequence and process he went through. If a person can remember that it's wrong for me to be picked up for drinking, then their judgment considering right from wrong applies to all other things, and that's one reason why I was trying to detect whether or not there was any consequences. Like, did he have any goal-directed behaviors?
"Q. Goal-directed behaviors? Would that be attempting to avoid being arrested?
"A. That's one goal-directed behavior. Also, getting into his car and knowing where his car was. If a person is confused and disoriented, they would have difficulty finding a car or remembering where they parked this car."
(R. 1769-70.)
Dr. Huggins concluded his testimony on cross-examination as follows:
"Q. Well, sir, tell us how it is that you can examine a person one time in a jail cell and do no other investigation and make no other tests and determine whether a person had a mental disorder months beforehand? ...
"A. Okay. By determining whether or not there is any evidence of a mental disorder at the present time that we are interacting and relating. During the time of the evaluation, I could not detect any evidence of any mental impairment or of any organic brain impairment. I also discussed with the Defendant the effects that lead up to it as he reported from memory. I could not detect any kind of mental or organic problems that could have been present at that point in time. If there was some problem that surfaced, then I would have explored it more in detail. Based on the available information that the Defendant provided, there was no objective evidence that suggested that he suffered with any kind of mental problem.
"Q. Dr. Huggins, can a person be psychotic at one time and then later on be nonpsychotic?

*913 "A. Yes, that's possible.
"Q. Would you agree, sir, that there's a possibility that Kenneth Thomas could have been psychotic on the night of this incident yet have been nonpsychotic on the day that you examined him?
"A. No, sir. That wasn't possible based on the information that the Defendant provided. Psychotic means that you have lost touch with reality. If you have lost touch with reality, that means that you cannot remember or will [not] remember what sort of problems or offenses that occurred during the time of your psychosis. If he didn't report that to me, then I assume that it didn't happen. If he reported it to me, then I would assume that it did happen, and that would require further investigation.
"Q. Well, if you did not conduct any tests, any CAT scans, any EEG's, any neurological examinations on Kenneth Thomas, then how can you say that he did not have some type of organic brain damage when you examined him in the cell?
"A. Because he didn't show any evidence of it. Organic brain damage doesn't come and go. It shows residual symptoms. He did not have any residual symptoms of organic brain damage."
(R. 1787-88.)
Dr. Clifford B. Hardin, the psychiatrist at Taylor Hardin, testified that he also examined Thomas in the spring of 1985 to determine his competency and his mental state at the time of the crimes. He explained that when a person is admitted to Taylor Hardin, he performs a brief "general mental status" examination to spot any signs of a severe mental illness; that a social history is then compiled and psychological testing is done; that information is obtained from the district attorney; that after the work-up is complete, he sees the patient for longer periods of time (60 to 90 minutes); and that the patient is under continuous observation by the mental health staff, who flags the patient's chart with any sign of psychosis so that Dr. Hardin can follow up. Dr. Hardin testified that, during his initial 30-minute interview with Thomas, Thomas talked about an invisible dog as he pretended to pet the dog, but that he (Dr. Hardin) reserved judgment as to whether Thomas's actions rested upon a true illusion; that he saw Thomas on several occasions; that he sometimes observed Thomas without Thomas's knowledge; that he saw Thomas occasionally act like he had a dog, but that Thomas later seemed to drop this behavior; that he does not recall Thomas asking for food for the dog or asking to take the dog with him when he left Taylor Hardin; that in arriving at his opinion of Thomas, he also considered the report of a medical examination performed by another doctor, a social worker's report of Thomas's family history, information on the alleged crimes from defense counsel and the prosecutor, psychological data, and the reports of Drs. Huggins and Salilas, who were the other members of the lunacy commission. He further testified that, during the considerable time he spent with Thomas on April 11, Thomas did not mention the invisible dog, he saw no signs of psychosis, and while he found Thomas to be "below average" in intelligence, he was not so below average as to not be responsible for his actions.
On cross-examination, the following occurred:
"Q. Doctor, is there any way that you can say with any degree of medical certainty that Kenneth Thomas was or was not mentally competent on December the 14th of 1994?
"A. I can state definitely that I see no reason to say that he was not competent on that date except for the deliberate use of substances for recreational purposes. I do not think you could ever state categorically without doubt that any person was completely sane on any day that you did not see them.
"Q....
"A. ... I see no reason to state that the person was mentally ill at the time of the alleged crime.
". . . .

*914 "Q. [J]ust how concrete is your opinion that this man was sane and okay on the night of December 14, 1984?
"A. My opinion is one of the strongest I have ever had."
(R. 1809-11.)
To summarize, Thomas has failed to establish the prejudice prong of Strickland because of (1) the credibility problems presented by Thomas's two Rule 32 experts; (2) Thomas's failure, even with his "handpicked" experts, to establish any effect of organic brain syndrome that would have excused the crimes; (3) the fact that any further evidence of Thomas's impulsiveness and organic brain syndrome would have been cumulative of the evidence introduced at trial; and (4) the state's evidence that Thomas was not suffering from a mental disease or defect at the time of the crimes was strong.
The above discussion and conclusions dispose of Thomas's claims regarding the competency of his expert Dr. Crowder: the allegation that trial counsel were ineffective for failing to secure the assistance of a competent mental health expert to offer testimony regarding Thomas's organic brain disorder (argued in Issue II(k)); the allegation that trial counsel were ineffective for failing to assert that Thomas's rights to a fair trial and sentencing were violated because Dr. Crowder allegedly failed to provide minimally competent assistance (argued in II(o)T., see amended petition, Rule 32 C.R. 557-58); the allegation that appellate counsel were ineffective in failing to assert the same issue on appeal (incorporated in Issue IV); and the underlying substantive issue (argued in Issue XX (Brief, pp. 82-84)). We specifically reject Thomas's argument that Dr. Crowder would have "been able to assist the defense in highlighting the gross deficiencies and flaws in the evaluations conducted by State's experts, Drs. Huggins and Hardin." (Rule 32 C.R. 557.) Defense counsel conducted exemplary cross-examination of the state experts. In fact, during cross-examination of Dr. Hardin about the results of a Minnesota Multiphasic Personality Inventory of Thomas, Dr. Hardin admitted that counsel had "outfoxed" him and that "[t]here's a possibility that there was an invalid test and ... not a deliberate fake bad." (R. 1808.)
(l) Counsel failed to adequately prepare Thomas to testify at the guilt phase.
Thomas offered no discussion of this issue to the circuit court (Rule 32 C.R. 523, 651), and he offer none to this court (Brief, p. 26). See Part II(f), supra. The circuit court correctly held that this issue was without merit.
(m) Counsel failed to call witnesses who would have allegedly impeached the prosecution's case in critical respects.
The only specific allegation supporting this general claim was that when counsel learned that Patricia Carter would testify that Billy (Thomas's brother) confessed to her that he, and not Thomas, had killed the victim, counsel should have asked that the defense's case be reopened so that Carter could testify in the guilt phase.
Thomas's claim is based on the false assumption that defense counsel knew the identity of the anonymous telephone caller in time to call that witness in Thomas's defense. According to the record before us, it is clear that counsel did not know that Patricia Carter was the anonymous caller until after the jury returned the guilty verdicts. As we noted in Part II(a), supra, defense counsel did not know the existence of a witness with possible exculpatory information until late afternoon of the day before the last day of the guilt phase, that they did not know until after 8:00 p.m. on the evening before the last day that this witness would state that Billy had killed the victim, and that they did not know this witness's actual identity until the evening after the jury had returned guilty verdicts. Thus, defense counsel could not possibly have asked that the defense's case be reopened so that Carter could testify in the guilt phase.
*915 In disposing of Thomas's claim, the circuit court made the following findings:
"The knowledge of Ms. Carter's alleged evidence was not known to trial counsel during the course of the guilt/innocence phase of the trial. It is clear from the record that Ms. Carter did not come forward until the conclusion of the guilt/innocence phase of the trial. However, it was brought to the attention of trial counsel prior to the conclusion of the guilt/innocence phase that the possibility of a witness may exist. This knowledge was conveyed to the Court, in chambers, outside the presence of the district attorney. Wherein, the Court stated that if this witness came for[ward], and could set out adequate testimony impacting upon the guilt or innocence of Thomas that this Court would allow the defense to reopen its case and put this testimony before the jury. It should be noted that this testimony was put before the jury during the penalty phase of this trial."
(Rule 32 C.R. 749.) The circuit court further noted, "[I]t is obvious from the trial of this matter, that this information was put before the Court and the jury at the first available opportunity." (Rule 32 C.R. 739.)
Moreover, as we noted in Part II(a), even if Carter's identity had been discovered before the close of the guilt phase and she had been called to testify, her testimony pertaining to Billy's confession would have been inadmissible under Alabama law.
(n) Counsel failed to object to the prosecutor's allegedly "numerous" prejudicial comments during his closing argument of the guilt phase.
Thomas refers us to the comments set out in Issue XXV of his brief. However, those comments were made during the sentencing phase. Nonetheless, the ineffective claims regarding counsel's failure to object to prosecutorial comments and conduct in the guilt phase closing argument (as specified in Issue XIX, pp. 74-81) and those in the sentencing phase closing argument (as specified in Issue XXV, pp. 92-94) are disposed of in Part II(o)S., infra. (o) "Trial counsel failed to raise objections to each of the substantive issues set forth in the Amended Petition at Sections E through EE. [Rule 32 C.R.] 528-74." (Brief pp. 27-28.) Those issues are as follows[18]:
In Issue IV of his brief, Thomas contends that appellate counsel was ineffective in failing to raise "each of the substantive issues presented in the Amended Petition at Sections E through EE." (Brief, p. 46.) We think it more logical, when disposing of each ineffective-assistance-of-trial-counsel claim, to address the corresponding ineffective-assistance claim as to appellate counsel rather than treating the claims relating to appellate counsel in a separate part of this opinion.
E. The competency hearing held by the trial court was constitutionally inadequate and its result inherently unreliable because "the defense did not have the opportunity to cross-examine the State's witnesses; to offer its own expert testimony or to otherwise adequately present evidence on behalf of [Thomas] or to challenge the State's evidence." (Amended petition, Rule 32 C.R. 528-29.)

This issue was addressed in Part I, supra, in regard to both trial and appellate counsel.
F. Thomas was not competent to stand trial because of the effects of his mental illness on his already impaired mental condition, i.e., his mental retardation and organic brain damage.

*916 This issue was addressed in Part I, supra, in regard to the effectiveness of both trial and appellate counsel.
G. The prosecutor allegedly engaged in racial discrimination in exercising his peremptory strikes, thus denying Thomas his right to equal protection and a fair trial by an impartial jury comprised of a representative cross-section of the community.

Foremost, Thomas has not met his Rule 32.3 burden of proving factual support for his allegation. The record fails to reflect any factual basis to support a prima facia case of discrimination: it does not indicate how many blacks, if any, the prosecutor struck, how many blacks were on the venire, or how many blacks served on the jury. While Thomas's Rule 32 counsel stated at the hearing that he "believed" that two of three blacks were struck, the circuit court replied that it was governed by the record. (Rule 32 R. 194-97.) We can find no verification in the record that two of three blacks were struck. While the trial transcript contains the venire list and strike sheet, the race of the veniremembers is not recorded. (C.R. 276A.) The only pertinent evidence introduced at the Rule 32 hearing was Barksdale's testimony that he had been previously involved in a case tried by the same prosecutor; that he had no basis for objecting to the prosecutor's use of preemptory strikes to remove blacks from the venire; and that he did not consider the prosecutor's exercise of his strikes in this case to be discriminatory.
Moreover, Thomas's claim that the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is without merit, as a matter of law. Thomas is white. Although Batson was extended to whites in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), Thomas was convicted on March 26, 1986, five years before Powers was decided. His appeal was also final before Powers. (The certificate of final judgment was issued by this court on January 20, 1989, and the United States Supreme Court denied Thomas's petition for writ of certiorari review on June 19, 1989.) Thus, Powers was not applicable to Thomas's case.
Not only because this claim lacks factual support, but also because the trial and the direct appeal in this case pre-dated Powers, Thomas's trial and appellate attorneys were not ineffective for failing to raise a Batson claim. See Holladay v. State, 629 So.2d 673, 685-86 (Ala.Cr.App.1992). See also Fortenberry v. State, 659 So.2d 194, 200 (Ala.Cr.App.1994) (appellate counsel was not ineffective in failing to argue a Batson claim where the white appellant's direct appeal was final in 1990), cert. denied, 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); McArthur v. State, 652 So.2d 782 (Ala.Cr.App.1994) (trial counsel was not ineffective for failing to raise a Batson claim for a white defendant, because that claim would not have been supported by law at the time of the trial), cert. denied, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 816 (1995). The circuit court properly denied Thomas's claims of ineffective counsel, based on the above rationale.
Moreover, Thomas's claim that he was denied a fair trial by an impartial jury comprised of a representative cross section of the community is also without merit, as a matter of law. The Supreme Court in Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), held that exclusion of blacks from a petit jury by the exercise of peremptory challenges is not a violation of the Sixth Amendment. Accordingly, trial and appellate counsel were not ineffective for not arguing this point.
Finally, the underlying substantive issue asserted in Issue VII of Thomas's brief whether the prosecutor's allegedly discriminatory use of peremptory challenges denied Thomas a fair trial by an impartial juryis procedurally barred because it was not raised at trial or on appeal. Rule 32.2(a)(3) and (5). See State v. Tarver, 629 So.2d 14, 19 (Ala.Cr.App.1993), cert. denied, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994).

*917 H. Since Thomas's direct appeal, new evidence has been discovered that tends to show that Thomas's brother Billy committed or was involved in the crimes.

The only allegedly new evidence Thomas specifically argues has been discovered is an unnamed individual who lived near Thomas and who saw Billy running through his backyard and away from the scene of the crimes shortly after the crimes are believed to have occurred.
The question before this court at this juncture is whether trial and appellate counsel were ineffective for failing to raise this substantive issue. We need state only that this information, if indeed it exists at all, was not discovered until after Thomas's appeal.
I. The trial court erroneously denied Thomas's motion for a change of venue.

The underlying substantive issue whether the trial court erroneously denied Thomas's motion for a change of venueis presented in Issue VIII of Thomas's brief. (Brief, pp. 50-52.) As the circuit court correctly held, this issue is precluded from review in a Rule 32 petition because it was addressed by the trial court (R. 672-74), and by this court on direct appeal. Rule 32.2(a)(2) and (4). See Thomas, 539 So.2d at 392-94.
Trial counsel were not ineffective for failing to raise the issue of the trial court's denial of his motion for a change of venue: by the trial court's denial of the motion, trial counsel had an adverse ruling from which to appeal. We note that the circuit court, in its written findings on Thomas's petition, stated that, at trial, it considered the informal survey, the press exposure, and the answers given by the veniremembers during the voir dire and that it "qualified the venire, after all challenges for cause to be a duly qualified panel pursuant to Alabama law." (Rule 32 C.R. 725.) The circuit court further correctly noted that "[n]o new evidence was adduced at the hearing held on Thomas' Rule 32 petition which would in any way indicate that the jury impanelled ... was in any way prejudiced by any outside information." (Rule 32 C.R. 725.) Moreover, the issue whether the ruling was proper after the voir dire of the venire was addressed on direct appeal, 539 So.2d at 394, and found to be without merit.
In Issue IV of his brief, Thomas contends that his appellate counsel were ineffective for failing to raise on appeal the issue of the trial court's denial of the motion for a change of venue. This issue is without merit. The issue was in fact raised and addressed on appeal. 539 So.2d at 392-94.
J. The trial court erred in failing to grant Thomas's motion for sequestered individual voir dire of the jury venire required by the alleged extensive pretrial publicity and the veniremembers' exposure to the group dynamic that, Thomas maintains, inhibited them from speaking freely.

The underlying substantive argument that the trial court erred in failing to grant Thomas's motion for sequestered individual voir dire of the jury venire because of the alleged extensive pretrial publicity and because of the veniremembers' exposure to the group dynamic that inhibited them from speaking freelyis presented in Issue X of Thomas's brief. (Brief, pp. 53-54.) As the circuit court correctly noted, the substantive issue is precluded because it was addressed at trial, Rule 32.2(a)(2), and it could have been, but was not, raised on appeal, Rule 32.2(a)(5).
We further note that while the trial court denied defense counsel's written motion for sequestered individual voir dire (C.R. 268), each veniremember was extensively questioned in chambers. During the general, initial questioning of the venire, counsel for both parties repeatedly told the veniremembers that any member could choose to reveal his or her answer to any voir dire question in chambers, and members repeatedly exercised this option. Moreover, all questions requiring specific answers regarding publicity and the death penalty were asked of the members individually, *918 in chambers. Two-thirds of the transcript of the voir dire examination are of the sequestered individual voir dire. From our review of the voir dire examination, we conclude that this venire gave absolutely no indication that the pressure of "group dynamics" was present. Given these facts, the allegation of ineffective trial counsel is factually without merit: counsel raised the issue of sequestered individual voir dire. Furthermore, on these facts, it is absurd to contend (as Thomas does in Issue IV) that appellate counsel were ineffective for failing to appeal the trial court's denial of Thomas's motion to allow sequestered individual voir dire of the veniremembers.
K. The trial court erroneously excluded veniremembers who expressed doubt about their ability to impose the death penalty under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), but whose answers, he says, were unclear and ambiguous.

The underlying substantive argument that the trial court erroneously excluded veniremembers who expressed doubt about their ability to impose the death penalty under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), but whose answers, he says, were unclear and ambiguousis presented in Issue XI of Thomas's brief. (Brief, pp. 54-55.) Thomas fails to address specifically the challenge of each veniremember dismissed pursuant to Witherspoon. In fact, no reference is made to the particular veniremembers; as was the circuit court, we were given the benefit of only page numbers: R. 99-101, R. 225-26, R. 592-94, and R. 666-67.[19] Thomas refers us to R. 225-26 and R. 592-94 to support his general conclusion that "these" veniremembers' answers were unclear and ambiguous. The cited excerpt R. 225-26, which is the voir dire of B.J.B., does not reflect anything pertinent to Witherspoon. Moreover, B.J.B. was struck by the defense. Thomas refers us specifically to the individual voir dire of only one other veniremember: M.W. (His other cited referencesR. 99-101 and R. 666-67are only generally pertinent to Witherspoon. One of the veniremembers in these excerpts B.H.was not excused by a challenge for cause but was the prosecution's first strike.) While we disdain the general, lackadaisical presentation of this issue, particularly the absence of any argument as to any specific veniremember, out of an abundance of caution, we construe Thomas's argument to pertain to the challenge for cause of M.W.
As the circuit court correctly noted, the substantive issue is precluded because it was addressed at trial, Rule 32.2(a)(2). In addition, the issue whether M.W. was erroneously excused and the general issue whether veniremembers were erroneously excused pursuant to Witherspoon, were presented to this court on rehearing and to the Alabama Supreme Court on petition for certiorari review. Thus, the substantive issue is also precluded because it was raised on appeal. Rule 32.2(a)(4).
In regard to Thomas's argument that counsel were ineffective for failing to pursue *919 this issue, we find that it is factually without merit: defense counsel had an adverse ruling from which to appeal. Thomas's argument that appellate counsel were ineffective for failing to raise the trial court's ruling is also without merit: appellate counsel did raise the issue before this court and also before the Alabama Supreme Court. Moreover, M.W. stated during individual voir dire that under no circumstances could he vote to impose the death penalty and also that he did not think that he could find the defendant guilty if the punishment were death. Thomas did not provide the circuit court and he has not provided this court, with any further argument that appellate counsel could have advanced on direct appeal.
L. Thomas was deprived of his right to a jury selected from a representative cross section of his community because veniremembers were excluded, based on their conscientious objection to capital punishment.

The substantive issuewhether Thomas was deprived of his right to a jury selected from a representative cross section of his community because veniremembers were excluded based on their conscientious objection to capital punishmentis presented in Issue XII of his brief. The circuit court properly determined that this issue was precluded: it was raised and addressed at trial (C.R. 144, 187, 268), Rule 32.2(a)(2), and could have been, but was not, raised on appeal, Rule 32.2(a)(5).
In regard to Thomas's argument that trial and appellate counsel were ineffective for failing to raise this issue, it is without merit, as a matter of law. The merits of the underlying substantive issue have been decided adversely to Thomas in Johnson v. State, 502 So.2d 877, 879 (Ala. Cr.App.1987), quoting the following from Lockhart v. McCree, 476 U.S. 162, 174, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986):
"`The essence of a "fair cross-section" claim is the systematic exclusion of "a `distinctive' group in the community." Duren [v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)]. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from preforming one of their duties as jurors, such as the "Wither-spoon-excludables" at issue here, are not "distinctive groups" for fair cross section purposes.'"
M. The trial court erred in failing to grant Thomas's challenges for cause of "at least" three veniremembers who allegedly expressed fixed opinions about Thomas's guilt; of "at least" five veniremembers who allegedly expressed fixed biases against the insanity defense; of two who allegedly expressed improper, fixed opinions about the defense's burden of proof in asserting the insanity defense; and of A.C.B. and J.R.E., who allegedly expressed fixed opinions against considering evidence of mental illness or infirmity in mitigation of a crime and/or punishment.

Thomas presents the merits of the underlying substantive issue to this court in Issue XIII. We point out here again that Rule 32 counsel refer only to page numbers to, we assume, identify the veniremembers in question, with the exception of two whom they refer to by nameA.C.B. and J.R.E. Moreover, for the most part, they offer no discussion of the specific responses of the veniremembers, but direct our attention to page numbers. We assume from the pages they cite us to the three veniremembers who allegedly expressed fixed opinions about Thomas's guilt are R.E.H., N.B.L., and W.O.T.; that the five who allegedly expressed fixed biases against the insanity defense are A.C.B., B.J.B., N.B.L., J.N.P., and H.D.P.; and that the two who allegedly had improper, fixed opinions about the defense's burden of proof in asserting the defense of insanity are J.R.E. and M.L.G. In regard to the named veniremembersA.C.B. and J.R.E.and Thomas's argument that they allegedly expressed fixed opinions against considering evidence of mental illness in mitigation, particularly in regard to statutory *920 mitigating circumstances,[20] we point out that, on the pages cited by Thomas in his argument (R. 208, 265), the veniremembers did not express any such view. Rather, A.C.B. expressed the view that someone who was mentally ill should be punished if that person commits a crime, and J.R.E. stated that he would recommend capital punishment for someone who was mentally ill if that person's guilt had been established beyond a doubt; upon further questioning, he stated that if the defendant was insane at the time of the crime, he would be opposed to capital punishment. We address Thomas's issue as regarding A.C.B. and J.R.E. within the factual context of the record, not the interpretation Thomas argues.
The circuit court correctly declared the underlying substantive issue of the trial court's denial of the challenges for cause to be procedurally barred because the issue of the exclusion of the veniremembers was raised and addressed in the trial court, Rule 32.2(a)(2), as further detailed below, and because the issue of the trial court's denial of these challenges for cause was raised and addressed on appeal, Rule 32.2(a)(4), as detailed below.
In regard to Thomas's assertion that trial counsel were ineffective for failing to assert this issue, we observe that trial counsel challenged for cause R.E.H. (R. 312, 314, 315, 320), N.B.L. (R. 370-71), and W.O.T. (R. 578-79), on the ground that they had fixed opinions as to Thomas's guilt. He challenged for cause A.C.B. (R. 210, 669), B.J.B. (R. 670), N.B.L. (R. 371), J.N.P. (R. 423), and H.D.P. (R. 423-33, 671), on the ground that they had expressed a fixed bias against the insanity defense. He challenged M.L.G. for her allegedly fixed opinion on the defense's burden in regard to the insanity defense. (R. 296, 670.) He also challenged J.R.E. (R. 269, 670). He challenged A.C.B. also on the ground that he had answered that a person should be punished even if insane, (R. 210, 669), and J.R.E. also on the ground that he answered that, even if the defendant were insane, he would recommend capital punishment (R. 670). Thomas's assertion of ineffective trial counsel is without merit.
Thomas's assertion in Issue IV that appellate counsel was ineffective for failing to assert the substantive issue is also without merit. Appellate counsel raised, and the appellate court addressed, the issue of the trial court's denial of defense counsel's challenges for cause of R.E.H., N.B.L., and W.O.T. for alleged fixed opinion of guilt. Thomas, 539 So.2d at 380-91. Appellate counsel also raised, and the appellate court addressed, the issue of the trial court's denial of defense counsel's challenges of A.C.B., B.J.B., N.B.L., J.N.P., H.D.P., J.R.E., and M.L.G. for alleged "entrenched bias against the insanity defense." 539 So.2d at 391-92. The particular allegation relating to A.C.B.'s statement that the mentally ill should be punished was also argued and addressed on appeal. 539 So.2d at 391. Although it appears that appellate counsel did not specifically point out J.R.E.'s initial statement that he would recommend capital punishment for someone mentally ill if that person's guilt had been established beyond a doubt, the appellate court specifically recognized, "At the end of voir dire, [J.R.E.] did state that he was opposed to punishing someone who was legitimately insane at the time of the crime (R. 261-69)." 539 So.2d at 391. We consider that the issue was before the appellate court.
Thomas makes the general conclusory statements in the presentation of the underlying substantive issue that the jury included jurors "who had been influenced about his case by the local news media" *921 and those "who indicated that they would automatically impose the death penalty if he was convicted." (Brief, p. 57.) He offers absolutely nothing in regard to these statements. Accordingly, we find them unworthy for consideration.
N. The trial court erroneously denied Thomas's request for expenses to hire a jury psychologist to assist defense counsel in the selection of a fair and impartial jury.

The underlying substantive issue, which is argued in Issue XIV, is procedurally barred: the issue was presented and addressed in the trial court, Rule 32.2(a)(2), and it could have been, but was not, raised on direct appeal, Rule 32.2(a)(5).
Trial counsel were not ineffective in failing to object: they requested the funds and their request was denied. (C.R. 168, 268-69.)
In regard to Thomas's argument in Issue IV that appellate counsel were ineffective for failing to assert the substantive issue on direct appeal, we note that the circuit court found that the trial court's denial of funds in no way impeded Thomas's right to a fair and impartial jury. The circuit court stated, "Thomas's trial counsel were experienced trial attorneys practicing in this area for an extended period of time. Thomas's counsel had tried numerous cases before a jury in this jurisdiction and were experienced in the selection of trial juries comprised of a representative cross-section of the community." (Rule 32 C.R. 731.) To contest these findings, appellate counsel asserts only, "In light of the pervasive pretrial publicity which aroused community prejudice against Mr. Thomas, his trial counsel could not effectively secure his rights to due process of law and a fair trial before an impartial jury without the aid of the requested expert assistance during voir dire." (Brief, p. 61.) This mere assertion fails to call into question the circuit court's findings; Thomas has failed to persuade us that he established prejudice. The trial court in no way restricted defense attorneys' voir dire questioning of the veniremembers, particularly in regard to any exposure to pretrial publicity. In fact, in the expert's affidavit submitted to the trial court in support of Thomas's motion for funds to employ the expert, the expert concluded that "the only possibility of obtaining a fair trial would be through extensive open ended, attorney conducted sequestered voir dire." (C.R. 181.) That is exactly what was done here. Moreover, Barksdale testified, "I composed a complete notebook of voir dire questions and went through that very methodically and very scientifically I thought.... [I]t was planned." (Rule 32 R. 150.) Because Thomas has made no effort to show how the trial court's denial of his request for a jury selection expert rendered his trial unfair or unreliable, nor do we think that, under these facts, he could have made such a showing, we hold that appellate counsel were not ineffective in failing to assert this issue on direct appeal. See Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (no need to determine what kind of showing a defendant would have to make to be entitled to the assistance of an expert if the defendant offered nothing more than mere assertions that the requested expert would have been beneficial to the defense); Dubose v. State, 662 So.2d 1189, 1192 (Ala.1995) (the Alabama Supreme Court interpreted Ake and Caldwell, taken together, to "hold that a defendant, to be entitled to funds to pay for an expert, must show more than a mere possibility of assistance from an expert"). Moreover, "The appellate courts of this state have upheld the denial of a jury selection expert. See Duren v. State, 507 So.2d 111, 119 (Ala.Cr.App.1986), aff'd, 507 So.2d 121 (Ala.1987), cert. denied, 484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 ... (1987)." MacEwan v. State, 701 So.2d 66 (Ala.Cr.App.1997) (upholding denial because the appellant had failed to demonstrate either that there was a reasonable probability that a jury selection expert would have been of assistance to her defense or that the denial of her request for a consultant deprived her of a fair trial). *922 See also Bush v. State, 695 So.2d 70, 104 (Ala.Cr.App.1995) (upholding denial in a capital case because the appellant made mere undeveloped assertions that requested assistance would be beneficial), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). See also State v. Kilpatrick, 343 N.C. 466, 472-73, 471 S.E.2d 624, 628-29 (1996); State v. Zuniga, 320 N.C. 233, 248, 357 S.E.2d 898, 908-09, cert. denied, 484 U.S. 959, 108 S.Ct. 359, 98 L.Ed.2d 384 (1987).
O. The trial court denied Thomas a fair trial before an impartial jury by limiting Thomas's challenges for cause (by denying his challenges discussed in subpart M supra, and the challenge against P.M.S.), allegedly in an attempt to maintain the statutory minimum of 36 venirepersons on the strike list, § 12-16-100(a).

The substantive issue is presented in Issue XV of Thomas's brief. (Brief, pp. 62-63.) It was properly precluded from consideration because it was essentially raised and addressed at trial (by the challenges for cause), Rule 32.2(a)(2). It was also properly precluded because Thomas raised on appeal the issue of the trial court's alleged preoccupation with ensuring the statutory requisite number of veniremembers (which included the scrutiny of the denial of the challenge for cause against P.M.S.), Rule 32.2(a)(4). (In addition, the denial of the challenges for cause discussed in subpart M, supra, was asserted on appeal.)
Because trial and appellate counsel in fact argued the above substantive issue, any claim that they were ineffective for failing to do so is without merit. Moreover, the trial court's rulings in regard to those challenges were upheld on appeal. Therefore, we need not consider what motivated the trial court to deny the challenges. However, we note that the circuit court, in its findings of fact supporting its denial of Thomas's Rule 32 petition, stated, "This Court in no way placed any limitations on `strikes for cause' in an effort to conform with present Alabama law with regard to the size of the jury pool to be stricken from." (Rule 32 C.R. 730.)
P. Thomas's rights to a fair trial and due process were violated by the introduction of allegedly irrelevant, inflammatory and unduly prejudicial photographs of the victim's wounds, many allegedly cumulative duplicates, close-ups, or autopsy photographs, including one of the victim's anus and buttocks; of color slides of the bloodstained evidence and the ransacked rooms of the victim's residence; and of tangible evidence, such as the victim's bloody nightgown and underwear.

In presenting the underlying substantive issue in Issue XVI of his brief (Brief, pp. 63-65), once again, for the most part, Thomas refers the circuit court and this court only to page numbers. We assume that by citing R. 865-76, Thomas is referring to the admission of State's Exhibits A-2 (photograph of wounds), A-3 (photograph of wounds on victim's face), A-4 (photograph of wounds on the victim's breasts and upper abdomen), A-5 (photograph of wounds to the lower torso and upper legs), A-6 (photograph of the body, showing its position as found at the scene), A-7 (photograph of wounds on one of the victim's arms), and A-8 (photograph of an automobile parked outside the victim's residence). All of these photographs were taken at the scene. We also assume that, by Thomas's citation in brief to R. 941-44, he is contesting the admission of State's Exhibit A-45, a photograph of the victim's wounds taken by the forensic pathologist at the time of autopsy. By reference to R. 948-49, we assume that he is referring to the admission of State's Exhibit A-46, a photograph of wounds to the victim's anus and buttocks taken by the forensic pathologist at the time of autopsy. We further assume, by Thomas's reference to R. 1068-70, that he is contesting the admission of State's Exhibits A-12 (photograph of the front window opening on the victim's front porch from the northwest bedroom), A-13 (photograph of the front northwest bedroom), *923 A-14 (photograph of the victim's living room), and A-16 (photograph of the victim's bedroom). We further assume that, by referring to R. 1096-1128, Thomas is referring to the use of photographic slides of the scene by the state's expert witness, a forensic microanalyst and criminalist, in his testimony pertaining to his investigation of each room of the victim's residence, of the outside of the victim's house and surrounding area, and of Thomas's vehicle. (Photographic copies of the slides were marked as State's Exhibits 18, A-20 through A-29, and A-31 through A-44 and were admitted without objection. (R. 1128.)) Finally, although Thomas's reference to R. 1137-51 could suggest any one of 11 State's Exhibits, he specifically refers to only two: "the bloody nightgown and underwear of the victim" (Brief, p. 65). We so limit our consideration. Thus, we assume that he is referring to the admission into evidence of State's Exhibits C-1 (the victim's blood-stained panties) and 6 (the victim's bloody nightgown, which was actually admitted on R. 1152).
In his cursory discussion in his brief to this court, Thomas groups these exhibits into four general groups: photographs of the victim's wounds, which he argues were irrelevant, prejudicial, and inflammatory; photographs of the wounds taken at the time of autopsy, including one showing wounds to the victim's buttocks and anus, all of which he contends were grossly inflammatory; slides of "the bloodstained evidence," which the prosecutor, using a projector, showed to the jury, although, he argues, they were not probative of any issue; and "tangible evidence, such as the bloody nightgown and underwear of the victim," which he asserts was highly inflammatory, prejudicial, and of no material evidentiary value whatsoever.
The substantive issue of the admission of these exhibits (Issue XVI) is precluded. Because defense counsel objected to the introduction of State's Exhibits A-2 through A-7 and A-45 (R. 866, 868, 870, 871, 874, 875, 941-43), the issue is precluded because it was raised and addressed at trial. Rule 32.2(a)(2). In regard to the other exhibits, the issue is precluded because it could have been, but was not, raised at trial. Rule 32.2(a)(3). Moreover, the issue in regard to all of the exhibits is precluded because it could have been, but was not, raised on appeal. Rule 32.2(a)(5).
In regard to whether trial counsel were ineffective in failing to object to the admission of the above-listed exhibits (with the exception of State's Exhibits A-2 through A-7 and A-45, which they did object to), we note that the circuit court found that "the photographs at issue here were relevant to the res gestae of the offense, and were further relevant to the especially heinous, atrocious or cruel aggravating circumstance." (Rule 32 C.R. 732; citations omitted.) We agree, particularly because they were not specifically called into question by Thomas.
Further, because Thomas treats the issue very generally, we likewise need only treat the issue generally. Charles W. Gamble, McElroy's Alabama Evidence § 207.01(1) (5th ed.1996), sets out the general rules of admissibility of the clothing of the victim of a homicide; and at § 207.01(2) sets out the general rules of admissibility of photographs of a homicide victim. See also Kuenzel v. State, 577 So.2d 474, 513 (Ala.Cr.App.1990) (allowing into evidence photographs of the crime scene and of the victim's body), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Upon these general principles, we find that trial counsel were not ineffective for failing to object to all of the exhibits and that appellate counsel were not ineffective (as argued in Issue IV) in failing to contest the trial court's admission of them.
Q. The trial court allegedly erroneously admitted into evidence Thomas's oral statements to the police in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Thomas argues that Miranda was violated because, he says, the prosecution allegedly relied on his statement that he knew what his Miranda rights were and *924 did not elicit testimony as to whether Thomas was properly advised of each of the Miranda rights, as to whether Thomas had the mental capacity to understood those rights, and as to whether he knowingly and intelligently waived those rights.
Chief Richard Faulk testified before the jury that, at the first interview, he read to Thomas the following from a standard waiver of rights form:
"I've been advised that I must understand my rights before I answer any questions. I have the right to remain silent. Anything I say will be used against me in court. I have the right to talk to a lawyer for advice before I answer any questions and to have him with me during questioning. I have the same right to the advice and presence of a lawyer even if I can not afford one. The police can not furnish me with a lawyer, but one will be appointed for me, if I wish, by the Court. If I wish to answer questions now, without a lawyer, I also have a right to stop answering questions at any time until I talk to a lawyer. Waiver: the above having been read to me or by me, I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure of any kind has been used against me."
(R. 1381-82.) Chief Faulk also testified that Thomas signed the waiver, that he appeared to understand his rights, and that he did not appear to be intoxicated at that time. In regard to their second meeting, Chief Faulk testified that he again informed Thomas of each of his rights, that they went over the waiver again, and that although Thomas signed that waiver, Thomas stated that he wanted to postpone any conversation until the following morning. In regard to the third meeting, which took place at Thomas's request 30 hours after he was jailed (on the morning of December 16), Faulk testified that when he started to read Thomas his rights from the rights and waiver form, Thomas interrupted and said that it was not necessary to repeat his rights because he knew the form; that he then gave Thomas the form to read himself; that Thomas looked at the form as if he were reading it; and that Thomas signed the waiver. In the hearing on Thomas's motion to suppress, Faulk further testified that, on this third interview, Thomas appeared to understand his rights.
In addition to Faulk's testimony, several witnesses testified in the suppression hearing in regard to Thomas's mental capacity to understand his rights and to knowingly waive them. The only testimony favorable to Thomas was to the effect that on an IQ test administered in 1968, Thomas scored 56; that an adult scoring within the IQ range of 52 to 68 has an intellectual level comparable to that of an average eight- to eleven-year-old child; that Thomas was considered mildly or educably mentally retarded; and that he had been in special education classes while he was attending school. However, the evidence at the suppression hearing further shows that Thomas can read and write, that he graduated from high school (with a special diploma), and that his IQ had improved since the administration of the 1968 test.
The underlying substantive issue of the admissibility of Thomas's two statements is presented in Issue XVII. (Brief, pp. 65-67.) The circuit court correctly ruled that this issue is precluded because it was addressed at trial, Rule 32.2(a)(2). (Rule 32 C.R. 727.) In his motion to suppress, defense counsel asserted that Thomas had not intelligently and knowingly waived his right to counsel. (C.R. 185-86.) Moreover, the trial court addressed this precise issue by ruling that the constitutional safeguards of Miranda had been followed. The trial court also made specific factual findings supporting its conclusion that Thomas had knowingly and intelligently waived his rights and made a statement. See R. 1373-74, quoted in Part I, supra.
The issue whether trial counsel were ineffective for failing to present the underlying *925 substantive issue is without merit. As noted above, the trial court addressed the issue.
We further find that the issue whether appellate counsel were ineffective in failing to raise the underlying substantive issue, as asserted in Issue IV, is without merit because the underlying substantive issue is without merit. The situation as portrayed by Thomas in his brief is inaccurate: in satisfying the requirements of Miranda, the prosecution did not rely solely on the blanket statement that Thomas knew his Miranda rights. Rather the prosecution met its burden of "spell[ing] out with clarity and precision the specific Miranda warnings the police gave the defendant." Ex parte Johnson, 620 So.2d 709, 711 (Ala.1993) (where, unlike the circumstances before us, the prosecution relied solely on the officer's general, conclusory testimony that he had informed the defendant of his Miranda rights), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).
"[O]nce Miranda warnings have been given and a waiver made, a failure to repeat the warnings before a subsequent interrogation will not automatically preclude the admission of an inculpatory response. Whether the Miranda warnings must be repeated depends on the facts of each individual case, with the lapse of time and the events which occur between interrogation being relevant factors to consider."
Hollander v. State, 418 So.2d 970, 972 (Ala.Cr.App.1982) (citations omitted; quoted in Nabors v. State, 649 So.2d 1327 (Ala.Cr.App.1994)). Under the circumstances presented here, it was reasonable for the police officer to rely on Thomas's assertion that he did not need to have the Miranda warnings repeated. We find that a third review of Thomas's Miranda rights was unnecessary. In addition, we find that evidence before the trial court sufficiently supports its finding that Thomas had the mental capacity to understand his rights and that he knowingly and intelligently waived those rights.
R. The trial court erred, as a matter of law, in allowing into evidence the pocketknife recovered from Thomas's car on the grounds that the police failed to follow proper procedures, thereby possibly contaminating the knife with foreign material and failing to preserve potentially exculpatory evidence.

Thomas asserts that the officers handled a pocketknife found in his car after they had been in the victim's home, thereby possibly contaminating the knife with foreign material, including inculpatory evidence, from the victim's home. He also asserts that, by handling the knife as they did, they failed to preserve any fingerprints that may have been on it.
Forensic examination of the knife revealed the following: fiber on the knife consistent with the green fiber of the victim's nightgown; other fiber consistent with the fiber of the victim's pink blanket; two hairs consistent with the victim's head hair; and one pubic hair consistent with the victim's.
Officer Mitchell testified that he seized the knife from the driver's seat of Thomas's vehicle after the officers had finally gotten Thomas, who was unruly and combative, out of the car and patted down; that he touched the blade when he partially opened the knife; that he noted that the blade was bloody and that a couple of small hairs were stuck by the blood to one side of the blade; and that he gave the knife to Officer Dempsey while he and other officers were scuffling with Thomas to get him across the street and into a patrol car. Officer Dempsey testified that, when he was given the knife, he placed it in his left breast pocket; that he did not do anything to change the condition of the knife; and that it was in the same condition when he received it as it was when he subsequently gave it to Sergeant Clark. Sergeant Clark testified that, when Officer Dempsey gave him the knife at city hall, Dempsey had already partially opened it to show him the hair caught on the tip of the blade; that he noted that a hair was *926 hanging from the broken tip of the blade; that he closed the blade and placed the knife in a plastic bag; that he did not alter the knife in any way while it was in his possession; and that he turned the knife over to Kilbourne, the forensic scientist, at the crime scene. After this testimony, defense counsel moved to exclude the knife from evidence on the ground that the condition of the knife had not been properly preserved though the chain of custody in accordance with police procedure and could thus have been contaminated, and the trial court denied the motion. (R. 1034-38.)
The underlying substantive issue, as asserted in Issue XVIII (Brief, pp. 67-69), regarding possible contamination, is precluded by Rule 32.2(a)(2), because it was raised and addressed at trial. In regard to the possibility of failure to preserve potentially exculpatory evidence, the underlying substantive issue is barred because it could have been, but was not, presented at trial. Rule 32.2(a)(3). The underlying issue, as to both grounds, is also procedurally barred by Rule 32.2(a)(5), because it could have been raised or addressed on appeal.
The issue whether trial counsel were ineffective for failing to bring the issue of possible contamination to the attention of the trial court has no basis in fact and thus is without merit: counsel did object on the precise ground now asserted and obtained an adverse ruling.
The issue whether appellate counsel were ineffective for failing to raise the underlying substantive issue of contamination on appeal, as argued in Issue IV, is also without merit. Thomas has failed to meet his burden of proof: there is no showing on the record that the evidence was contaminated or that conditions of safeguarding the knife were so lax that it could have been contaminated. We can find no evidence in the record to support Thomas's conclusion that Officer Mitchell entered the victim's house before he seized the knife from Thomas's car and gave it to Officer Dempsey or that Officer Dempsey entered the house before he transferred the knife to Sergeant Clark. While Thomas argues to the contrarythat Officers Mitchell and Dempsey had gone into the victim's house and examined the crime scene before they handled the knifehe offers no citations to the record to support this bare assertion. He also failed to present any evidence on this point at the Rule 32 hearing. Moreover, the forensic scientist testified at trial that he did not recall any police officer on the scene who was wearing a uniform with green acetate fibers or pink polyester fibers (like those found on the knife blade). (R. 1209.) The possibility that the knife was contaminated by fibers and hairs picked up by the two officerswho were not shown to have been in the residence before handling the knifeis based on sheer speculation.
The law pertaining to chain of custody is stated in Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991),[21] as follows:
"Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. [Ex parte Williams, 548 So.2d 518, 520 (Ala.1989).] In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' McCray v. State, 548 So.2d 573, 576 (Ala.Cr.App.1988). Because the proponent of the item has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each *927 link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2)[the] ultimate disposition of the item, i.e., transfer, destruction or retention; and (3)[the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."
We are of the opinion that the evidence, albeit circumstantial, established the three criteria and, thus, the evidence was admissible, and its weight and credibility were left to the jury. In fact, defense counsel did a good job placing the issue of weight and credibility before the jury: he thoroughly cross-examined witnesses on the procedure used by the police to preserve the evidentiary integrity of the knife. See, e.g., R. 1172-73.
"`The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981)(emphasis supplied)."
Ex parte Williams, 548 So.2d 518, 520 (Ala.1989) (quoting Ex parte Williams, 505 So.2d 1254, 1255 (Ala.1987)).
As a final note, we point out that the other trace evidence, which remains beyond question, clearly buttresses the integrity of evidence on the knife. For example, an examination of the jeans which Thomas was wearing when he was arrested revealed fibers consistent with the victim's nightgown and also a hair similar to the victim's. An examination of Thomas's shoes revealed fibers similar to those of the carpet in the victim's bedroom.
The issue whether trial and appellate counsel were ineffective for failing to move to exclude the knife on the ground that the officers failed to preserve potentially exculpatory evidence has not been proven.
"`[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' [Arizona v.] Youngblood, 488 U.S. [51,] 58, 109 S.Ct. 333, 102 L.Ed.2d 281 ... [(1988)]. `The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' Youngblood, 488 U.S. at 57, 109 S.Ct. 333 (footnote)...."
Ex parte Gingo, 605 So.2d 1237, 1240-41 (Ala.1992), cert. denied, 506 U.S. 1049, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993). Thomas's general claim that the officers acted in bad faith is unsupported by any argument or even one citation of authority. The knife was seized in a potentially dangerous confrontation in which the officers were trying to arrest and pat down a combative, hostile, intoxicated person covered in blood. The knife was then transferred from one officer to another while the officers were trying to subdue Thomas and place him in a patrol car. We are unwilling to find that the officers acted in bad faith by not stopping the intense struggle long enough to slip the knife into a plastic bag. Moreover, at the time the knife was *928 seized, the knife had no apparent exculpatory value.
S. Thomas was denied a fair trial and sentencing by the prosecutor's allegedly improper statements and misconduct during the guilt phase.

In regard to our review of prosecutorial argument, we have adhered to the following principles.
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397 (Ala.Cr.App.1978), and we will not reverse the trial court on that issue unless there has been an abuse of that discretion, Miller v. State, 431 So.2d 586 (Ala.Cr.App.1983). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v. State, 423 So.2d 348 (Ala.Cr. App.1982). In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. In doing so, the prosecutor's comments must be evaluated in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990)[, aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992)]. If the argument is determined to be improper, the test, for review, is not whether the comments did influence the jury, but whether the comments could have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala.1986); Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App.1987), rev'd and remanded on other grounds, 523 So.2d 1118 (Ala.1988). In judging a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144... (1986)."
Gentry v. State, 689 So.2d 894, 905-06 (Ala.Cr.App.1994), rev'd on another ground, 689 So.2d 916 (Ala.1996). "[I]t `is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir.1983)). Furthermore, "As we have previously stated, the task of this Court in reviewing alleged acts of prosecutorial misconduct is to consider the impact of those acts in the context of the particular trial, and not view the allegedly improper acts in the abstract." Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
"Moreover, this Court has also held that statements of counsel in argument to the jury must be reviewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict."
Bankhead v. State, 585 So.2d 97, 106 (Ala. Cr.App.1989), aff'd in pertinent part, rem'd on another ground, 585 So.2d 112 (Ala.1991), opinion on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on another ground, 625 So.2d 1146 (Ala.1993). "The fact that an argument has emotional overtones does not independently indict it as improper, and the propriety of argument rests primarily in the relation of its content to issues relevant to the ... jury's concern." Rutledge v. State, 523 So.2d 1087, 1101 (Ala.Cr.App.1987), rev'd on another ground, 523 So.2d 1118 (Ala.1988).
In our review, we have considered Barksdale's expression of his trial strategy:
"I've been trying cases on a regular basis for 25 years, and I guess when I first started trying cases I thought, well, everything the other side does wrong or is perceived wrong, you get up and object. I guess that's what you learn in law school, but I found out later that that could be the worst thing you can do. I think that ... if there's something that's objectionable that can affect the *929 outcome of the trial, then ... you need to get up and object, but if it's something of a minor nature, then when you get up and object, all you are going to do is just call attention to it a second time. I tried not to object unless it was something of a crucial nature because I think it hurts you otherwise."
(Rule 32 R. 143-44.) Failure to object to argument is within the "wide range" of reasonable professional assistance for which a strong presumption of sound judgment is due. As Judge Bowen explained in his special concurrence in King v. State, 518 So.2d 191, 197-98 (Ala.Cr.App.1987):
"When a prosecutor makes an improper comment at trial, defense counsel has two choices. He can object and request curative instructions, hoping the trial judge will sustain his objection and give adequate instruction to the jury to disregard the improper remark. Whether or not the objection is sustained, he must question whether or not he has called the jury's attention to a bell that once rung cannot be unrung.
"Defense counsel's second choice is to attempt to deflate the significance of the prosecutor's comment by not objecting to it when made and by either responding to the comment in his rebuttal argument or simply ignoring it altogether."
We also note that the trial court instructed the jurors several times that their decision was to be based on the evidence alone, and that arguments of counsel were not evidence.
As we further explain infra, we are confident that, absent the alleged misconduct and allegedly improper remarks of the prosecutor, the jury's decision would not have been different. Thomas's trial cannot be said to have been fundamentally unfair. Thomas has failed to satisfy the "but for" test of Strickland.
60. The prosecutor's allegedly improper comments during his opening argument:

(a) The prosecutor stated that the indictment is a finding by the grand jury that there was a "likelihood" that the defendant had committed the crimes.

We have addressed this issue in Part II(i), supra, in regard to the allegations of ineffective trial and appellate counsel.
(b) The prosecutor made "repeated improper, inflammatory, and highly prejudicial statements, declaring several times, for example, that the victim had been `slaughtered.'" (Rule 32 C.R. 547.)

We have addressed this issue in Part II(i), supra, in regard to the allegations of ineffective trial and appellate counsel.
61. The prosecutor allegedly engaged in misconduct throughout the trial:[22]
(a) He elicited testimony from the victim's daughter that when she last saw the victim, the victim was in good health and looked "real good," (R. 1431), thereby "parading an emotional display of the victim's family members before the jury," (Rule 32 C.R. 548).

The underlying substantive issue, which Thomas presents in Issue XIX(a) (Brief, pp. 71-72), is precluded because it could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
Trial counsel was not ineffective in failing to object to this testimony. In Ex parte Slaton, 680 So.2d 909, 927-28 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), the Alabama Supreme Court reviewed the admission of *930 the victim's daughter's testimony at the guilt phase that before her mother's murder, she was in good health, she enjoyed working with crafts and gardening, and, as a result of throat surgery, she had trouble talking. Finding this information to be irrelevant, the court held, "Although the admission of this evidence was error, it was not prejudicial to Slaton's defense and was therefore harmless." Id. The court, citing Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), further found that the introduction of the daughter's testimony did not constitute federal constitutional error.
Upon this authority, we also find to be without merit Thomas's assertion (in Issue IV) that appellate counsel was ineffective for failing to raise the propriety of the testimony on direct appeal.
(b) The prosecutor had several state's witnesses refer to and testify from notes when, Thomas argues, no foundation had been laid that the witnesses either lacked a present recollection or that there was any other reason their testimony should have been exempted from the prohibition against the admission of hearsay.

We have addressed the claims of ineffective trial and appellate counsel in regard to this issue in Part II(j), supra.
(c) "The prosecutor called several witnesses in his case-in-chief solely for the purpose of eliciting testimony rebutting Mr. Thomas's anticipated defenses before Mr. Thomas had had the opportunity to introduce any evidence in his defense. (R. 1274-85; R. 1286-95.)" (Rule 32 C.R. 518.)

This statement is Thomas's entire argument. We assume that, by citing the above page numbers, he is referring to the complete testimony of witnesses Addie Siniard and Kathy Guess Pylant. Siniard testified that on the evening of December 14, 1984, she went to a party at the residence of Marshall Pylant and Kathy Guess; that Thomas arrived between 8:00 and 8:30 p.m.; that Thomas left for about 15 minutes at around 8:30; that he was wearing a beige velour shirt, which she identified as Exhibit B-1 (which was the shirt found in the victim's bedroom with a hair on it consistent with Thomas's head hair); that he was carrying a pocketknife; that Thomas and Pylant talked about the point of the knife being broken off; that she turned down his offer to leave the party and go out to eat; that shortly before Thomas left, Dot Carter showed up at the party and was very angry at Thomas; that he did not say or do anything bizarre at the party, but appeared to understand where he was and what he was doing; that he was drinking alcohol and smoking marijuana, and was staggering when he left; and that when he left between midnight and 12:30 a.m., he said that he had to go home because he had to go to work the next morning.
Kathy Guess Pylant testified that Thomas arrived at the party between 6:00 and 6:30; that, like the other men there, Thomas was drinking beer and whiskey and smoking marijuana; that the men smoked four or five joints; that she did not see Thomas do or say anything bizarre; that Dot Carter had an argument with Thomas between 7:00 and 8:00 p.m.; that when he left in his vehicle between midnight and 1:00 a.m., he said that he had to go to work the next morning; and that he was very intoxicated when he left.
The underlying substantive issue, which Thomas raises in Issue XIX(c) (Brief, p. 72), is precluded because it could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
The issue whether trial counsel was ineffective in failing to object to the testimony of these two witnesses is without merit. Even assuming this testimony rebutted Thomas's anticipated defenses, Thomas has failed to establish prejudice. In Brown v. State, 686 So.2d 385, 408 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), the court, holding that the introduction in the prosecution's case-in-chief of evidence that *931 allegedly rebutted the appellant's insanity defense was harmless error, stated:
"Although it may have been the better practice for the State to have reserved this evidence until the appellant raised his insanity defense, we do not believe that the appellant was harmed by the admission of this evidence during the State's case-in-chief. Defense counsel told the jury during opening arguments that the appellant had pleaded not guilty by reason of insanity and that the defense intended to put on experts who would testify that the appellant was suffering from a mental disorder when these crimes occurred. Thus, the State, in anticipation of the appellant's insanity defense, had a right to produce evidence rebutting the appellant's defense."
In the opening statement in the present case, defense counsel explained to the jury that Thomas is mentally retarded; that he has a history of mental illness; that on the day before the crimes, he was drinking and smoking marijuana; that, before being found at the scene, he had been to a bar where he had badly cut his finger in a fight; that, upon seeing the bloody victim on the floor, he "freaked out" and tried to flee from the victim's house; and that he blacked out and has no memory from the point of trying to flee from the house until he woke up in jail.
Upon the reasoning in Brown, we also find that the issue of ineffective assistance of appellate counsel, asserted in Issue IV., is without merit.
(d) The prosecutor elicited allegedly irrelevant, prejudicial testimony from several state's witnesses.

As examples, Thomas refers to the testimony of Ava Gilbert, who came on duty as an employee of the Athens City Police Department at 6:00 a.m. on the morning Thomas was arrested. Thomas specifies as objectionable her testimony that Thomas "looked mean and wild," was "mean looking," and was "nervous acting." (R. 1050.) Defense counsel moved to strike this testimony, and the trial court responded that "there seems to be some question about his condition" and that because words like "mean" and "wild" are not conducive to precise definitions, the meaning intended by the witness could be discerned on cross-examination. Thomas further highlights Gilbert's testimony that Thomas cursed all day after his arrest. (R. 1051-52.) He also refers to the testimony of Lisa Ham, who was on duty as an employee of the Athens City Police Department when Thomas was brought to the jail after his arrest, that Thomas screamed "motherfucker" and "goddamn pigs" for 5 or 10 minutes after he arrived. (R. 1043.)
The substantive issue, which is presented in Issue XIX(d) (Brief, 72-73), is precluded because, with the exception of the first set of comments by Gilbert, the issue could have been asserted at trial, but was not. Rule 32.2(a)(3). The issue, as to the first set of comments by Gilbert, is precluded because it was raised and addressed at trial. Rule 32.2(a)(2). Moreover, the issue as to all statements is precluded because it could have been, but was not, raised on appeal. Rule 32.2(a)(5).
The contention that trial counsel was ineffective in failing to object to that testimony not objected to and the contention that appellate counsel was ineffective in failing to raise the substantive issue are without merit. Thomas has shown no prejudice. The evidence that he acted nervous, looked wild and mean, and repeatedly used profanity was cumulative of other testimony properly admitted. See, e.g., R. 784, 899, 922, and 979. Moreover, it was not only harmless in light of the record in its entirety but bolstered Thomas's defense of not guilty by reason of mental disease or defect. The introduction of such evidence without objecting was, in our opinion, a matter of trial strategy.
(e) "The prosecutor frequently led his witnesses on direct and re-direct examination, asked them repetitive questions and questions that had been asked and answered, and asked them questions on *932 re-direct examination that exceeded the scope of what they had been asked on cross-examination." (Rule 32 C.R. 549.)

This statement is Thomas's entire argument. We will not legitimize this mere statement with any consideration. Even if we were inclined to do otherwise, how could we treat the merits when the prosecution's case was presented through 34 witnesses? Once again, we remind Thomas of the critical specificity requirement of Rule 32.6(d), specifically the requirement of "full disclosure of the factual basis." Accordingly, Thomas has failed to prove ineffective trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(e) (Brief, p. 73), is properly precluded.
(f) "The prosecutor improperly bolstered the testimony of State witnesses and pre-empted meaningful cross-examination by the defense." (Rule 32 C.R. 549.)

Once more, Thomas has chosen to forgo any factual or legal treatment: the above statement is to this court, and was to the circuit court, his entire argument. Here, again, by failing to meet the specificity requirement of Rule 32.6(d), Thomas did not prove ineffective trial or appellate counsel (Issue IV). The underlying substantive issue, as presented in Issue XIX(f) (Brief, p. 73), is precluded.
(g) The prosecutor asked questions without laying the required evidentiary predicate before doing so and improperly impeached witnesses with statements allegedly made to other witnesses without ever "completing the impeachment" by calling those witnesses to testify.

The only specific example of the prosecutor's failure to lay a proper predicate argued to the circuit court (Rule 32 C.R. 549-50) and to this court is that after asking Thomas if he remembered three specific fellow inmates at Limestone Correctional Facility, the prosecutor asked, "You don't remember telling some folks down there when you got back that you had really faked all those doctors down there at Taylor Hardin?" (R. 1733.) When Thomas answered that he did not remember, the prosecutor asked, "You don't remember telling anybody that?" (R. 1733.) Thomas again answered no. The prosecutor did not call any of the three inmates as witnesses.
We are unwilling to hold, on the record before us, that trial counsel were ineffective in failing to object to this questioning: Thomas has failed to meet his burden of establishing that defense counsel's failure to object fell "outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. 2052. Rule 32 counsel did not prove, from the prosecutor or any of the three named inmates, that Thomas never made such a statement. Moreover, he did not question Barksdale about this incident. For all we know, Barksdale had reason to know that Thomas had made such a statement or a reason not to want a witness who could have proved that Thomas had made such a statement to testify. Because of Thomas's failure to support his allegation with evidence, we cannot "reconstruct the circumstances of counsel's challenged conduct, and .... evaluate the conduct from counsel's perspective at the time," 466 U.S. at 689, 104 S.Ct. 2052. In recognizing the inherent difficulties in attempting such an evaluation, the Supreme Court declared that a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. Without some indication that the facts were such that Barksdale should have objected, Thomas has not overcome the presumption that defense counsel's failure to act was sound trial strategy.
We further find that Thomas has failed to meet his burden of proof in regard to his claim of appellate counsel. In his seven-sentence argument, he cites no authority for his claim that, had counsel asserted this issue on appeal, there is a reasonable probability that he would have prevailed.
*933 The underlying substantive issue, as presented in Issue XIX(g) (Brief, p. 73-74), is precluded.
(h) "During the course of examining witnesses, the prosecutor also improperly repeated and highlighted witnesses' answers, elicited prior consistent statements of witnesses without their having been impeached with prior inconsistent statements, commented on their testimony, and elicited testimony which, when considered in relation to other testimony in the case, left the jury with biased and erroneous impressions about the evidence." (Rule 32 C.R. 550.)

This sentence is Thomas's entire argument. Again, we will not legitimize this general argument with any consideration. Even if we were inclined to do otherwise, how could we treat the merits when 51 witnesses testified? Once again, we remind Thomas of the critical requirement of "full disclosure of the factual basis." Rule 32.6(d). Accordingly, Thomas has failed to prove ineffective trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(h) (Brief, p. 74), is procedurally barred.
62. and 63. The prosecutor made the following allegedly improper, prejudicial statements comments during his closing arguments of the guilt phase:[23]
(a) The prosecutor referred to the victim's personal characteristics and life history in an allegedly improper effort to project the trial as a contest between Thomas and the victim and the victim's family.

By referring to R. 1828, we assume that Thomas is referring to the following comments:
"As a teenager, [the victim] saw the doughboys go off to Europe during World War I. As a young mother, she kept a family together and raised them during the great depression and then, as a fairly young adult, she saw two million persons go off again to Europe, many of them not returning, to fight in World War II. She lived through tornadoes and droughts and bad times. She lived through killer tornadoes in the 1930s that killed 200 people in the southeast and the killer tornadoes of 1974 that claimed the lives of 6 or 7 people here in this county."
The prosecutor concluded this vein of argument with, "About 11:45 on December 14, 1984, ... the evidence has shown you that this man up here, this criminal, was going into her yard and about to commit one of the most atrocious crimes in the history of this county."
While we find that these comments were outside the evidence, we can find no prejudice, certainly none rising to such a level as to project the trial as a contest between Thomas and the victim and the victim's family. There is no reasonable likelihood that these comments so infected the trial as to deny Thomas a fair trial. Accordingly, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(a) (Brief, p. 75), is procedurally barred by Rule 32.2(a)(3) and (5).
(b) The prosecutor repeatedly referred to Thomas as "this street punk," "this criminal," "this thug," "a murderer," and a "manipulator."
Our review of the prosecutor's closing argument reflects that the prosecutor did not repeatedly call Thomas names: he called him "this street punk" three *934 times; "this criminal" once; "this thug" twice; "a murderer" once; and a "manipulator" once. "[T]he prosecutor, in the appropriate case, may use opprobrious terms to characterize the accused or his conduct, provided that the remarks are in accord with the evidence." Bankhead v. State, 585 So.2d at 105.
We find the above characterizations appropriate in this case. For example, in regard to the prosecutor's descriptions of Thomas as a "street punk," a "criminal," and a "thug," we note that in opening argument (R. 740-45), defense counsel portrayed Thomas this way, and the defense relied on the evidence in presenting the circumstances and consequences of Thomas's childhood: he was taught by his father at age five to steal, he frequently stayed out all night with his father, he was arrested at age 12 for starting a fire at a church, he stole from a teacher as a child and stole as an adult, he frequently took illegal drugs, etc. See, e.g., Bankhead v. State, 585 So.2d at 106 (use of term "punk" to describe defendant supported by evidence).
The prosecutor used the term "murderer," saying that the "murderer" left a "calling card": a bloody fingerprint on a check found in the victim's storage room. This was a permissible comment. Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925). See also Kinard v. State, 495 So.2d 705, 711-12 (Ala.Cr.App.1986) (the prosecutor's statement that the appellant was "an unmitigated liar and murderer" in murder prosecution "resulted in no apparent prejudice to the appellant" and "did not have `a natural tendency to influence the finding of the jury' and therefore would not require a reversal").
We also find that the prosecutor's reference to Thomas as a "manipulator" was supported by the evidence. Thomas testified that he had "always had a way with women," and thus was able to talk a female cashier into cashing a forged check (R. 1711); that he maimed himself three or four times while in jail so that he could get "a shot of dope" at the hospital (R. 1715); that it is not "hard for [him] to get women" (R. 1719); and that he hid his drug abuse from his mother (R. 1736). See Arthur v. State, 575 So.2d 1165 (Ala.Cr. App.1996) (the prosecutor's comment that the appellant was a manipulator was not improper and highly prejudicial because it was a reasonable inference from the facts in evidence, including his relationship with a number of females, his work-related behavior, and his exploitation of the work release program), aff'd, 711 So.2d 1097 (Ala.1997).
Based on the above considerations, we find that Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(b) (Brief, p. 75), is procedurally barred by Rule 32.2(a)(3) and (5).
(c) The prosecutor stated that the case was about "murder and meanness" and "murder and mayhem" and compared the case to others by stating that the offense was "one of the most atrocious crimes in the history of this county" and "one of the most saddest slaughters in its history." (R. 1828.)

The prosecutor's comments that the case was about "murder and meanness" and "murder and mayhem" were a legitimate, proper response to defense counsel's opening remark, "This is a story of murder and madness." (R. 732.) "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala.1994). See McWilliams v. State, 640 So.2d 982, 1002 (Ala.Cr.App.1991) (the appellant was not denied due process by the prosecutor's comment that "the evidence presented concerning the appellant's mental state indicated not that he was mentally ill, but rather that he was simply mean" because "[t]his argument was based on the report from the lunacy commission stating that the appellant did not have a mental defect, *935 but rather had a character defect and repercussions from that defect"), aff'd in pertinent part, 640 So.2d 1015 (Ala.1993), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 (1996).
In regard to Thomas's allegation of the prosecutor's unfavorable comparison of this case with others, we note that the prosecutor did not say that these observations were his personal opinion. Thus these comments did not have the impact of the comments in Jackson v. State, 674 So.2d 1318, 1335 (Ala.Cr.App.1993), aff'd in pertinent part, 674 So.2d 1365 (Ala. 1994). There, the trial court had to admonish the prosecutor not to make arguments that "of all the cases I have tried... this case was the most...." Id. at 1335. In finding no reversible error, the court stated:
"The trial court gave the jury subsequent instructions as to its evaluation of the attorneys' comments. Moreover, these comments must not be viewed in the abstract. Wysinger v. State, 448 So.2d 435 (Ala.Cr.App.1983).
"`In light of the brevity and isolated nature of the remarks and the thorough instructions of the trial court which charged the jury that they were the exclusive judges of the evidence in the case and the sole judges of the credibility of the witnesses, we find that the remarks, although inappropriate, do not constitute reversible error. The statements did not so infect the trial with unfairness "as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 ... (1986) (citation omitted)."
"Dill v. State, 600 So.2d [343,] 358-59 [(Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992)].
"The record reveals only one remark by the prosecutor that clearly indicated any type of comparison with other cases. This remark, in the context of the entire argument, did not constitute reversible error.
"In Smith v. State, 588 So.2d 561, 572 (Ala.Cr.App.1991), the appellant argued that the prosecutor improperly commented that `this case is one of the most gruesome and terrible [cases] that I have ever been involved with.' This court held:
"`This comment was based on a legitimate inference drawn from the evidence and did not constitute an impermissible injection of the prosecutor's personal opinion. The atrocity of this crime was clearly in evidence through the admission of the pictures, as well as through the testimony of the witnesses to the scene of the crime and the physician's testimony to the condition of the victim's body.'
"See also Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990), reversed, 581 So.2d 531 (Ala.1991) (Alabama Supreme Court held as plain error a comment by the prosecutor inferring that the defendant would kill again, but did not find as plain error the prosecutor's statement that the defendant was one of the worst ever to come into the county.)"
674 So.2d at 1335. As the court in Smith, 581 So.2d at 519, observed, such a comment is simply one made "in the heat of debate." Compare also Carroll v. State, 599 So.2d 1253, 1269 (Ala.Cr.App.1992) ("The prosecutor's argument, `I have tried several capital cases. To me this is the worst,' was improper because it constituted a comment that was not based on the evidence and because it injected the personal knowledge and opinion of the prosecutor into this case. Johnson v. State, 246 Ala. 630, 22 So.2d 105 (1945)."), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
Considering the circumstancesincluding the prosecutor's failure to characterize the comparisons as his personal opinion and also including the atrocity of the crimes committedwe find that Thomas has failed to prove ineffective assistance of *936 trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(c) (Brief, p. 75), is procedurally barred by Rule 32.2(a)(3) and (5).
(d) The prosecutor stated that this case was "about a street punk [who] took the very best that this community had to offer and spit in this community's face" and that Thomas "had the advantage of having psychologists and counsellors as he grew up to help him with whatever problems that he had, but all the social workers, the preachers, the foster parents, the teachers, and the psychologists together couldn't keep this kid from being what he was and what he isevil, mean, and violent." (R. 1829.)

Thomas argues that, by these comments, the prosecutor was asking the jury to ignore mitigating evidence, was improperly characterizing mitigating evidence as aggravating evidence, and was grossly mischaracterizing Thomas's "sad and pitiable upbringing." (Rule 32 R. 551.)
We first note that these comments were made during the guilt phase and thus at that point any mitigating circumstance was not before the jury for consideration. Moreover, when the mitigating evidence did become relevantat the sentencing phase before the jurythe trial court thoroughly and properly instructed the jury on all the statutory and nonstatutory mitigating circumstances. These comments during the guilt phase in no way restricted the jury's consideration of the mitigating circumstances. We are unwilling to hold that these comments were not legitimate references from the evidence made in the heat of debate. Even Thomas testified (on cross-examination) that, although as a minor he went from foster home to foster home, each trying to provide him a good home, he continued to steal, to forge checks, and to take drugs. (R. 1733-35.) Certainly, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.
The underlying substantive issue, as presented in Issue XIX(d) (Brief, p. 76), is procedurally barred by Rule 32.2(a)(3) and (5).
(e) The prosecutor stated, "This case is about a street punk who has been excused by this community and society for everything that he ever did wrong before." (R. 1828-29.)

Thomas contends that this comment misled the jury about his prior criminal record. He fails to specify how this comment misled the jury. We will not speculate. Thomas's unlawful behavior, especially as a minor, was a significant topic in defense counsel's opening statement and was repeatedly referred to during the presentation of Thomas's case. While Thomas had been incarcerated on a second conviction for theft, any inaccuracy in the prosecutor's comment quoted above is insignificant, especially in light of defense counsel's comments in opening, "He was sent to prison, as he should have been. He paid his debt...." (R. 745.) Again, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV).
The underlying substantive issue, as presented in Issue XIX(e) (Brief, p. 76), is procedurally barred by Rule 32.2(a)(3) and (5).
(f) The prosecutor stated that Thomas "seem[ed] to claim" that he was "one of the biggest potheads in the world" (R. 1831)[24]; that "[y]ou [the jury] heard the *937 Defendant ... brag about his prior drug use" (R. 1856); and "[y]ou saw his face light up, and he almost got gleeful as he described that" (R. 1856).

Thomas claims that these comments distorted and mischaracterized his testimony. Thomas testified on direct as follows:
"A.... I started off on pot, then I startedthe first time I ever done hard drugs was a quaalude 714they don't make them no more.... I went from a half to a whole. Then acid, you know. You start and you work your way up.
". . . .
"Q. [Y]ou went from a quaalude, did you say, to LSD?
"A. Well, I didn't do LSD then. I went to orange sunshine, purple micro dot, chocolate mescaline, and that kind of an acid.
". . . .
"Q. What would [orange sunshine] do to you when you would take it?
"A. It would make you see stuff crawling on you. See stuff coming down the wall. You would be driving and looking at the red light getting further and further away from you. You see stuff you wouldn't see if you ain't high if you hadn't taken it.
"Q. Was that enjoyable to see all that stuff?
"A. Yes. To me it was.
"Q. Why?
"A. Because it was fun. I don't know. I just liked it. I just liked to see it.
". . . .
"Q. [D]id LSD 25 make you see things, too?
"A. Yes, sir. One night I done two of them out there in Houston, Texas. When I got through doing it, they took a picture of me. They showed it to me the next morning. I sure enough looked wild.... That's rough acid right there.
". . . .
"Q. Now, did you take anything else besides the quaaludes and the LSD before you started shooting stuff?
"A. Yes. I took Valiums and a lot of speed and daytimes and speckled birds and stuff like that.
". . . .
"Q. When you were taking this stuff by mouth, how often were you taking drugs?
"A. Well, downers, you know, them downers, I would do them when I first started out. I done downers, quaaludes, and Valiums, and stuff like that on weekends. Speed, I was taking speed everyday....
". . . .
"Q. Now, then you mentioned that you started shooting drugs. What do you mean by that, Kenny?
". . . .
"A. The first time I ever did any, Jimmy hit me.... He said, `Do you want to try any of this?' I said, `I'll try anything once.' That probably is what my problem was.
". . . .
"Q. Tell us every drug that you have shot into your veins including the LSDs. "A. Well, plastic deal, Seconals. I shot them. Acid, Percodans, Talwins, Tuinal, Demerol, morphine, and Valium.... I about shot everything that would break down in a spoon.... I loved that crystal because it was speed."
(R. 1704-08.) In addition, Thomas testified, "I smoked a joint about every morning before I even got to work." (R. 1722.); on the day of the crimes, he and a coworker "smoked all day long ..., about 15 or 20 [marijuana joints]" (R. 1723); he "sure was" "a junkie" (R. 1736); and "if you [the prosecutor] smoked a joint, you would probably get wasted [but s]omebody like me, I can stand to smoke to 15 or 20 a day." (R. 1741). From this testimony, we find the prosecutor's comments interpreting the tenor of this testimony to be reasonable, but clearly such a conclusion was within the discretion of the trial court. We find the circuit court's rejection of Thomas's claims of ineffective trial and *938 appellate counsel in this regard to be a proper exercise of its discretion. The underlying substantive issue, as presented in Issue XIX(f) (Brief, pp. 76-77), is procedurally barred by Rule 32.2(a)(3) and (5).
(g) The prosecutor stated, in regard to the absence of blood on the steering wheel and gear shift of Thomas's car, "He told you, perhaps, the most incredible story about the fight in Ardmore [to explain the blood all over him and the cut on his finger] and jumping into the car and driving home." (R. 1838-39); the prosecutor also stated "It's a statement of the lies tied together with other lies with one big hole right in the middle." (R. 1851); and he also stated that Thomas, in regard to his testimony that he had eaten lightbulbs, "lied about it." (R. 1857).

Thomas claims that, in so commenting, the prosecutor was expressing his personal opinion about Thomas's testimony. We disagree. In Bankhead v. State, 585 So.2d at 105-06, where the appellant's credibility was a fundamental issue for the jury's determination, the court held that it was permissible for the prosecutor to devote a substantial portion of the state's argument to persuading the jury that the state's two witnesses were more credible than the appellant and that the evidence was more consistent with their version of the events. The court held, "The credibility of a witness is a legitimate subject for criticism and discussion by either party during closing arguments." Id. at 105. Based on this rule, the court also found that the prosecutor's references to the appellant as a "liar" were supported by the evidence and were therefore also permissible. See Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App.1988). See also United States v. Willis, 759 F.2d 1486, 1502 (11th Cir.1985) (in describing the appellants' defenses as "incredible and ludicrous," the prosecutor was not expressing personal opinion as to the appellant's guilt, but was merely drawing logical, noninflammatory inferences from the facts), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); Holladay v. State, 629 So.2d 673, 684 (Ala.Cr.App.1992) (counsel was not ineffective for failing to object to prosecutor's closing argument on lack of credibility of the appellant's testimony; comments were reasonable inferences from the evidence); Smith v. State, 588 So.2d at 571 (the court approved the prosecutor's guilt-phase closing remarks that the testimony of a defense witness was "astonishing" and that the witness was "trying to mislead" the jury; the court found them to be proper inferences from the evidence). Trial counsel were not ineffective in failing to object to these comments, and appellate counsel were not ineffective in failing to raise the plain error review of them on appeal.
The underlying substantive issue, as presented in Issue XIX(g) (Brief, p. 77), is procedurally barred by Rule 32.2(a)(3) and (5).
(h) The prosecutor shifted the burden of proof to the defense by stating that Thomas's testimony was "unprovable and unsubstantiated." (R. 1857.)

This comment was a specific reference to Thomas's testimony that, while incarcerated, he ate lightbulbs. In arguing that Thomas lied about these events, the prosecutor argued that Thomas produced no hospital records to substantiate his claims that he had tried to kill himself in this manner. The prosecutor was not shifting the burden of proof, but merely commenting on Thomas's credibility, on the lack of evidence to refute the facts presented by the prosecution, and on the omissions in the defense's case. See Haney v. State, 603 So.2d 368, 397 (Ala.Cr. App.1991) (prosecutor's comments regarding the failure of the defense to produce certain medical records were not improper; they were legitimate comments on the evidence), aff'd, 603 So.2d 412 (1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Speigner v. State, 369 So.2d 39, 44 (Ala.Cr.App.1979), cert. denied, 369 So.2d 46 (Ala.1979). Moreover, Thomas's testimony about his alleged suicide attempts was offered in support of his *939 insanity defense. Thomas had the burden of proving the defense of not guilty by reason of mental disease or defect. See § 13A-3-1(c). The burden was not shifted. Trial counsel were not ineffective in failing to object to this comment, and appellate counsel were not ineffective in failing to have it reviewed on direct appeal.
The underlying substantive issue, as presented in Issue XIX(h) (Brief, p. 77), is procedurally barred by Rule 32.2(a)(3) and (5).
(i) The prosecutor told the jury, "You saw the most despicable and inhumane photographs that I think a jury has ever seen." (R. 1830); the victim had been "cut, slashed, and maybe a better word was tortured" (R. 1830); and "[t]he sickening grotesque evidence [was] overwhelming" that the victim had been sexually abused, (R. 1851).

The prosecutor followed the first comment above with the question, "[C]an there be any question in a reasonable person's mind that this lady was sexually abused?" (R. 1830.)
Thomas contends that these comments were an exaggeration of the evidence. We find that they were in the permissible range of prosecutorial interpretation of the evidence presented to the jury. Even defense counsel began his opening statement by stating, "This is a story ... of an innocent and saintly woman ... who was brutally murdered under very bizarre circumstances." (R. 732.) Moreover, the comments actually support Thomas's version that he did not participate in the commission of the crimes: Thomas testified, in regard to seeing the victim, "I freaked out. I never seen nothing like that before." Thus, we find that trial counsel were not ineffective in failing to object to these comments, and appellate counsel were not ineffective in failing to have them reviewed on direct appeal.
The underlying substantive issue, as presented in Issue XIX(i) (Brief, p. 77), is procedurally barred by Rule 32.2(a)(3) and (5).
(j) The prosecutor stated, "In my judgment, the most probative witness to insanity alone was Dr. Hardin." (R. 1855); "What I thought was most important is that [Dr. Hardin] said ... that he was more or less convinced of this man's sanity about as strong as [he] ever has been of anyone." (R. 1856); and "Dr. Hardin, I believe, sunk whatever defense of insanity there was." (R. 1856).

The prosecutor made the above comments in the context of comparing the testimonies of the experts on the issue of Thomas's mental state at the time of the crimes. He pointed out that of the three defense experts (Dr. Brown, Lee, and Dr. Crowder), only Dr. Crowder testified as to Thomas's mental state at the time of the crimes, and he merely speculated that it was possible that Thomas suffered from some type of psychosis. The prosecutor followed this observation with the reminder that Dr. Hardin arrived at his opinion after extensive observation and study of Thomas. The prosecutor followed the contested comments with the observation, "[T]he validity of the insanity defense will be for you to decide." (R. 1856.)
Thomas contends that, by these comments, the prosecutor gave his personal opinion in vouching for the state's expert witness, Dr. Hardin. A prosecutor's personally vouching for the credibility of a state's witness, i.e., improperly attempt to bolster the witness's testimony, has been "soundly condemned." Ex parte Parker, 610 So.2d 1181, 1183 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). See generally Guthrie v. State, 616 So.2d 914, 929-31 (Ala.Cr. App.1993), aff'd, 689 So.2d 951 (Ala.1997), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). However, those comments that constitute personal vouching are not necessarily easily distinguished from proper comments, as illustrated by the following findings in Ex parte Rieber, 663 So.2d 999, 1014 (Ala.1995), cert. denied, *940 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995):
"[W]e view those comments that the prosecutor prefaced with `I think,' `I believe,' `I feel,' `I am satisfied,' and `I have no doubt,' as expressing his reasonable impressions from the evidence. The prosecutor was allowed to argue every legitimate inference from the evidence, and the trial court was afforded wide discretion in regulating his comments. We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as `crossing the line' of permissible argument, they, nonetheless, would not constitute reversible error. There is no fixed standard for determining whether a prosecutor's comments so prejudiced the factfinding process as to require a new trial. Each case must be judged on its own merits. Hooks v. State, [534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989)]; Racine v. State, [290 Ala. 225, 275 So.2d 655 (1973)]. These remarks by the prosecutor were not as potentially prejudicial as those of the prosecutors in Ex parte Parker, supra, wherein we held that the prosecutors' remarks did not undermine the fundamental fairness of the trial. We further note that the prosecutor, referring to State's witness Tommy Erskine, stated: `He was extremely believable to me.' This isolated comment, although improperly expressing the prosecutor's personal opinion as to Erskine's credibility, likewise did not constitute reversible error. Ex parte Parker."
Compare remarks reviewed in Arthur v. State, 575 So.2d 1165, 1180-84 (Ala.Cr. App.1990), cert. denied, 575 So.2d 1191 (Ala.1991); and King v. State, 518 So.2d 191 (Ala.Cr.App.1987).
While arguably one or two of these comments bordered on inappropriate, they were not so inappropriate as to undermine the fairness of Thomas's trial. The prosecutor was arguing the effect of the witness's testimony. Moreover, there is no implication in his comments that he had reasons not known by the jury, i.e., reasons other than those arising from the evidence before the jury, for knowing that what the witness said was true. In addition, the prosecutor gave neither his personal assurance nor guarantee of Dr. Hardin's veracity. See DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Cr.App.1993) (in holding that it was not improper vouching for prosecutor to comment, "I'll submit to you, [the state's main witness] is telling you the truth," the court observed that the credibility of a witness is a legitimate subject of discussion, and the prosecutor's remark was grounded on some testimony given by the witness himself), aff'd, 651 So.2d 624 (Ala.1994). Finally, we note that the trial court instructed the jury at the beginning of the trial, as follows:
"It is the duty of the jury to take the evidence as it comes to you and decide from the evidence what the true facts are. You and you alone are the sole judges of the facts in this case.
". . . .
"As members of the jury, you have taken an oath to try this case on the evidence as it comes to you and on the law of the state as I give it to you. That is your duty to try it on the facts as you determine them and the law as I give it to you. Now, the evidence, as I said, comes from the witness stand. Statements of the attorneys are not evidence. Their statements are intended to help you in understanding this case and help you in carrying [out] your duties. Their statements are not evidence. They fall into a different category from the evidence. Their statements are important and evidence is important, but they fall in different categories."
(R. 690-91.) After considering these factors, we find that the prosecutor's comments had no effect on the jury's ability to judge the evidence fairly. Nonetheless, we take this opportunity to once again remind prosecutors to avoid making comments that may be taken as personal guarantees *941 of the credibility of the state's witnesses.
Thus, we find that Thomas has failed to establish that trial or appellate counsel were ineffective in failing to contest these comments.
The underlying substantive issue, as presented in Issue XIX(j) (Brief, pp. 77-78), is procedurally barred by Rule 32.2(a)(3) and (5).
(k) The prosecutor stated, "There is no real evidence presented by the defense that at the time of the crime ... this man was suffering from a mental disease or defect. There may be some speculation and guesswork and projection." (R. 1853.)

Thomas contends that, by these comments, the prosecutor improperly expressed his personal opinion of the defense's evidence regarding Thomas's mental state. We disagree. The comments were merely permissible deductions and conclusions based upon the evidence.
"`The remark of the State's attorney was no more than a comment that a certain phase of the State's evidence was uncontradicted. Certainly, the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength. That certain evidence is uncontradicted tends to show its strength.'"
Welch v. State, 263 Ala. 57, 58, 81 So.2d 901, 902 (1955) (quoting Littlefield v. State, 36 Ala.App. 507, 512-13, 63 So.2d 565, 570 (1953), cert. denied, 258 Ala. 532, 63 So.2d 573 (1952)). Thomas has failed to establish that trial counsel or appellate counsel were ineffective in failing to contest these comments.
The underlying substantive issue, as presented in Issue XIX(k) (Brief, p. 78), is procedurally barred by Rule 32.2(a)(3) and (5).
(l) The prosecutor allegedly falsely stated that Thomas had been "committing felonies" at the party he attended earlier in the evening of the capital offense (R. 1837.)

This comment by the prosecutor was an isolated remark; no other reference was made to Thomas having committed felonies at the party. Further, it was made in the context of describing the testimony of one of the witnesses who had been at the party: "One said that at the party [Thomas] was reveling in whiskey and marijuana and getting drunk and intoxicated and committing felonies there in the mobile home...." Thomas has failed to meet his burden in proving the ineffectiveness of trial or appellate counsel, particularly in light of Thomas's testimony that he had contributed $5.00 to purchase a "dime" bag of marijuana during the party and that he had shared it with others at the party (R. 1724). The underlying substantive issue, as presented in Issue XIX(l) (Brief, p. 78), is procedurally barred by Rule 32.2(a)(3) and (5).
(m) The prosecutor stated to the jury, "You are going to have to decide who you want to believe." (R. 1836).

Thomas argues that, by this remark, the prosecutor suggested that in order for the jury to reject the testimony of the state's witnesses, it would have to accept the testimony of the defense witnesses. This remark was made in regard to the conflict in the evidence as to what time Thomas left the party. As noted, supra at II(o)S.62 and 63(g), the credibility of witnesses is a legitimate subject for discussion during closing arguments.
Thomas has again failed to establish ineffectiveness of either trial or appellate counsel.
The underlying substantive issue, as presented in Issue XIX(m) (Brief, p. 78), is procedurally barred by Rule 32.2(a)(3) and (5).
(n) The prosecutor, in regard to the two defense witnesses who estimated the time Thomas left the party, stated that they "were drunk and intoxicated and have at least an admitted prejudice for this Defendant because they are either related or friends" (R. 1838), and further stated that "[h]e is the one *942 that brings the dope and whiskey to the parties" (R. 1838), thereby allegedly suggesting that the witnesses were beholding to Thomas; and the prosecutor referred to defense witness Dr. Charles Brown as "Little Charlie Brown" (R.1854).

Thomas contends that, by these remarks, the prosecutor impugned defense witnesses. The remarks about the two defense witnesses who were at the party were permissible and were factually accurate. As noted, supra, the credibility of the witnesses is within the proper scope of argument. Flint v. State, 370 So.2d 332 (Ala.Cr.App.1979). Moreover, the remarks were supported by the evidence. See Hunt v. State, 659 So.2d 933, 943 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.1995), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995); Jackson v. State, 674 So.2d 1318, 1336-37 (Ala.Cr. App.1993), aff'd as to conviction, remanded for new sentencing, 674 So.2d 1365 (Ala.1994). Marshall Pylant, one of the two defense witnesses at the party, testified that he was a friend of Thomas's, that he (Pylant) got "pretty drunk" at the party, that Thomas brought beer to the party, and that Thomas bought the marijuana that was smoked at the party. The other defense witness, Leland Haggermaker, testified that he was "pretty well lit" at the party and that he is Thomas's second cousin. Moreover, Thomas testified that these two witnesses were drunk at the party; that he had contributed money to buy a bag of marijuana that contained enough marijuana to make about six joints that were passed around to the party guests; and that he and another person had brought two pints of whiskey to the party, but Pylant did not drink any because he and Jeff had brought it. The prosecutor contrasted these defense witnesses against the two state witnesses who testified as to the time that they saw Thomas near the crime scene: Brenda Pressnell and Penny Corum. The latter two, he pointed out, had not been drinking or smoking marijuana at a party nor did they have any vested interest in the outcome of the case, and they could base their time estimates on known, established facts and events.
Although the prosecutor's sole reference to Dr. Brown was inappropriate, it was not prejudicial.
We find that trial counsel's failure to object to these comments was not ineffective nor was appellate counsel's failure to raise them ineffective.
The underlying substantive issue, as presented in Issue XIX(n) (Brief, pp. 78-79), is procedurally barred by Rule 32.2(a)(3) and (5).
(o) The prosecutor characterized the testimonies of Pressnell and Corum, two state's witnesses who placed Thomas in the immediate vicinity of the crimes at the estimated time of the commission of them, as "critical and believable" (R. 1838), and stated that they "had very logical explanations for what they saw and what time it was" when they saw Thomas (R. 1837).

Thomas contends that, by these comments, the prosecutor improperly bolstered the testimony of state's witnesses. We disagree. These observations were permissible arguments concerning the credibility of the two witnesses based upon the testimony presented at trial. Legitimate subjects of criticism and discussion during argument include "the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations." Gaddy v. State, 698 So.2d 1100, 1127 (Ala.Cr.App. 1995), aff'd, 698 So.2d 1150 (Ala.1997), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Edson v. State, 53 Ala.App. 460, 464, 301 So.2d 226 (1974)). The prosecutor's remarks were grounded on the witnesses' testimony; the prosecutor was not attempting to personally vouch for them. Pressnell testified that, as she was going home from a business she owned, she pulled up behind a vehicle she later identified as Thomas's; that she followed it as it slowly proceeded until it *943 turned into the parking lot of the middle school; and that she estimated the time, based on her habits, as around 11:30 p.m. She further testified that she had not been drinking beer or smoking marijuana. Corum, a teenager, testified that while she and a friend were going home after riding around looking at Christmas light decorations, they saw a man walk across the street from the school into the victim's yard; that this man was "kind of ruffled" and appeared to be intoxicated; that he was wearing a light-colored shirt and glasses and had curly hair; and that she is certain that it was around 11:45 p.m., because she was on her way home and she had a midnight curfew. She identified the man she saw that night as Thomas. The prosecutor was contrasting these two witnesses' estimate of time with the testimony of the guests of the party that Thomas attended before the offenses.
We find that neither trial counsel's failure to object to these comments nor appellate counsel's failure to raise them on appeal was ineffective.
The underlying substantive issue, as presented in Issue XIX(o) (Brief, p. 79), is procedurally barred by Rule 32.2(a)(3) and (5).
(p) The prosecutor stated that Thomas had "used [the sink] to wash himself, his hands, his genitals, and he used it to wash away the life's blood of [the victim]." (R. 1845.)

Thomas contends that this comment was improper because, he argues, the fact that he may have used the sink was sheer speculation based on the criminalist's testimony that the soot patterns in the victim's sink suggested that there had been water in it. The criminalist testified that dried bloodstains were noted on the corner of the sink. (R. 1114.) He further testified, over defense counsel's objection, that "the pattern inside the sink is indicative that the sink was wet inside at the time of the fire at the time that the soot was deposited" and that "[t]he pattern in which the soot is accumulated in various degrees of density in the sink is the type of pattern you see any time there has been water on a surface." (R. 1115.) Clearly, the prosecutor's remark was a reasonable inference from the evidence.
"In Alabama, liberal rules are allowed counsel in drawing inferences from the evidence in their arguments to the jury.... Counsel has a right to argue any reasonable inference from the evidence or lack of evidence, ... and to draw conclusions from the evidence based on their own reasoning....
". . . .
"Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though farfetched.... So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled."
Roberts v. State, 346 So.2d 473, 476-77 (Ala.Cr.App.1977), cert. denied, 346 So.2d 478 (Ala.1977) (quoted in DeBruce v. State, 651 So.2d at 610). "Whether an inference is reasonable is generally within the sound discretion of the trial judge." Hayes v. State, 588 So.2d 502, 505-06 (Ala.Cr.App. 1991), overruled on another grounds by Nichols v. State, 629 So.2d 51 (Ala.Cr.App. 1993).
Accordingly, we find that Thomas has failed to establish that trial counsel's failure to object to this comment or appellate counsel's failure to raise it was ineffective.
The underlying substantive issue, as presented in Issue XIX(p) (Brief, p. 79), is procedurally barred by Rule 32.2(a)(3) and (5).
(q) The prosecutor stated that "the only time during this investigation [Thomas] came close to admitting the truth" was when he stated in his tape-recorded statement, taken shortly after his arrest, that he "just want[ed] to die." (R. 1851.)

Thomas contends that, by this argument, the prosecutor minimized the jury's concern of whether the death sentence *944 was appropriate by suggesting, he argues, that Thomas had confessed to the crimes and that a death sentence would be acceptable to Thomas. He further argues that the prosecutor expressed his personal opinion in this comment.
In reviewing this remark, we put it into the context in which it was said:
"[Thomas's version of the events is] a statement of the lies tied together with other lies with one big hole right in the middle. He remembers what he wants to remember. He conveniently forgets those parts that would incriminate him or convict him. He told Chief Faulk on this tapeI think this is crucialhe told Chief Faulk, `I just want to die.' ... The Chief says, `Well, you'll feel better. No, I won't ever feel better. I want to die.' It's the only time during this investigation he came close to admitting the truth."
Put in context, the remark Thomas complains about is a comment on Thomas's credibility, which, as we have noted supra, is a legitimate topic of argument. It was not in any way related to the appropriate sentence for Thomas if the jury found him guilty. (Any relation to the sentence would have been improper and premature, because the remark was made in the guilt phase of the trial.) "A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way." Watson v. State, 398 So.2d 320, 328 (Ala. Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
Accordingly, Thomas has failed to establish that either trial or appellate counsel were ineffective.
The underlying substantive issue, as presented in Issue XIX(q) (Brief, pp. 79-80), is procedurally barred by Rule 32.2(a)(3) and (5).
64. During the prosecutor's closing rebuttal argument in the guilt phase, the following allegedly improper comments were made:

(a) "Who is going to take the responsibility for the death of Mrs. Flossie McLemore? Me? For being a dumb D.A. or a weak D.A? Bobby Smith? For not being the best investigator in the world? Police? For not having a car on every street corner on December 14, 1984? The defense would have you put the responsibility for her death and for that killing on everybody but the one man in this whole wide world that could have prevented that death and prevented that tragedy. The one man who can only be held responsible for it today." (R. 1879.)

Thomas contends that the prosecutor, in making these comments, framed the jury's task as a choice of placing blame among disparate parties and that the prosecutor implied that if the jury did not convict Thomas, no one would be held responsible. We find that, by these comments, the prosecutor was urging the jury to hold Thomas responsible for his actions, which is proper argument. See Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997) (a plea to hold the defendant accountable for the capital murder is an acceptable appeal to law enforcement and as such, is permissible in closing argument).
Accordingly, Thomas has failed to establish that either trial or appellate counsel were ineffective in failing to contest these comments.
The underlying substantive issue, as presented in Issue XIX(a) (Brief, p. 80), is procedurally barred by Rule 32.2(a)(3) and (5).
(b) "I'm not the head of some Gestapo or a bunch of Nazi's trying to kill somebody. I'm Jimmy Fry, who on a cold November morning in 1950 was born two blocks from here at Powers Hospital. I'm here to see that law and order is maintained, and that hopefully, beyond all else, justice is done so that the people of this county can go to sleep at *945 night and be in bed and be safe and secure in their homes." (R. 1879-80.)

Thomas alleges that the prosecutor injected his personal background and beliefs in an attempt to get the jury to sympathize with and identify with the prosecution. While we do not wholeheartedly approve of such comments, we find them to be in the nature of an appeal for law enforcement, which is generally permissible argument.
Therefore, we find that Thomas has failed to establish ineffective trial or appellate counsel.
We further find that the underlying substantive issue, as presented in Issue XIX(b) (Brief, pp. 80-81), is procedurally barred by Rule 32.2(a)(3) and (5).
(c) The prosecutor allegedly invoked the victim's presence in the courtroom.

Thomas contends that, by the comments highlighted in the following passage, the prosecutor invoked the victim's presence to encourage the jury to do vengeance for the victim's family and to portray the case as a contest between the rights of Thomas and the rights of the victim.
"You've heard the explanation of the rights of the Defendant in this case, and all that we have to prove and all of the burden that's on Jimmy Fry as stated in this case. You know somebody else had rights, too. There should have been a third chair over here this week between Bobby and I. If we had had that chair it would be empty. This is the chair for Mrs. Flossie McLemore. She had rights, too. She had the right to love and be loved. She had the right to grow those flowers in her garden until her Maker called her home. She had the right to be lying there in her bed safe and secure after having locked her locks on her doors before having gone to bed on the night that she was broken into and raped and robbed."
(R. 1884.) (Emphasis added.)
We find the references invoking Mrs. McLemore's presence permissible. See McNair v. State, 653 So.2d 320, 335-36 (Ala.Cr.App.1992) (by draping the victim's bloodstained nightgown over a chair and referring to it as "Mrs. Riley," the victim, the prosecutor "did not venture outside the circumstances of the offense to inflame the jury with irrelevant emotional considerations"; "[t]his personification of the evidence was undoubtedly an emotionally-charged part of the argument, but the sensations evoked were those which legitimately arose from the evidence itself and were not `extraneous emotional factors'"), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
In regard to Thomas's allegation that the prosecutor's remarks injected the victim's rights into the trial, we again find guidance in McNair v. State. There, the prosecutor made numerous references in his closing argument in the guilt phase to the victim's rights, including that the victim's "right to live, a right to come and go, to breathe, and a right to be protected. Just like [the appellant] has Constitutional rights that should be protected, so does she." 653 So.2d at 336. The court, in finding no reversible error, stated:
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict."
Id. at 337-38 (citations omitted). See also Carroll v. State, 599 So.2d 1253, 1268 (Ala. Cr.App.1992) ("the prosecutor's argument may be construed as `an attempt to illustrate for the jury the defendant's total disregard of the rights of the victim, rather than an attempt to discredit' the appellant for the exercise of his constitutional rights. Kirkpatrick v. Blackburn, 777 F.2d 272, 284 (5th Cir.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 ... (1986)."), aff'd, 627 So.2d 874 (Ala. *946 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
Accordingly, Thomas has failed to establish that trial or appellate counsel were ineffective in not contesting these comments.
We further find that the underlying substantive issue, as presented in Issue XIX(c) (Brief, p. 81), is procedurally barred by Rule 32.2(a)(3) and (5).
(d) The prosecutor stated that the victim "was broken into and raped and robbed" and that thereby "[e]very home in this county was raped and robbed." (R. 1884.)

Thomas contends that, by referring to the victim's having been raped, the prosecutor misstated the evidence and the charges against Thomas and thus inflamed the passions and fears of the jury. Dr. Joseph Embry, the forensic pathologist who performed the autopsy of the victim's body, when asked if there was any evidence that the victim had been raped, stated, "There's evidence that she may well have been, in my opinion." (R. 962.) He more specifically testified that the injuries to the victim's were similar to other bodies he had autopsied that had been raped and that a man's erect penis could partially cause the kind of trauma inflicted to the victim's vagina and anus.
"`The basic issue [in assessing the impact of argument designed to inflame the passions of the jury] should be whether the prosecutor's conduct was designed to induce a decision not based on a rational assessment of the evidence. If so, the conduct should be held improper.'" McNair v. State, 653 So.2d at 334-35 (quoting D. Overby, Improper Prosecutorial Argument in Capital Cases, 58 UMKC L.Rev. 651, 670 (1990)). The extent and the nature of the sexual abuse inflicted on the victim was so overwhelming and atrocious that the fact that Thomas may not have, in the strictest legal sense, committed "rape" is virtually insignificant. Surely, with the evidence before the jury, the prosecutor's characterization was not designed to, and indeed did not, induce a decision not based on a rational assessment of the evidence. (In regard to the prosecutor's comment that "[e]very home in this county was raped and robbed," see Byce v. State, 352 So.2d 1160, 1161 (Ala.Cr.App.1977) (in robbery prosecution, the prosecutor's argument to the jury that "you are all victims in this case" was not improper; rather, it was "nothing more than an appeal for law enforcement and an assertion of trespass on the rights of society which is the ultimate and general victim")).
Accordingly, Thomas has failed to prove that trial or appellate counsel were ineffective in not contesting these comments.
The underlying substantive issue, as presented in Issue XIX(d) (Brief, p. 81), is procedurally barred by Rule 32.2(a)(3) and (5).
(e) The prosecutor stated that the jury was "setting the standard for what conduct is going to be in this community" and allegedly implored the jury to convict so as not to "[send] out a very bad message" to "other thugs and murderers." (R. 1884-85.)

The prosecutor made the above remarks in the following context:
"If you are satisfied under the law with this Defendant's guilt and if you are convinced beyond a reasonable doubt and to a moral certainty, it is your duty and obligation as a juror to convict him, because what you are doing here today, if you are so convinced of his guilt, is setting a standard for what conduct is going to be in this community. If you are convinced that he is guilty, and you don't convict him, you are sending out a very bad message to people like him out in the community, other thugs and murderers."
"Generally, the prosecutor is in error by exhorting the jury to `do what's right,' or to `do its job,' if that exhortation `impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the *947 court's instructions on the law.'" McNair v. State, 653 So.2d at 339-40 (quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr. App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)) (citation omitted). Here, the prosecutor's exhortation to convict was expressly dependent on the jury's satisfaction that Thomas was guilty under the law. The prosecutor's remarks were proper, as an appeal for law enforcement. "An abundance of case law exists holding that urging the jury to render a verdict in such a manner as to punish crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument." Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr.App.1993) ("send a message" to the people in the county by convicting the defendant), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). See also Smith v. State, 698 So.2d 189, 204 (Ala.Cr.App.1996) ("send a message" is proper appeal for law enforcement), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
Accordingly, we find that trial counsel's failure to object to these comments was not ineffective nor was appellate counsel's failure to raise them on appeal ineffective.
We further note that the underlying substantive issue, as presented in Issue XIX(e) (Brief, pp. 81-82), is procedurally barred by Rule 32.2(a)(3) and (5).
65. The combined effect of all of the prosecutor's allegedly improper comments violated Thomas's constitutional rights.

We have reviewed all guilt-phase prosecutorial comments called into question by Thomas in his Rule 32 petition, and we find that while several are arguably objectionable, considering the totality of the circumstances, no comment, viewed alone or in combination with other comments, was so prejudicial as to render the trial fundamentally unfair. We agree with the following:
"Even if the court were to view one or more of these particular comments as improper, it cannot be said that, taken together or separately, they denied the petitioner fundamental fairness. There is no reasonable probability that the outcome of the guilt/innocence determination would have been different if these arguments had not occurred. There was overwhelming evidence against the petitioner.... Given the evidence against him, there is no reasonable probability that these arguments infected the entire trial and caused a denial of fundamental fairness."
Waldrop v. Thigpen, 857 F.Supp. 872, 928 (N.D.Ala.1994), aff'd, 77 F.3d 1308 (11th Cir.1996), cert. denied, 519 U.S. 898, 117 S.Ct. 247, 136 L.Ed.2d 175 (1996).
Therefore, neither trial nor appellate counsel were ineffective in failing to argue the cumulative effect of various prosecutorial remarks.
In addition, the underlying substantive issue, as presented in Issue XIX (Brief, p. 82), is procedurally barred by Rule 32.2(a)(3) and (5).
T. Thomas's rights were violated because his expert witness, Dr. Crowder, failed to provide assistance in a minimally competent manner in both his psychological evaluation of Thomas and in his testimony at trial.

This allegation was addressed in Part II(k), infra.
U. The prosecutor violated Thomas's rights by including the victim's family in Thomas's prosecution.

Thomas gives the following specific examples: the family members' admission into the voir dire proceedings; his calling the victim's daughter as a witness when, Thomas alleges, she had no relevant testimony to offer and then asking her irrelevant questions; and, during the penalty phase, his "inject[ing] the victim's family members into the proceedings and [seeking] to make the jury react emotionally to the offenses and to convict and sentence Mr. Thomas based on the emotional impact of the offenses upon the victim's family." *948 (Rule 32 C.R. 558; Brief, p. 85.) It appears that, as to the latter assertion, Thomas is referring to the prosecutor's alleged misconduct and improper arguments raised in Section Y of Thomas's amended petition (Rule 32 C.R. 562-65). We will address the allegations of Section Y, infra.
The contentions that trial counsel were ineffective for failing to object to the attendance at trial of the victim's family members and that appellate counsel were ineffective in failing to raise this issue on appeal are without merit. Thompson v. State, 581 So.2d 1216, 1236 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). The Crime Victims' Court Attendance Act, § 15-14-50 et seq., which allows for a representative of deceased victim to be seated alongside the prosecutor at "trial or hearing or any portion thereof," applies to capital offenses. Coral v. State, 628 So.2d 954, 984 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). See also Williams v. State, 601 So.2d 1062, 1079 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.1992), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). Furthermore, defense counsel testified at the Rule 32 hearing that he did not observe any sort of outburst or emotional reaction by the members of the victim's family and that there was no basis for asking them to be excluded from the courtroom. See also O'Shields v. State, 689 So.2d 227, 232-33 (Ala.Cr.App.1996) (trial counsel not ineffective for failing to move for a mistrial or to preserve record of alleged prejudicial conduct of members of victim's family that occurred in presence of venire where record was silent as to what occurred), overruled on another ground, Cothren v. State, 705 So.2d 849 (Ala.Cr. App.1997), aff'd, 705 So.2d 861 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998). We note that defense counsel stated to the trial court that the defense had no objection to the exclusion of the victim's daughter, the designated member of the victim's family, from the rule that witnesses are generally not permitted to remain in the courtroom and hear the testimony of other witnesses. (R. 686.)
We addressed the allegation of ineffective counsel in regard to the prosecutor's eliciting allegedly irrelevant testimony from the victim's daughter in Part II(o)S.61(a), supra. We will address the allegation of ineffective counsel in regard to the prosecutor's allegedly improper behavior during the penalty phase in Part II(o)Y., infra.
Thomas asserts the merits of the underlying substantive allegations in Issue XXI. (Brief, pp. 85-86.) However, they are precluded because they could have been, but were not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
V. The statutory presumption, in § 13A-5-45(e), that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial [(here, that the capital offense was committed during the commission of a burglary)] shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing," is unconstitutional because, he argues, it reduces the prosecution's burden of proof.

Thomas specifically contends that "[i]f the crime which a defendant intends to commit during a burglary is murder, the burglary does not serve to adequately narrow or limit those persons eligible for death as is constitutionally required because the aggravating circumstance is a component of the offense of capital murder." (Rule 32 C.R. 560; Brief, p. 87.) He asserts the merits of the underlying substantive issue in Issue XXII. (Brief, pp. 86-87.) However, this issue is precluded because it could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
Thus, we turn to the ineffective counsel arguments. Foremost, Thomas has not established the premise upon *949 which his argument is basedthat the crime which he intended to commit during the burglary was murder. In fact, the indictment charged that Thomas committed the burglary with the intent to commit theft. (C.R. 20.) Moreover, the specific substantive issue has been rejected in Lindsey v. Smith, 820 F.2d 1137, 1152-53 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989), as follows:
"Appellant's assertion that murder during the course of a burglary is invalid as an aggravating factor [under the Alabama capital punishment act] is based upon a misconstruction of Proffitt v. Wainwright, 685 F.2d 1227, 1268 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 ... (1983). In Proffitt, this court held only that the habeas petitioner was entitled to resentencing after several of the aggravating circumstances relied upon by the trial court were found invalid as applied in that case. Of the four aggravating circumstances relied upon by the trial court, the only one found valid by this court was that the defendant had committed a murder during the course of a burglary. This court concluded, however, that because the sole purpose of the burglary was to commit the murder, that circumstance might not have been sufficiently aggravating, in itself, for the trial court to have imposed the death penalty. See 685 F.2d at 1268.
"In finding that the habeas petitioner was entitled to resentencing, this court clearly did not conclude either that the aggravating circumstance of murder committed during the course of a burglary was constitutionally invalid or that this circumstance alone could not justify the imposition of the death penalty. To the contrary, this court gave full recognition to the Supreme Court's earlier determination that this and other aggravating circumstances contained in the Florida capital punishment statute were facially sufficient to prevent the imposition of the death penalty in an arbitrary or capricious manner. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 ... (1976); see also Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upholding as facially valid Georgia capital punishment statute also containing aggravating circumstance of murder committed during the course of a burglary). Moreover, here, in contrast to Proffitt, appellant burglarized the victim's house to commit a robbery, which resulted also in a murder. The act of burglary accordingly constituted a valid aggravating circumstance."
See also White v. State, 587 So.2d 1218, 1228, 1235 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Because the underlying substantive issue is without merit, trial counsel were not ineffective in failing to raise it and appellate counsel were not ineffective for failing to assert it on appeal.
W. Section 13A-5-49(8), which is the aggravating circumstance that "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses," is unconstitutionally vague and is applied in an overbroad and arbitrary manner because, he argues, the jury was not provided adequate guidance in applying the circumstance, i.e., the jury was not instructed as to its full meaning.

Thomas argues the merits of the underlying substantive issue in Issue XXIII (Brief, pp. 88-89). It is precluded because it could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
We are puzzled that Thomas cites Hallford v. State, 548 So.2d 526 (Ala.Cr. App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), as authority for his argument. The jury instruction that the court scrutinized and upheld in Hallford, 548 So.2d at 541-42, is virtually identical in all pertinent parts to the instruction given to the jury in this case. (See R. 1999-2002.) See also McWilliams v. State, *950 640 So.2d 982, 996-97 (Ala.Cr.App.1991), aff'd in pertinent part, 640 So.2d 1015 (Ala.1993), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 (1996). Moreover, the Hallford court rejected the argument that the aggravating circumstance is unconstitutional on its face. 548 So.2d at 543. In addition, we note that the jury was instructed in the limited language discussed in Ex parte Clark, 728 So.2d 1126 (Ala.1998). In Clark, the Alabama Supreme Court reiterated that the courts of Alabama must limit the application of this aggravating circumstance to include only "`those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" 728 So.2d at 1138 (quoting Lindsey v. Thigpen, 875 F.2d 1509, 1514 (11th Cir.1989), which is quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added in Clark).
Based on the foregoing, the substantive issue has no merit, as the circuit court correctly found. (Rule 32 C.R. 733.) Accordingly, trial counsel's failure to object to the constitutionality of § 13A-5-49(8) and its application does not constitute ineffective counsel. Likewise, appellate counsel were not ineffective in failing to raise the substantive issue before this court on direct appeal.
X. The trial court erroneously failed to instruct the jury on lesser included offenses, including manslaughter, based on the evidence that Thomas was intoxicated.

The underlying substantive issue is presented in Issue XXIV (Brief, pp. 89-91). Because Thomas specifically argues to this court, as he did to the circuit court, only the absence of a charge on manslaughter, we likewise limit our consideration. The issue of whether the trial court should have charged the jury on manslaughter as a lesser included offense was precluded from the circuit court's consideration because it could have been raised or addressed at trial, Rule 32.2(a)(2), and was raised and addressed on appeal, Rule 32.2(a)(4). Although it was not presented to this court on direct appeal, it was raised before the Alabama Supreme Court as Issue VI of the brief filed by Thomas (Brief on petition for certiorari review, pp. 54-56).[25] (Thus, any argument that appellate counsel was ineffective for failing to raise this issue on appeal is frivolous.) Appellate counsel argued,
"[T]he failure of the defendant to carry its burden on the affirmative defense of insanity should not preclude the necessity of a charge to the jury on manslaughter should the evidence suggest a high degree of intoxication at the time of the commission of the crime. The defendant should not be put in the position of choosing insanity or intoxication when both could reasonably be propounded as a defense in a given situation."
(Brief, p. 55.) Although the Alabama Supreme Court did not specifically address this issue in its opinion, it implicitly held that it was without merit. Its opinion reads, in its entirety, as follows:
"Pursuant to Rule 39(c), A.R.App.P., we granted the defendant's petition to review the judgment of the Court of Criminal Appeals affirming his conviction and sentence of death. Thomas v. State, 539 So.2d 375 (Ala.Crim.App. 1988). After carefully and thoroughly considering the record of trial, the Court of Criminal Appeals' opinion, and the briefs and arguments of the parties, we find no basis for reversal of the judgment of the Court of Criminal Appeals."
539 So.2d at 400 (emphasis added).
We note that in reviewing the merit of this allegation, the circuit court found, in its order denying Thomas's Rule 32 petition, that the "claim is meritless because it has no basis in fact." (Rule 32 C.R. 732.) It stated, "Thomas's claim is factually incorrect in that this Court did in fact charge the jury on the lesser included offenses as contained in the indictment. (See p. R-1918 of the trial transcript)." (Rule 32 C.R. 732.) This finding is incorrect. The trial court instructed that, as to *951 the capital charge of murder-burglary in Count I, the jury could consider the lesser included offense of murder, first-degree burglary, second-degree burglary, attempted burglary in the first or second degree, first-degree criminal trespass, and third-degree criminal trespass (R. 1890, 1901-03, 1918); and that, as to the charge of first degree arson in Count II, the jury could consider second degree arson (R. 1890, 1904). The trial court's oral charge to the jury did not include the offense of manslaughter.
Thomas contends that his trial counsel were ineffective for failing to object to the trial court's allegedly erroneous failure to instruct the jury on manslaughter. Thomas is correct in his assertion that "the defense presented substantial, unchallenged evidence that [he] was intoxicated at the time the crimes were committed" (Brief, p. 89).[26] Thomas is also correct *952 in his assertion that it is well settled that "[e]very prisoner at the bar is entitled to have charges given, which, without being misleading, correctly [state] the law of his case, and are supported by any evidence, however weak, insufficient, or doubtful in credibility." Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983) (quoting Gibson v. State, 89 Ala. 121, 8 So. 98 (1890)).[27]Accord Chavers v. State, 361 *953 So.2d 1106, 1107 (Ala.1978). However, Thomas has failed to establish the two prongs of Strickland v. Washington. In implicitly rejecting the underlying substantive issue as failing to present any plain error, Rule 45A, Ala.R.App.P., the Alabama Supreme Court implicitly found that the alleged error did not or probably did not adversely affect the substantial right of Thomas. Thus, we must concur with the attorney general that Thomas's ineffective trial counsel argument fails because, by virtue of the Alabama Supreme Court's implicit ruling, Thomas cannot satisfy the prejudice prong of Strickland.
The underlying substantive issue, as presented in Issue XXIV (Brief, pp. 89-91), is precluded because it could have been, but was not, raised at trial, Rule 32.2(a)(3), and also because it was presented *954 and addressed on appeal, Rule 32.2(a)(4).
Y. The prosecutor's misconduct and arguments at the penalty hearing allegedly deprived Thomas of his constitutional rights.

78. He made the following comment during his examination of a defense witness at the penalty phase:

(a) After the defense witness affirmatively answered the prosecutor's question as to whether she was sure that she had never been treated for any kind of mental disease or illness, the prosecutor commented, "I guess we'll have to take your word for it." (R. 1949.)

This comment was inappropriate, and we caution against such comments; they are clearly unworthy of a respected prosecutor. However, we think the jury valued this trite and trivial comment at its true worth and that it was not a factor in the sentence recommendation. Therefore, we find that neither trial nor appellate counsel were ineffective in failing to contest this comment.
The underlying substantive issue, as presented in Issue XXV(a) (Brief, p. 92), is precluded because it could have been, but was not, raised at trial or an appeal, Rule 32.2(a)(3) and (5).
79. The prosecutor made the following comments during his closing argument of the penalty phase:

(a) He allegedly improperly grossly characterized the offenses in the following highlighted argument and thus inflamed the jury:

"I think the evidence is without a doubt that this unmistakably was a savage slaughter. It was almost animalistic. It goes beyond all human dignity. The evidence is that this crime was more like some kind of Nazi war crime. It goes to the point of offending all of human sensibility.
"Mrs. McLemore was 82 years old when she died. There's been a lot [of] talk during this case about people having the mentality of a child and of being like a child. In a lot of ways, Mrs. McLemore was like a child.... [W]e all return sooner or later to being a child all over again. We do it as our first days on earth and our last days on earth. I say to you that the crime that occurred here was very similar to a crime being committed against a child. This lady, because of her age, was unable to defend herself. She was an innocent prey of this Defendant."
(R. 1980-81.)
The issue underlying the ineffective counsel claims is argued in Issue XXV(a) (Brief, p. 92). It is procedurally barred because it could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
In regard to the assertion that trial counsel were ineffective for failing to object to these characterizations of the crimes, we remind Thomas, "`In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.'" Johnson v. State, 620 So.2d 679, 703 (Ala.Cr.App.1992) (the prosecutor's reference to the "animalistic nature of the human mind" and his comment that the offense was "absolutely filthy, horrendously dirty and despicable" were "either proper statements of the evidence, proper inferences from the evidence, or conclusions that were properly drawn from the evidence," 620 So.2d at 702; also the prosecutor's comment in penalty phase that the appellant was not a civilized human being was in accord with the evidence that the two victims had been brutally beaten and then their home set on fire), rev'd on other ground, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993) (quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala. Cr.App.1987), aff'd, 521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)). See also Taylor v. State, 666 So.2d 36, 65 (Ala.Cr. App.1994) (characterizations of the crime *955 as a "massacre" and of the crime scene as a "slaughterhouse" were proper inferences from the evidence), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); McMillian v. State, 594 So.2d 1253, 1262 (Ala.Cr. App.1991) (comments characterizing the killing as "uncivilized" and "befitting animals" were reasonable inferences drawn from the evidence and legitimate comments on the evidence); Hurst v. State, 356 So.2d 1224, 1236 (Ala.Cr.App.1978) (prosecutor's closing remark that "[t]his man slaughtered him" did not overstep the bounds of fairness and impartiality). See also Wright v. State, 279 Ala. 543, 550-51, 188 So.2d 272, 279 (1966)("[a]rgument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts").
In regard to the prosecutor's characterization of the crimes as "very similar to a crime being committed against a child," we direct Thomas's attention to McNair v. State, 653 So.2d at 332 (referring to the victim's solitude, frailty, and kindness was "at least tangentially relevant to the trial issue of the appellant's state of mind" and thus permissible; "[t]he prosecutor was entitled to draw the inference that the appellant's awareness of these characteristics had a bearing on his intent in going to the victim's home on the night in question"). Moreover, we consider it an appropriate response to the defense's argument for the jury to consider, as a mitigating circumstance, Thomas's mental age. (R. 1933.)
Based on the foregoing, we find that trial counsel were not ineffective in not objecting to these comments. Because any attack on the comments would have been without merit, we likewise find that appellate counsel were not ineffective for failing to raise the issue on appeal.
(b) The prosecutor expressed his personal opinion about the evidence by the remarks highlighted below:

"I think the evidence is without a doubt that this unmistakably was a savage slaughter. It was almost animalistic. It goes beyond all human dignity. The evidence is that this crime was more like some kind of Nazi war crime. It goes to the point of offending all of human sensibility.

"... I don't know what he could have done to her that would have been more degrading and more inhumane than the things that he did and the things that you all have convicted him of doing."
(R. 1980-81.)
The substantive issue underlying the ineffective counsel claims is argued at Issue XXV(b) (Brief pp. 92-93). It is procedurally barred by Rule 32.2(a)(3) and (5).
In regard to the assertion that trial counsel were ineffective for failing to object to these comments, we find that the first two comments are characterizations of the crimes and are within the confines of permissible argument, as recognized in the preceding discussion. We do not see how they could have been construed as an improper expression of the prosecutor's personal opinion. In regard to the third highlighted comment, we direct Thomas's attention to Smith v. State, 588 So.2d 561, 572 (Ala.Cr.App.1991), in which the prosecutor stated that "this case is one of the most gruesome and terrible [cases] that I have ever been involved with." In rejecting the appellant's argument that this comment was improper, the court stated,
"This comment was based on a legitimate inference drawn from the evidence and did not constitute an impermissible interjection of the prosecutor's personal opinion. The atrocity of this crime was clearly in evidence through the admission of the pictures, as well as through the testimony of the witnesses to the scene of the crime and the physician's testimony to the condition of the victim's body. `It is well established that no legal standard exists to judge the prejudicial qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case.' Carpenter v. State, 404 So.2d *956 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981), and cases cited therein. See also Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990) (prosecutorial comment that the defendant was one of the worst ever to enter the county was held to have been made in the heat of debate, was not an interjection of personal experience, and did not constitute plain error)."
Id. at 572.
Based on the foregoing, we find that trial counsel were not ineffective in not objecting to these comments. Because any attack on these comments would have been without merit, we likewise find that appellate counsel were not ineffective for failing to raise the underlying substantive issue, as argued in Issue IV of Thomas's brief.
(c) The prosecutor allegedly appealed to the prejudice and sympathy of the jury by, Thomas argues, emphasizing the age and vulnerability of the victim, comparing her to a child and characterizing her as "an innocent prey of this Defendant," (R. 1981).

The underlying issue, which is argued in Issue XXV(c) (Brief p. 93), is procedurally barred by Rule 32.2(a)(3) and (5).
In Part II(o)Y.79(a), supra, we found that the characterization of the 82-year-old victim as a child was permissible argument. We likewise find that the prosecutor's characterization of the victim as Thomas's "innocent prey" was permissible argument. See McNair v. State, 653 So.2d at 332. Therefore, trial counsel were not ineffective for failing to object to these characterizations of the victim, and appellate counsel was likewise not ineffective for failing to make this argument on appeal.
(d) The prosecutor stated that the jury "may consider that if this man is sentenced to life without parole there's always the possibility of escape." (R. 1983.)

Thomas argues that this comment was calculated to arouse the jurors' allegedly preexisting concern about prison escapes, because, he argues, before Thomas's trial, there had been widespread publicity of prison escapes. We first note that Thomas makes no reference to the record to support his allegation that, before his trial, there was widespread publicity of prison escapes. Thus, we discount this undocumented allegation in assessing possible prejudice arising from this remark; it is outside the evidence and the record before this court.
This isolated comment was followed by defense counsel's general objection. After the trial court sustained the objection, the following occurred:
"MR. MOFFATT [defense counsel]: That's not the law of the State of Alabama nor of the United States Constitution by a well established line of cases.
"THE COURT: Ladies and gentlemen, I'm going to, at the end of the arguments, charge you as to the law, and you are to apply the law as I give it to you. Now, the attorneys have the right to state what they feel the law is and what they feel the charge is going to be, but you are not to follow what they tell you the law is. You are to follow what I say the law is and take what they state to you as only their argument.
"MR. MOFFAT: Judge, I believe it would be proper for us at this time, in fact, it's necessary, to reserve the right that we must move for a mistrial based on misconduct of the prosecutor.
"THE COURT: Well, I'll deny the motion then for a mistrial."
(R. 1983-84.)
Trial counsel's actions were sufficient to present the issue to the trial court; therefore, Thomas's argument that trial counsel were ineffective is without merit. Thus, we turn to the question of whether appellate counsel were ineffective.
"[I]t has long been the law of this State that comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute *957 improper argument." Ex parte Rutledge, 482 So.2d 1262, 1265 (Ala.1984). In Rutledge, the Alabama Supreme Court condemned the prosecutor's comment to the effect that as long as parole boards, federal courts, and the state legislature exist, there is a chance that, if given a sentence of life imprisonment without the possibility of parole, the defendant would eventually be released. See also Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (in which the Court concurred in the lower courts' condemnation of the prosecutor's remarks to the effect that the death penalty is the only way to ensure that the defendant, who had murdered while on a weekend furlough from prison, would never be "out on the public" again, but also concurred with the lower courts' holding that these comments did not deprive the defendant of a fair trial); Eaton v. State, 278 Ala. 224, 227, 177 So.2d 444 (1965) (remarkif defendant were to be sentenced to life imprisonment, "he would be out and around" raised inference that defendant would either escape the penitentiary or be paroled, neither of which was for the jury's consideration). There is no question that the prosecutor's comment concerning escape was improper.
However, "[i]t is not enough that the prosecutor's remarks were undesirable or even universally condemned.'" Darden v. Wainwright, 477 U.S. at 181, 106 S.Ct. 2464 (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir.1983)). Rather the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Id. In determining whether appellate counsel were ineffective in failing to contest this issue, we start with the following principle:
"It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both."
Allred v. State, 291 Ala. 34, 38, 277 So.2d 339 (1973), cert. denied, 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86 (1975). In reviewing the prosecutor's improper reference during voir dire to the possibility of parole, this court in Prince v. State, 623 So.2d 355, 358-59 (Ala.Cr.App.1992), made the following statement, which we find to be applicable here:
"`There is no question but that the argument of the solicitor to the effect that a man sentenced to the penitentiary will at some time become eligible for pardon or parole was improper....
"`The remarks of the solicitor were of the class of improper argument which may be remedied or their evil effect eradicated by instructions of the court.'
"Lee v. State, 265 Ala. 623, 629, 93 So.2d 757, 763 (1957). See also Eaton v. State, 278 Ala. 224, 227, 177 So.2d 444, 448 (1965)....
". . . .
"Although erroneous, `[a]rgument in the nature of that under consideration is not so inflammatory and prejudicial that its harmful quality cannot be eradicated.' Murray [v. State], 359 So.2d [1178,] 1181 [(Ala.Cr.App.1978)]. See Doyle [v. State], 487 So.2d [996,] 998-99 [(Ala.Cr.App.1986)] (judge's action in sustaining objection and stating, `Let's stick to the evidence' sufficient to cure error). `Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action [in immediately sustaining defense counsel's objection].' Hooks v. State, 534 So.2d 329, 361 (Ala. Cr.App.1987), affirmed, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 ... (1989). See Thomas v. State, 373 So.2d 1149, 1159-60 (Ala.Cr.App.1979), affirmed, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 ... (1980)." *958 In Hooks v. State, 534 So.2d 329, 360-61 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989), a capital case, this court reviewed the following comments of the prosecutor: "[Defense counsel] says [the defendant will] be locked up where he can't get into trouble. I wish that it were true.... Even in prison." The court, noting that the trial court sustained the objection, held, "Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action." Id. at 361. Compare Rutledge.

In reviewing the comment made in this case for prejudicial effect, we note a subtle distinction between it and comments concerning parole or commutation: the possibility of escape is within a realm of common knowledge, while the laws of parole and commutation are not. See Brooks v. Kemp, 762 F.2d 1383, 1411-12 and n. 46 (11th Cir.1985) (in discussing the propriety of prison escape argument in penalty phase, the court observed, "Although there was no record evidence concerning escape, the fact that escape is a possibility was within the common public knowledge."), cert. denied, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); People v. Hovey, 44 Cal.3d 543, 244 Cal.Rptr. 121, 749 P.2d 776, 798 (1988) ("Rather than comment upon the possibility of parole or commutation, the prosecutor merely noted the possibility of an unspecified change in `laws,' or an escape from prison"; although these matters were extraneous to the penalty determination, "they were also matters of common knowledge appreciated by every juror who must choose between a death sentence and a sentence of life without parole."). While we find that this distinction does not save such a comment from condemnation, it does account for a less prejudicial effect.
We find heregiven the nature of the comment and the fact that it was an isolated remarkthat the trial court's swift, appropriate actions were curative. With the court's instruction immediately after the remark and the instructions given for the jury's deliberation of sentence recommendation, the prosecutor's comment did not divert the jury's attention from the offenses and the offender. Under the circumstances here, there was no real danger that this isolated comment was likely to allow the jury to disregard its duty to determine the aggravating and mitigating circumstances and to then weigh such factors.
For these reasons, we do not believe that appellate counsel were ineffective for failing to contest the trial court's rulings on appeal.
The underlying substantive issue, which is argued in Issue XXV(d) (Brief p. 93), is procedurally barred because it was raised and addressed at trial, Rule 32.2(a)(2), and could have been, but was not, raised on appeal, Rule 32.2(a)(5).
(e) By concluding his initial closing remarks of sentencing with the following highlighted comments, the prosecutor allegedly improperly characterized the jury's decision on the proper sentence as a choice between doing justice and saving Thomas's life:

"I want you to do what you think is right. I want you to do justice. What they want is, I guess, to save this man's life. I want justice. I'm not asking you to kill anybody or take anybody's life. I'm asking you to enforce the law of the State of Alabama, and if you find that this crime fits the category in which the death sentence should be recommended, then I just ask you to obey the law and recommend that to the Judge. I won't ever ask you to do anything else."
(R. 1985.)
We find that this argument was not improper.
"Generally, the prosecutor is in error by exhorting the jury to `do what's right,' or to `do its job,' if that exhortation `impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the *959 law.' See United States v. Young, 470 U.S. [1,] 18, 105 S.Ct. 1038, 84 L.Ed.2d 1... [(1985)].' Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)."
McNair v. State, 653 So.2d at 339-40. However, in this case, the prosecutor was not exhorting the jury to render a certain verdict, regardless of the evidence. See also DeBruce v. State, 651 So.2d at 612 (approval of comments referring to the jurors's doing what they think is right and just under the law, finding that the prosecutor did not argue that the jury could fulfill its duty only by recommending a sentence of death). Rather, the comments were a proper and legitimate response to the defense counsel's argument that while the defense was not asking that Thomas not be punished, it was asking the jury to consider that, on the upcoming Easter weekend,
"[t]he Easter message is one of love and mercy, and Jesus hung on the cross, and if you will recall, he spoke to the Lord and said, `Father, forgive them for they know not what they do.' He was asking for forgiveness for the very people who were putting him to death."
(R. 1937.) See McNair v. State, 653 So.2d at 340 (prosecutor's exhortation to the jury "to do what's right" was permissible, for it was a response in kind to defense counsel's religious appeals for mercy and denunciation of the law of "an eye for an eye and a tooth for a tooth"). "A prosecutor's argument `in telling the jury not to let sympathy, emotions, or compassion affect its decision... did not result in any error.' Stewart v. State, 601 So.2d 491, 506 (Ala. Cr.App.1992)." DeBruce v. State, 651 So.2d at 613.
Accordingly, we find that trial counsel were not ineffective for failing to object to these comments and likewise find that appellate counsel were not ineffective for failing to raise the underlying substantive issue.
The underlying issue, which is argued in Issue XXV(e) (Brief p. 93), is procedurally barred by Rule 32.2(a)(3) and (5).
(f) The prosecutor suggested to the jury that, in making its decision as to the penalty to recommend, it simply look at "the photograph of this man shot through the bars at the jail with the blood on his face" and look at "one of the photographs of Mrs. McLemore lying there in the floor in a pool of blood with her body mutilated and abused beyond what we all would consider inhumane [sic]." (R. 1984-85.)

These comments, in context, do not support Thomas's assertion that the prosecutor was asking the jury to make its sentencing recommendation solely by considering the photographs. For example, immediately after these comments, the prosecutor concluded his argument with the plea, "I'm asking you to enforce the law of the State of Alabama, and if you find that this crime fits the category in which the death sentence should be recommended, then I just ask you to obey the law and recommend that to the Judge." (R. 1985.)
Moreover, the photographic evidence was relevant to sentencing; it accurately depicted the gruesome and shocking manner in which the crimes were committed. The photographs illustrated the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). See Ex parte Bankhead, 585 So.2d 112, 118-19 (Ala.1991). "[A] photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury." Id. Any "sensations evoked were those which legitimately arose from the evidence itself and were not `extraneous emotional factors.'" McNair v. State, 653 So.2d at 335. The photographs were relevant pieces of evidence whose emotional content was already obvious and whose capacity to elicit an emotional response could not have been eliminated from the case. Id. at 336.
*960 Accordingly, trial counsel were not ineffective for failing to object to these comments; likewise appellate counsel were not ineffective for failing to raise the issue on appeal.
The underlying issue, which is argued in Issue XXV(f) (Brief pp. 93-94), is procedurally barred by Rule 32.2(a)(3) and (5).
(g) In his allegedly improper attempt to minimize the jury's responsibility to determine the proper sentence, the prosecutor stated, "I'm not asking you to kill anybody or take anybody's life. I'm asking you to enforce the law of the State of Alabama." (R. 1985.)

We do not construe these comments as an improper attempt by the prosecutor to diminish the importance of the jury's sentencing responsibility. Rather, this argument was in response to the following comments by defense counsel:
"From the initial time on Monday morning when we started the voir dire of the case, we told you that the State of Alabama through the District Attorney was here to ask you to kill ... Thomas. He put it in a little more polite term, I think, a while ago when he said, `Impose the death penalty.' The fact remains that you are being asked to put to death a human being.... I don't know why they've tried to keep that from you."
(R. 1931.)
In Ex parte Taylor, 666 So.2d 73, 87 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), the court rejected the appellant's claim that the following prosecutorial comments misled the jury as to the importance of its responsibility in rendering an advisory verdict: "[Y]ou're not going to kill anybody. Nobody is asking you to do that. Nobody is walking up and saying, `Here's the switch, pull it.'" The court ruled that these comments were a fair response to defense counsel's statement that a recommendation of death would kill both the defendant and his mother. Id. at 88. See also McNair v. State, 653 So.2d at 337-38 (the prosecutor's remarks to the effect that it was the state rather than the jury who was putting the defendant to death were proper response to defense counsel's powerful suggestion that the moral significance of the verdict would hound the jurors "from now until eternity"; the court found that the prosecutor was not diminishing the legal significance of the jury's verdict, but merely the moral significance of the verdict).
Accordingly, trial counsel were not ineffective for failing to object to these comments and appellate counsel were not ineffective for failing to raise this issue on appeal.
The underlying substantive issue, which is argued in Issue XXV(g) (Brief p. 94), is procedurally barred by Rule 32.2(a)(3) and (5).
Z. The trial court erroneously sustained the prosecution's objections (on an evidentiary ground other than unreliability) to the following, which, Thomas argues, was exculpatory and in mitigation, thereby violating his right to introduce reliable evidence that is exculpatory and may tend to mitigate punishment, even if it does not technically meet evidentiary requirements:

81. At the guilt phase, after Thomas's mother testified that her other son, Billy, came home immediately after the crimes had occurred and went into the bathroom and that she heard water running,[28]the court refused to allow her to testify as to Billy's answer when she went into his room, after she was awakened *961 by the sound of fire trucks responding to the fire at the crime scene, and asked him, "Son, what happened up there?" (R. 1515.)

No offer of proof of Billy's response was presented at trial or at the Rule 32 hearing, although Mrs. Ratliff testified. Without an offer of proof, we have nothing upon which to gauge the impact Mrs. Ratliff's response would have had. Therefore, we find that Thomas has failed to meet his burden under Strickland v. Washington as to both trial and appellate counsel.
The underlying issuewhether the trial court erroneously sustained the objection to the unspecified testimony of Thomas's mother as to Billy's statement soon after the crimes were discovered (as argued in Issue XXVI, p. 94-99)is precluded because it was presented to, and addressed by, the trial court, Rule 32.2(a)(2); because the offer of proof could have been, but was not, presented at trial, Rule 32.2(a)(3); and because the issue could have been, but was not, presented on direct appeal, Rule 32.2(a)(5).
82. At the guilt phase, after Thomas's mother testified that Billy went to the scene about 6 a.m. the morning after the crimes and that when he returned home, he fell on the living room floor and began patting his hands on the floor, the trial court refused to allow her to testify that, after falling on the floor, Billy said, "Mom, I did not know Kenneth was going to come up there." (R. 1517.)[29]
The underlying issuewhether the trial court erroneously sustained the objection to the proposed testimony of Thomas's mother as to Billy's statement after his visit to the scene (as argued in Issue XXVI, p. 94-99)is precluded because it was presented to, and addressed by, the trial court, Rule 32.2(a)(2), and was also presented and addressed on direct appeal, Rule 32.2(a)(4). See Thomas, 539 So.2d at 394-96.
The issue whether trial counsel were ineffective is without merit, because Thomas received an adverse ruling on the issue (R. 1516-17); nothing more was required of trial counsel. The issue whether appellate counsel were ineffective for failing to present the issue on direct appeal is also without merit, because it was presented on appeal.
83. At the penalty phase, the trial court would not allow defense witness Carter, who testified that Billy confessed to her, to testify as to whether Billy had ever bragged to her about attacking or murdering other women.[30]
*962 The underlying substantive issue is procedurally barred because it was presented to, and addressed by the trial court, Rule 32.2(a)(2), and could have been, but was not, presented on appeal, Rule 32.2(a)(5).
The issue whether trial counsel were ineffective for not raising any objection regarding to Ms. Carter's anticipated testimony is without merit because the issue was before the trial court. The issue whether appellate counsel were ineffective for failing to present the issue on direct appeal is also without merit. The trial court's ruling excluding any extraneous prior bad acts by Billy was proper. See Gamble, supra, at § 48.01(10) (in attempting to prove guilt of another, an accused may not prove acts of violence by that person against those other than the present victim).
84. Also at the penalty phase, the trial court sustained an objection to defense counsel's attempt to elicit from defense witness T.H. Speegle, a jail chaplain, the contents of a conversation he had with Billy.[31]In addition, the trial court sustained an objection, on the basis of irrelevancy, to the proposed testimony of defense witness Sandra Gibson, Thomas's girlfriend that Billy had "bragged about enjoying sex with older women and that he liked older women and preferred older women over younger women." (R. 1951-52.)

In regard to the trial court's ruling on the objection to defense counsel's questioning Chaplain Speegle about any conversation with Billy, no offer of proof of the contents of the conversation was presented at trial or at the Rule 32 proceedings. Without an offer of proof, we have nothing upon which to gauge the impact of Speegle's anticipated testimony. Therefore, we find that Thomas has failed to meet his burden under Strickland v. Washington as to both trial and appellate counsel.
The underlying issuewhether the trial court erroneously sustained an objection to the unspecified testimony of Speegle (as argued in Issue XXVI, p. 94-99)is precluded because it was presented to, and addressed by, the trial court, Rule 32.2(a)(2); because the offer of proof could have been, but was not, presented at trial, Rule 32.2(a)(3); and because the issue was presented on direct appeal to the Alabama Supreme Court, Rule 32.2(a)(4). (See Brief on petition for certiorari review, p. 50.)
In regard to the proposed testimony of Gibson, the underlying issuewhether the trial court properly sustained an objection to her proposed testimony (as argued in *963 Issue XXVI, p. 94-99)is precluded because it was presented to, and addressed by the trial court, Rule 32.2(a)(2), and because it was also presented on direct appeal to the Alabama Supreme Court (Brief on petition for certiorari review, pp. 49-50, 52) and indirectly addressed that court, Rule 32.2(a)(4). See 539 So.2d at 400.
The issue whether trial counsel were ineffective for not raising the issue regarding Gibson's proposed testimony is without merit because the trial court did rule on the issue and Thomas received an adverse ruling (R. 1951-52). The issue whether appellate counsel were ineffective for failing to present the issue on direct appeal is also without merit; as noted above, it was presented on appeal.
AA. The trial court failed to consider as nonstatutory mitigating evidence, the following: (1) that Thomas is mentally retarded; (2) that Thomas was under the influence of drugs and alcohol at the time of the offenses; (3) that Thomas had a pitiable childhood, including a violent and alcoholic father; and (4) that Thomas's brother, Billy, had had some involvement in the offenses and the trial court had knowledge of that involvement.[32]
The underlying issue, as argued in Issue XXVII (Brief, p. 100-01) is procedurally barred by Rule 32.2(a)(3) because it could have been, but was not, raised before the trial court. It is also procedurally barred by Rule 32.2(a)(4), with one exception, because it was, in essence presented to, and implicitly addressed by, the Alabama Supreme Court. (See Brief on petition for certiorari review, pp. 51-53, where Thomas alleged that the trial court failed to consider the following: Thomas's borderline mental retardation; his high degree of intoxication at the time of the crimes; the involvement of his brother Billy; his mental instability and indications of emotional disturbance; his brain damage from drug use; his lack of any history of violent behavior; his age; and his being easily influenced.)[33] The only one not specifically mentioned in the brief to the Supreme Court was the trial court's alleged failure to consider Thomas's pitiable childhood, including a violent and alcoholic father. Our consideration of this subpart is procedurally barred by Rule 32.2(a)(5) because it could have been, but was not, raised on appeal.
In regard to the question whether trial counsel were ineffective in failing to present the underlying substantive issue before the trial court, Thomas fails to sustain the Strickland burden of establishing prejudice. The Alabama Supreme Court rejected the substantive issue on the merits (with the one noted exception) on the petition for the writ of certiorari. By finding the issue to be without merit, it implicitly found that either the issue had no legal or factual merit or that the error, if any, was harmless. In regard to whether Thomas was prejudiced by the trial court's alleged failure to consider his pitiable childhood, including the influence of his violent and alcoholic father, Thomas has *964 failed to establish that the trial court in fact failed to consider this particular evidence. See Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (in regard to the appellant's argument that the trial court's failure to list in its sentencing order all the nonstatutory items he offered in mitigation, including his family background, was indicative of the court's failure to consider all nonstatutory mitigation, the Alabama Supreme Court proclaimed, "There is no requirement that a trial court list in its sentencing order all nonstatutory mitigation offered."), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). In fact, the judge who presided over the Rule 32 proceedings was the same judge who sentenced Thomas, and he made the specific finding in his order denying Thomas's petition that "the nonstatutory mitigating evidence offered by Thomas was in fact considered." (C.R. 733.) Moreover, "[t]rial judges are presumed to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions." Ex parte Slaton, 680 So.2d at 924. The trial court instructed the trial jury:
"Now, a mitigating circumstance does not have to be included in the list that I have read to you in order for you to consider that as a mitigating circumstance. In other words, the mitigating circumstances which you may consider are those enumerated by statute or any that you find exists from the evidence. It may include any aspect of a Defendant's character or his record or any circumstances of the offense that the Defendant has offered as a basis for a sentence of life imprisonment without parole instead of death."
(R. 2005.)
Based on the foregoing, we likewise conclude that appellate counsel were not ineffective for failing to argue on appeal that the trial court had failed to consider, as nonstatutory mitigating evidence, Thomas's pitiable childhood.
BB. Thomas's constitutional rights were violated because, in the penalty phase of the trial, the trial court instructed and the prosecutor told the jury that its sentence decision was advisory only and that the trial court would impose the actual sentence.

Thomas argues that the jury was given the impression that its verdict was of no consequence, that it did not need to be concerned about its recommendation because any mistake it made would be corrected by the trial court, and that if it recommended a death sentence, that sentence would not be carried out.
In opening remarks to jury in the penalty phase, the court stated:
"The law provides that the jury, after having heard all of the evidence presented at this sentencing hearing and having been charged as to the law, is then to bring back the verdict making the recommendation as to which sentence is to be imposed by the Court. Following that recommendation, then, the trial judge sets another hearing in which the parties will be heard on the final sentencing to be imposed. So it is for the trial judge to make a sentence, but before that's done, you are to hear the evidence that's presented at this hearing and to bring back a verdict that will make a recommendation."
(R. 1928.)
In rebuttal to the defense's opening remarks at the penalty phase, the prosecutor stated:
"I feel I have to respond. I would like to remove the switch from the electric chair from each of your hands. The defense keeps trying to put your hand on the switch. What you are being asked to do this morning is to render an advisory verdict for the judge. You are not about to put somebody in the electric chair. The judge is not bound by what you recommend to him."
(R. 1938.) This argument was in response to defense counsel's comments that the prosecutor "was here to ask you to kill ... Thomas," (R. 1931); "you are being asked to put to death a human being," (R. 1931); *965 and "You pull the switch when you vote for [the death penalty] as if your hand was on it." (R. 1934).
These remarks by the prosecutor and the court's instruction were not improper.
"It is well established that `the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)].'"
Ex parte Taylor, 666 So.2d at 88 (quoting Martin v. State, 548 So.2d 488, 494 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)). Moreover, the prosecutor's comments were "a fair response to defense counsel's statement made immediately before, by which defense counsel argued to the jury that a recommendation of death would kill [the defendant]." 666 So.2d at 88.
We note that the trial court concluded its jury instruction with the following:
"You should carefully weigh, sift, and consider the evidence, realizing that a human life is at stake, and you should bring to bear your best judgment on the sole issue which is before you."
"As members of this jury, you may assume that any punishment ultimately set by this court, that a final sentencing of the defendant will be carried out."
(R. 2009, 2011.) The jury was aware of the significance of its recommendation. See Martin, 548 So.2d at 494.
Based on the foregoing, neither trial nor appellate counsel were ineffective in not contesting to the trial court's instructions or the prosecutor's remarks.
The underlying substantive issue, as argued in Issue XXXIII (Brief, pp. 101-04) is precluded because it could have been but, was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
CC. Thomas's rights to a trial that is fundamentally fair and to due process were violated by the manner in which his trial and sentencing hearing before the jury were conducted:

(a) Permitting the prosecutor's misconduct, set out in Sections Q and W of the petition to go unchecked;

(b) Improperly overruling defense counsel's evidentiary objections; and
(c) Erroneously admitting "improper matters" into evidence, including, but not limited to, State's Exhibits C-1, N-1, and R-6, as well as identification testimony and testimony of Thomas's oral statements.

Thomas prefaces the above allegations with the proclamation that the conduct resulting in the violation of his constitutional rights is not limited to these examples. Once again we remind counsel that we, as well as the circuit court, will not address general, conclusory allegations; such allegations do not meet the requirements of Rule 32.3 and Strickland v. Washington.
The first and most of the third areas of complaint have already been treated in this opinion, supra, and Thomas offers absolutely no argument at this point. In regard to subpart (a), while Thomas's petition directed the circuit court's attention and thus our attention to Sections Q and W, these were apparently miscites: Q concerns the admission of Thomas's statements and W concerns an aggravating circumstance. We assume from the argument of the underlying substantive issue in Issue XXIX (Brief pp. 104-05), that Thomas is actually referring to the prosecutor's alleged misconduct set out in Parts II(o)S. and II(o)Y., supra. The allegation in subpart (c), in regard to State's Exhibits C-1 (the victim's bloodstained panties) and R-6 (the victim's bloody nightgown), was disposed of in Part II(o)P., supra. The admission of State's Exhibit N-1 (the bloody knife) was treated in Part II(o)R., *966 supra, and the admission of Thomas's statements was treated in Part II(o)Q., supra. See these parts of our opinion for rulings on allegations of ineffective trial and appellate counsel and on the preclusion of the underlying substantive issues.
In regard to subpart (b) abovethat the trial court improperly overruled defense counsel's evidentiary objectionsThomas has not specified any ruling he contests here. Therefore, we cannot further consider this allegation. We find likewise as to the admission of identification evidence and other "improper matters" generally alleged in subpart (c) of this issue.
DD. Thomas's execution would be cruel and unusual punishment because Thomas is mildly mentally retarded, with an IQ that places him in the bottom one percentile of the population, at a comparable intellectual level of an 10-to 11-year-old and he suffers from organic brain damage.

With no authority, Thomas asserts the underlying issue in Issue XXX (Brief, 105-07). In addition to being precluded because it could have been, but was not, presented at trial or on appeal, Rule 32.2(a)(3) and (4), this issue is without merit. See Daniel v. Thigpen, 742 F.Supp. 1535, 1564 (M.D.Ala.1990) (relying on Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), court rejected argument that sentencing mentally handicapped defendant to death is cruel and unusual punishment).
EE. Alabama's death penalty is arbitrarily and discriminatingly applied on the basis of the victim's race.

Thomas cites neither factual support from the record nor legal authority in his argument to the circuit court (Rule 32 C.R. 574, 711-12) or in his three-sentence argument to this court on the underlying issue, presented in Issue XXXI (Brief. 107). Thomas has failed to establish that trial and appellate counsel were ineffective in failing to raise this claim. The underlying substantive issue is likewise without merit on the record before us. See Bell v. State, 518 So.2d 840, 843 (Ala.Cr.App.1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).
(p) Trial counsel failed to request certain special jury instructions, including but not limited to, failing to ask that the jury be instructed on the lesser included offenses of murder and manslaughter.
This allegation was addressed in Part II(o)X., supra.
(q) "Trial counsel failed to deliver a reasonably effective closing argument to the jury at the guilt/innocence phase of the trial." (Brief, p. 28.)
This statement is Thomas's entire argument in his brief to this court, and he was no more specific in his petition or post-hearing brief. (Rule 32 C.R. 525, 652.) He identifies no specific act or omission. Without any argument presenting proof of specific facts, we concur with the Rule 32 court's findings, as follows, without need for further analysis: "From the trial court's recollection of the closing argument and a review of the record on this matter, trial court finds that this claim is without merit and is rejected by this Court." (Rule 32 C.R. 751.)

III.
Thomas contends that his trial counsel were ineffective at the penalty phase by "failing to prepare and present an effective strategy for the presentation of mitigating evidence" (Brief, p. 28) and that, but for counsel's alleged ineffectiveness, he would have received a sentence of life imprisonment without parole rather than the death penalty. He specifically contends (1) that counsel failed to present allegedly available evidence that he was suffering from mental retardation, mental illness, organic brain damage, and impulse control disorder; (2) that counsel failed to present evidence of his good character and family history, i.e., that his father was a violent man with a serious drinking problem, that he was a supportive and caring brother and a loving son, that he had close relationships with his immediate family and young nephew, and that he never presented *967 any disciplinary problems; and (3) that counsel failed to call a single family member to testify on his behalf in the penalty phase.
To support this last allegation, Thomas presented the testimony of three family members at the Rule 32 hearing: his mother, Mrs. Ratliff (who also testified at the guilt phase); his oldest sibling, Connie Hurston; and another sister, Kathy Schimpf.[34] Thomas contends that these witnesses would have testified as to "his troubled childhood, lack of violent behavior, and many other endearing and redeeming qualities." (Brief, p. 40.)
In support of these allegations, Thomas's mother testified, at the Rule 32 hearing, that when Thomas was 12, he was placed in a foster home after having set a fire in church; that he remained in a foster home until he graduated from high school and then he returned to live with her; that while living with her, he committed no violent acts; that he was a good, kind, loving, and thoughtful person; that he often volunteered to do things for others; that he had not changed during the period he was in foster care; that she had not received any unfavorable reports from school about Thomas; that he returned from foster care with a puppy and that he took good care of the pet; and that since he has been incarcerated on the capital charge, he calls about four times a month, writes, sends cards for various holidays, and makes things for his 15-year-old-sister.
Connie Hurston, Thomas's oldest sibling (four years' older than he), testified as follows. From the time she was 10 until she was 16 years old, she took care of Thomas and six other siblings because their mother worked in the cotton fields and their father was either in prison or "stay[ed] out drinking all night long." (Rule 32 R. 85.) She said that during this time, Thomas was a wonderful, caring, and happy person. He helped her with the housework, he loved animals, "everybody loved him" (Rule 32 R. 86), he did not like to see anyone mistreated, he exhibited no signs of violence, "[h]e did no wrong" (Rule 32 R. 86), and she had no discipline problems with him. She said that she knew that he was especially sensitive by his reaction to his two puppies dying in the fire that burned down their house and that had been set by their father when Thomas was 11 years old: "[h]e just cried and cried and cried." (Rule 32 R. 87.) She further described him as having been "very close" to their mother and "extremely close" to their father. (Rule 32 R. 87.) Thomas and his siblings were placed in foster homes because their father had been accused of molesting one of his other daughters. She lost contact with Thomas from the time he was placed in a foster home at age 12 until he was 18, but when their relationship recommenced, he had changed only by being "a little older." (Rule 32 R. 89.) Hurston also testified that she talked to Thomas's attorneys after his arrest. In this meeting, her mother was present, and the attorneys asked both of them about Thomas's background and family life. They told them about the same "kind of things" she testified to in the Rule 32 hearing. (Rule 32 R. 88.)
Kathy Schimpf testified in the Rule 32 hearing that when she and Thomas were sent to a foster home when she was 11 years old and Thomas was 13, he was very supportive and helped her adjust; that during the 2 ½ years in that foster home, Thomas was happy and was close to her and to the other foster children in the home; that he was respectful to the foster parents, he helped with chores, and he was fairly obedient; and that he was very good with the 18-month-old baby in the home. She further testified that after he was removed from that home, she lost contact with him for 7 or 8 years and that when they reunited, he seemed more mature. When asked if she would describe Thomas as a loving person, she answered, "Very *968 much" (Rule 32 R. 98) and described his relationship with her young son. She explained that Thomas bought him things and spent time in their home.
We agree with Thomas that we must ensure that the following mandate is observed:
"It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. Thus, the jury's attention should be focused on the `particularized nature of the crime and the particularized characteristics of the individual defendant.' Gregg [v. Georgia,] 428 U.S. [153,] 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 ... [(1976)]."
Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.1989), cert. denied, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989) (other citations omitted). In making these allegations, however, Rule 32 counsel completely ignores the wealth of evidence in mitigation of sentence produced at the guilt phase. Section 13A-5-45(c) provides in pertinent part:
"Evidence presented at the trial of the case may be considered [at the sentencing hearing] insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of re-introducing that evidence at the sentence hearing, unless the sentence hearing is conducted before a jury other than the one before which the defendant was tried."
The trial court instructed the jury, "In making your determination concerning existence of any aggravating or mitigating circumstance, you ... may also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of any aggravating or mitigating circumstance." (R. 1999.) Moreover, defense counsel relied in their penalty arguments to the jury on evidence presented at the guilt phase of the trial.
It is for this reasonthat guilt-phase evidence can be considered by the jury in making its sentencing recommendation that we find Thomas's contention that counsel failed to present allegedly available evidence that he was suffering from mental retardation, mental illness, organic brain damage, and impulse control disorder to be without merit. The jury heard a wealth of evidence on these subjects not only the evidence specified in our discussion in Parts I and II(k), supra.
In regard to Thomas's other two allegations concerning counsel's alleged failure to present evidence of his good character and family history and counsel's failure to call a single family member to testify on his behalf in the penalty phase, we have reviewed the evidence introduced in the guilt phase and compared it to the testimony of the Rule 32 witnesses.
Thomas's mother testified, in the guilt phase, that Thomas's paternal grandfather committed suicide by hanging himself; that Thomas's father was institutionalized in an "insane asylum" at 12 years of age and was not released until he was 18; that Thomas's father was incarcerated at least 3 times in a state prison and "a lot" in the Limestone County jail; that Thomas's father was an alcoholic and was sometimes mean to his family; that Thomas and his father were very close, "like two peas in a pod" (R. 1526); that Thomas's father would steal in Thomas's presence and made Thomas steal when Thomas was 7 years old; that Thomas's father set fire to some houses, including the one they lived in, which burned down completely, and that shortly after the family's house burned down, Thomas set a fire at a church; that after Thomas set the fire, he was placed in foster care; that five of her other children were also placed in foster care; that she saw Thomas only 4 times during the period that he was in foster care from age 12 to age 18; that he stayed in 3 foster homes until his 18th birthday, when he came to live with her; that he was later arrested for burglary and was incarcerated for a different burglary; that she and Thomas's father divorced after 21 years of marriage; that Thomas's family was receiving welfare benefits when Thomas was born; that since he was small, he *969 had nightmares 2 to 3 times a week in which he would "just jump up screaming and run through the house and tell [her] that things was after him" (R. 1528); and that she was informed as early as Thomas's first year of school that he was "too slow" (R. 1522) and could not do the schoolwork required. In describing Thomas's reaction to his father's death on November 22, 1984-23 days before the murder of Mrs. McLemoreThomas's mother testified:
"Kenneth just went to pieces. He just couldn't accept it. He just was so torn up. He would just lay and cry. I tried to talk to him, and he wouldn't talk. He would just be in a trance, like.... This went on for quite a while. Just two or three weeks, he wasn't hisself.... After that, he just withdrew into hisself. He wouldn't talk to anybody much and just stared off in space and things like that. It was just like he was somewhere else."
(R. 1529.) Finally, she testified that, before his father's death, Thomas "was a loving and caring boy. He was jolly and all. After that, he just withdrew into hisself." (R. 1529.)
Kathy Schimpf testified, in the guilt phase, that during the time she lived in the foster home with Thomas, he was always a discipline problem[35] although he was a good person and that he had more nightmares than the other children. In regard to Thomas's relationship with his father, Ms. Schimpf testified that their father and Thomas were very close, that their relationship was closer than the relationships between their father and Thomas's siblings, that Thomas listened to their father a lot, that their father influenced Thomas greatly, and that before Thomas was placed into foster care, Thomas and their father were inseparable. She also testified that their father abused most of the children in different ways, that he was an alcoholic who drank every day, that he did not provide for his family at all, and that he stayed in trouble with law enforcement. In describing their family life, she testified that it was always in chaos, that their father always came home drunk, that he was physically abusive to their mother and to the children, and they were always afraid of him. She further testified that before their father died, Thomas stayed with him in their father's home and later at the hospital while he was sick; that their father's death greatly upset Thomas; that afterwards, Thomas seemed to be depressed a lot, he carried on "conversations" with his father, he started drinking alcohol, and "he would just sit and stare, like, he was really in another world" (R. 1623), not aware that others were in the room. She also testified that, when he came by her house on the afternoon before the murder to reschedule a dinner date they had set, they visited a little while and he played with her son; and that during this visit she noticed that he was a little depressed. She explained,
"Well, he came in, and he had an odd look on his face. I asked him if he had a bad day at work. He said, `Well, kind of.' I said, `Is there anything you want to talk to me about?' He said, `No. I'll be all right.' I told him if he needed to talk that I would be more than glad to talk to him. He said, `Well, sis, I'll be all right.' Then when he left, he told me he loved me and he would see me tomorrow."
(R. 1624-25.) She further testified, "[M]e and Kenny always had a close relationship." (R. 1624.)
Carol Bynum, the social worker assigned to Thomas's case, testified at the guilt phase that she first met Thomas on August 24, 1971, when he was 12 years old and had been arrested for setting a fire to a bulletin board and a door at a church. She stated that, at the court hearing after the fire, Thomas said that he wanted to go *970 to the "Boy's School" instead of going back home. She also testified that an investigation into Thomas's family background revealed that his family had a very limited income and that his father was disabled from a gunshot wound when Thomas was about 10 years old; that his father had a low IQ, a severe drinking problem, and a history of numerous convictions; that his father was incarcerated at least 3 times, including once for arson of his own home; that his father, after having spent time at the "Boys' Industrial School" for stealing, was committed at a young age to a mental institution, but escaped 5 years later; that his father spent the family money on things other than the family, such as gambling; that his father was "ruthless" when he was drinking; that his father had sexually abused one of Thomas's sisters; that Thomas's grandmother expressed her opinion that Thomas's father was to blame for Thomas's disobedient behavior and further stated that Thomas's father taught Thomas to steal and lie and took Thomas everywhere with him; that Thomas stayed out with his father while his father drank until the early morning hours; and that both he and his father admitted that Thomas stole for him. Ms. Bynum further testified that all of his siblings, except the youngest who was born in 1977, were placed in foster care; that Thomas was placed in one foster home for 7 months, but was returned to his family home because he was stealing and having an intensifying conflict with his foster mother (she did not want him to maintain his relationship with his family) and because his father had since been incarcerated; that after staying with his mother for 5 or 6 months, he was moved to another foster home because his mother could not control him; that he stayed in that foster home 2 years (at ages 13 and 14) during which time he attended weekly mental health sessions because he was having problems with nervous disorders, nightmares, and nervous tics and because he was masturbating in front of other children; that while in the this foster home, he was caught stealing money from a teacher's purse; that after he requested to be removed from the foster home, he was sent to a third foster home; that while in that home, he helped his foster mother with the farm work; that he lived there until he graduated from high school; and that thereafter he returned to his mother's home and maintained a job. She further testified that when Thomas first entered foster care, he "remarked on numerous occasions that he did have a hard time distinguishing right from wrong, but he did come to know what was the difference between right and wrong" (R. 1572); that when Thomas's nervous tics started, neurological tests disclosed no neurological damage causing the tics; and that Thomas developed a stutter, which was the subject of ridicule by Thomas's classmates. She gave her impression of the kind of person Thomas was from age 12 to age 18: "He was a likable person. He seemed to enjoy life. He was always full of energy. As a young child in foster care, he was active in his sports. He was kindhearted and was lovable." She also noted that Thomas maintained his grades in the special education program in school and that she never knew him to commit any crimes except stealing and setting the fire in the church.
Thomas's first foster mother testified in the guilt phase of the trial to the following. When he was living with her, he ran away almost every day and when asked his reason for running away, he would say, "My old daddy made me do that." (R. 1671.) She would ask him what he meant by that statement and he would reply, "I don't know. He just makes me do things like that." (R. 1671.) However, during the time that Thomas lived with her, he did not visit his father in person or by telephone. The several times Thomas and his foster mother unintentionally ran into his parents while in town, Thomas did not speak to them and held onto his foster mother "like he was scared to death," saying, "I don't want [to be] around them. Just don't let them get me." (R. 1672.) While Thomas was living with her, he rarely slept; almost every night, he screamed *971 and tried to tear up his pillow. Upon her inquiry, he would explain, "They was after me. That old daddy of mine, all of them, is after me." (R. 1671.) She concluded that, during her contact with him, "[h]e didn't seem to be normal at all.... He didn't act right or do right. I've kept enough children. I know when one's right and one's wrong." (R. 1672-73.)
The daughter of the second set of Thomas's foster parents testified that while Thomas lived in their home when he was 11 or 12 years old, she lived next-door; that she saw Thomas almost every day; that he played with her three-year-old son "on [her son's] level ... more like a four-or five-year-old child" (R. 1676); that she was unaware of any violent act committed by him, he never fought with her son, and he never hurt her son; that he developed the nervous habit of twitching; and that the few problems he caused her parents stemmed from his stealing. In describing him, she stated: "He was a real sweet child. He went to church where I went to church. All the people there really liked Kenneth. I never met anybody that didn't like him when mother had him. All the people liked Kenneth." (R. 1676.) She also described him as always having been very kind. On cross-examination, she testified that he left her parents' home because he stole again after having been caught for stealing and given one more chance by her father.
Reverend Ted Swann testified that he met Thomas in 1971 after discovering that someone had set fire to paper on the bulletin boards and posters on the doors in the education building of the church he was the pastor of; that a few minutes after the sheriff arrived at the church, Thomas rode up on a bicycle and told the sheriff that he had set the fire; that Thomas, who at the time was between 10 and 12 years old, was arrested and placed in the county jail; that at a court hearing, Thomas asked to be taken from his home and placed in a foster home; that he developed a relationship with Thomas; and that after he moved from the area a year later, Thomas wrote him a couple of letters, two about his getting involved in church. On cross-examination, Rev. Swann testified that Thomas "very definitely" needed help and had shared things with him that "are very tragic." (R. 1683.)
In reviewing the evidence introduced at the guilt phase and relevant to mitigation, we have considered Thomas's testimony at the guilt phase of the trial. Thomas testified to the following. His father took Thomas with him frequently when Thomas was young. For example, his father took him to "the beer joint" where he bought him beer and took him on his out-of-town deliveries for his job without his mother knowing his whereabouts. He witnessed his father commit numerous thefts, arsons, and assaults. Nonetheless, Thomas loved his father and considered him to be a good man. Thomas was closer to his father than to any other family member. Thomas testified that when his father died, he wanted to die with him. He also testified that, since his father's death, he has talked to him a few times. After Thomas was placed in the first foster home, he missed his father. One day he left, but he does not know why. Whenever he ran away from this foster home, he told her that his father had made him, but that was not true and he does not know why he told her this lie. When he left this foster home, he was sent back to his family home, but his father was in the penitentiary and he missed him. Then he was sent to the second foster home, and he loved being there. He was taken fishing, camping, boating, and to ball games and restaurants. The older children treated him like a younger brother. He did not get into trouble until two foster boys came to live there. One of them talked him into running away and stealing. He explained, "I've always been an easy person to talk into doing something." (R. 1697.) He does not know why he stole money from a particular teacher because she was a good teacher, she was kind, and he had money at home. He left this foster home, he guessed, because he did not want to cause them more trouble. He only stayed a *972 couple of months with the next foster family because they wanted younger children. He loved it at the next foster home; it was the best time of his life. He especially liked her children and the numerous outside chores that he was assigned to do on her farm. He did not get into trouble in school, he did not take illegal drugs, he played baseball at Piney Chapel, and he liked going to church three times a week and to revivals. After he left this home, he lived with his mother, but he continued to do farm work for his foster mother's son and son-in-law until he was hired in Muscle Shoals. He worked there about two years. He was to go into the United States Navy in January 1979, but he was incarcerated for burglary and thus rejected. Later, he worked in Texas as a carpenter's helper. The first time he went to Texas, he stayed three or four months. During that time, he was arrested for forgery of a check and was released on bond. He skipped bond and returned to Athens in 1980. He was arrested in Alabama for the Texas crime and after incarceration for eight months in Colbert County, he returned to Texas. After staying about four or five months, he returned to Alabama, where he pleaded guilty to receiving stolen property, although he actually was guilty of the theft of the property. He was sent to a state prison around April 1984. He "started having real bad nerve problems" there. (R. 1719.) Inmates repeatedly wanted "to have sex" with him (R. 1718), and he felt that everyone around him was trying to hurt him. After he was released from prison on August 30, 1984, he returned to Athens, where he lived with his mother and worked three days a week.
While in the Colbert County jail, he had a star tattooed in the area between his eyes, a sun on his left cheek, a half moon on his right cheek, a "lightening bulb" on his nose, a bee on his left hand, a "little cross with sparks on it" on the area between his thumb and forefinger (R. 1714), "thirteen and a half" (meaning "one judge, twelve on the jury, and a half chance to make it" on his right hand (R. 1714)), and "a lot" of tattoos on the remainder of his body, including a bolt of lightening and three dots representing the three years he had spent in prison (R. 1714). When asked by the sheriff why he had had his face tattooed, he said, "I don't know. A friend and I looked in the mirror. I said, `Go for it,' and I laid down on the table. He done it. I don't even know why he done it though." (R. 1712.)
Thomas has no recollection of nightmares or of talking in his sleep. He does not know why he developed a nervous tic. He still stutters sometimes. He failed the first two years of school, the second year because he wanted to be with his father instead of being in school. He did not take drugs until after he started working in Muscle Shoals and did not start drinking "real bad" until after his father died. In 1978, he advanced from marijuana to "downers," quaaludes, Valium, speed, "daytimes," "speckled birds," "orange sunshine," "purple micro dot," "chocolate mescaline," and "LSD 25." (R. 1704-05.) The latter four made him hallucinate. When doing drugs by mouth, Thomas took "downers, quaaludes, and Valium, and stuff like that on weekends." (R. 1706.) He took "speed" every day because he could not work unless he had speed "to keep [him] going." (R. 1706.) He eventually started "shooting" (injecting with a syringe) "crystal," which is "homemade speed"; "LSD 25"; "orange sunshine acid"; "750 plastic deals"; Seconal; Percodans; Talwins; Tuinal; Demerol; morphine; and Valium: "about ... everything that would break down in a spoon." (R. 1707-08.) He tried cocaine only three or four times. His preference was "crystal," which would keep him "up" all night and the following day. When asked how many days per week he would shoot up while he lived in Texas, Thomas testified: "Every day. Every night. Every evening. Whenever the time would come. I used to get up and go to work, and I would do me a shot of crystal. At dinner time, I would do me a shot of crystal. I never did eat." (R. 1710.) He continued to take drugs until 1983.
*973 In explaining the church fire, Thomas stated, "I always thought I was lighting a cigarette. Anyway, I caught, you know, some papers on fire at the church. I didn't mean to do that. I don't know why I done it. There's a lot of stuff I done that I don't know why I done it." (R. 1693.)
Thomas also testified that in 1978 or 1979 he had a dog named "Dolly." She was hit by a car and died. He testified, "I loved her so much ... more that I did my mom." (R. 1717.) He also stated that sometimes "Dolly" is with him and he sees her. On cross-examination, Thomas testified that Dolly has been with him for a long time; that he asked for a flea collar for her; that he did not ask for a shovel to clean up the dog's excrements in jail because, he said, he could take care of that himself.
Thomas also testified that he inflicted harm to himself on 10 occasions, all while incarcerated in the Limestone County jail. When asked to explain why he slashed his arm or wrist on the three or four occasions that resulted in his being taken to the hospital, Thomas testified, "Well, I was in jail. I was strung out on dope. I done it to get me a shot of dope. I was having withdrawals. At a point in time I didn't want to live. I didn't care." (R. 1715.) He claimed that, in further attempts to commit suicide, he drank toilet bowl cleaner a couple of times, ate a few light bulbs a couple of times, and drank shampoo once.
When asked if he heard things, he said, "I hear things all the time.... Somebody is up there with me. They may be sound asleep, but I think I hear them talking about me.... They may be talking and they won't be talking about me, but it sounds like they are talking to me." (R. 1721.) He further testified that, at the jail, he saw a bear a few times, "looking out of a jar of honey" while sitting on the floor (R. 1722), and also an eagle on the roof.
We have also reviewed the evidence admitted at the penalty phase. Thomas's parole officer testified that Thomas's prior crimes were property-related and that he had no reputation for violence. Rev. Swann testified that he and Thomas have maintained a relationship while Thomas has been incarcerated for these convictions; that, in almost every contact, Thomas has stated that he wants to help children stay away from drugs; and that Thomas has indicated his personal belief in Christ and his desire for "things to be right in his life spiritually." (R. 1959.) Carol Bynum again gave a history of the Thomas family. A foster home member testified that, while Thomas was in his foster home, Thomas was a good child. He further testified,
"[I]f anybody ever needed any help, Kenny was there. There were a lot of elderly people that lived around us there. If any of them ever needed any help, Kenny would be the first one to help them. He would go out of his way to do things even if he needed to do other things around the house.... [H]e never had any violence or anything in his nature."
(R. 1974-75.)
Considering all the evidence introduced in the guilt and penalty phases of Thomas's trial, we fail to see how the evidence that Thomas argues should have been elicited at the penalty phase would have had any impact. It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable. The proposed evidence would either have been cumulative to the evidence produced at trial or would have been so contradicted by other evidence as to have been rendered useless. For example, Thomas claims that evidence should have been elicited that he had created no disciplinary problems. Not only was there overwhelming evidence to the contrary, but having a family member testify as to that would not only have cast doubt on the credibility of the person testifying, but could have also cast doubt on the testimony of favorable witnesses such as Mrs. Bynum.
*974 In regard to Thomas's allegation that trial counsel was ineffective in failing to call any family member to testify, we point out that two family members and members of two foster families testified at the guilt-phase proceeding and a member of yet another foster home testified at the penalty-phase proceeding. We disagree with Thomas that the jury was left with the impression, from the absence of family testimony at the penalty phase of the trial, that family members had nothing positive to say about him and that they did not care about him. No implicationexplicit or implicitwas made to the jury that family members did not testify because they had rejected Thomas. Compare Harris v. Dugger, 874 F.2d at 763. The prosecutor did not make any comment emphasizing the absence of family members as witnesses. Compare Cave v. Singletary, 971 F.2d 1513, 1519 (11th Cir.1992). Furthermore, in argument in the penalty-phase proceeding, defense counsel stated:
"I think we all and others [who] did know [Mrs. McLemore] suffer a loss [as] a result of her death, but in considering whether or not this person should be put to death, there's another family. The families that themselves are victims. They had nothing to do with the crime that was committed in this case. That's the family of Kenny Thomas. His mother and sisters."
"In some other place [while Thomas is being executed, if so sentenced], a loving mother, an old woman who has carried life on her shoulders, will wail in sorrow and grief. Sisters will cry and gnash their teeth and ask why did it have to happen. Brothers will bite their lips and attempt to muffle their anguish and their sorrow, but it will be there. Kenneth Glenn Thomas, the little baby [who] was born on the cold rainy day down at the old red brick hospital who had the open innocent blue eyes and the innocent heart will be dead."
(R. 1937-38, 1988-89.)
Based on the foregoing, we reject Thomas's claims of ineffective trial counsel in the penalty phase.
In concluding our review of Thomas's numerous claims of ineffective counsel, we are confident that the following can be said about this case.
"The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conductedeven if defense counsel may have made demonstrable errorsthe kind of testing envisioned by the Sixth Amendment has occurred."
United States v. Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

IV.
Thomas contends, in Issue IX of his brief to this court, that evidence pointing to Billy's involvement in the crimes and discovered since direct appeal entitles him to a new trial. In his three-sentence argument to this court (Brief, pp. 52-53), as in his pleadings in the circuit court (Rule 32 CR. 530-31, 669-70), in setting forth any newly discovered evidence, he refers only to an unnamed person who allegedly saw Billy running away from the scene shortly after the crimes were committed. Such is grossly inadequate to satisfy the burden of pleading and proof of Rule 32.3 and 32.6(b). No such witness testified at the Rule 32 hearing nor did Thomas submit an affidavit of this alleged person.

V.
In Issue XXXII of his brief to this court, Thomas contends:
"The claims for relief set forth in Mr. Thomas's amended petition, whether considered individually or together, or in any combination, establish that Mr. *975 Thomas was deprived of a fair competency hearing, a fair trial, and a fair and reliable sentencing in violation of his rights to confrontation, compulsory process, silence, due process of the law, equal protection of the laws, the effective assistance of counsel, and his right not to suffer cruel and unusual punishment under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Art. 1 §§ 1, 5, 6, 7, 8, 9, 11, 13, 15, and 16 of the Alabama Constitution."
(Brief, p. 108.) Thomas offers no argument. Based on the foregoing, this issue is without merit.
We affirm the circuit court's judgment.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, BROWN, and BASCHAB, JJ., concur.
NOTES
[*] Note from the reporter of decisions: On the Court of Criminal Appeals' docket sheet, this defendant's name is spelled "Kenneth Glen Thomas."
[1] For purposes of this opinion, any reference to a specific page in the transcript of the Rule 32 hearing is designated "Rule 32 R. __"; in the clerk's record of the Rule 32 proceedings, "Rule 32 C.R. __"; in the original transcript, "R. __"; in the clerk's record of the trial record, "C.R. __"; and in Thomas's brief on this appeal, "Brief, p. __."
[2] In his brief to this court, Thomas contends that this court should be skeptical of the circuit court's order because, he argues, the circuit court allegedly adopted in toto an order drafted by the state. He further accuses the circuit court of doing so without reviewing the state's proposed findings, which he claims are untrustworthy and inaccurate and fail to address eight of Thomas's claims.

The record offers no factual support for the proposition that the circuit court adopted an order proposed by the state. Although the record contains a cover letter from a state's attorney claiming to enclose a proposed order (Rule 32 C.R. 715), the record does not contain a copy of that proposed order.
In addition, this matter was not preserved for review, as Thomas never objected to the circuit court's order denying his petition. See Morrison v. State, 551 So.2d 435, 436-37 (Ala. Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).
[3] Many of the ineffective-assistance-of-counsel claims in Thomas's brief are too undeveloped to analyze: they are unsupported by facts or by legal argument and authority. The length of this opinion is directly attributable to Rule 32 appellate counsel's failure to adhere to the requirements of Rule 28, Ala.R.App.P. Although this failure has in no way diminished our level of review of the points raised, we consider it an indication that appellate counsel believes the majority of points in issue are not worthy of argument, i.e., that they are clearly without merit.
[4] The record supports the inference that defense counsel did not have these records at the time of the competency hearing. The transcript of the competency hearing reflects that the only records introduced were a medical report from Dr. Lynn Boyer and the records compiled during Thomas's stay at Taylor Hardin. However, our review of the Taylor Hardin records reveals no mention of the prior examinations of Thomas by Lee and Dr. Brown.

Moreover, the record shows that defense counsel filed a motion on February 13, 1986, which the trial court granted on that same date, asking that the Department of Corrections be ordered to provide defense counsel with all its records pertaining to Thomas's incarceration prior to the capital crime. (C.R. 166-67.)
Accordingly, it appears that the trial court did not have this information when it first ruled on Thomas's competency.
[5] Section (o) of Issue II of Thomas's brief to this court states in its entirety:

"(o) Trial counsel failed to raise objections to each of the substantive issues set forth in the Amended Petition at Sections E through EE. [Rule 32 C.R.] 528-74."
Thus, we must refer to the amended petition to even know the 27 issues (3 of which have a total of 44 subparts) Thomas raises for our review by this one sentence in his brief. However, the substantive issues underlying many of these issues are raised elsewhere in Thomas's brief to this court. (See Issues V through XXXI, Brief, pp. 47-107.) In reviewing many of Thomas's ineffective counsel claims asserted by this one-sentence reference to Sections E through EE of his amended petition, we have referred to that portion of Thomas's brief to this court in which Thomas sometimes asserts an argument supporting the underlying substantive claim. We have, in most instances, found that our attempt to determine exactly what Thomas is arguing has been more challenging than our consideration of the substance of the legal issues presented. We have repeatedly been frustrated by the manner in which Thomas has presented issues for this court's review.
The labeling of the list of contentions to which trial counsel allegedly should have objected corresponds with the labeling in Thomas's Amended Petition.
[6] In Issue IV of his brief to this court (Brief, pp. 45-47), Thomas asserts that appellate counsel were ineffective for failing to assert on appeal the substantive issues presented in sections E through EE of the amended petition and refers this court to Rule 32 C.R. 528-74.
[7] "Alienist" is "one that treats diseases of the mind; esp: a physician specializing in legal problems of psychiatry." Webster's Third New International Dictionary of the English Language Unabridged (1971).
[8] We note that Ala.R.Crim.P. 11.6(b)(2), which was not in effect at the time of Thomas's trial, states,

"The defendant shall ... be afforded an opportunity ... to confront and cross-examine witnesses who appear at the [competency] hearing; provided, however, that in lieu of introducing evidence regarding the defendant's mental competency, the parties may, by stipulation, submit the matter to the circuit judge on the reports of the qualified mental health experts."
[9] For ease of reference, we have labeled our paragraphs using the same alphabetical system Thomas used in his brief to this court.
[10] In specific regard to the motion for a change of venue, we further note that the trial court denied the motion, and this court reviewed this ruling on direct appeal. We affirmed. See Thomas, 539 So.2d at 392-94. We concur with the Rule 32 court's finding that "[n]o new evidence was adduced at the hearing held on Thomas's Rule 32 petition which would in any way indicate that the jury impanelled to hear Thomas's case was in any way prejudiced by any outside information." (Rule 32 C.R. 725.) The newspaper articles that were attached to Thomas's petition (Rule 32 C.R. 61-88) were the same as those submitted with Thomas's motion for a change of venue, minus two (C.R. 235-63).
[11] This court, in Parker v. State, 549 So.2d 989 (Ala.Cr.App.1989), relied on State v. Onidas. See our discussion, infra.
[12] See Andres v. United States, 163 F.2d 468, 469 (9th Cir.1947), for observation that no exception was taken or objection made.
[13] In his argument in his brief to this court, Thomas also appears to assert that had counsel not been ineffective, the jury's sentencing recommendation would have probably been different. This specific argument in regard to sentencing was not presented to the circuit court in any of Thomas's pleadings. (See Rule 32 C.R. 18, 523, 647-51.) Therefore, it is not before this court. Moreover, the rationale we have used to determine the effect on the guilt phase would also apply to any review of the effect on the sentencing phase.
[14] Dr. Goldberg described "cognitive capacity" as those "capacities to remember or learn new information, to solve problems, to analyze the world in spacial terms, to perceive the world accurately, and also to understand and express yourself through language." (Rule 32 R. 27.)
[15] We note the following testimony by Dr. Goldberg, although Thomas did not rely on it in his argument. Dr. Goldberg testified that one test in the series he administered to Thomas showed that Thomas, who completed 12 years of school, mostly in special education, had achieved a 4.2 grade level in mathematics, a 5.2 grade level in reading recognition, and a 6.5 grade level in reading comprehension. He testified as follows:

"Q. [Thomas's counsel:] Dr. Goldberg, in general, how did Mr. Thomas perform on these tests [Defendant's Exhibits 2 through 14, Rule 32 proceedings]?
"A. On the vast majority of tests Mr. Thomas performed in the impaired range, sometimes in the moderately impaired range and sometimes in the severely impaired range. These results were consistent with his basic intellectual functioning.
"Q. What is his basic intellectual functioning?
"A. Based on prior results his intellectual functioning was in the mildly retarded range."
(Rule 32 R. 25.) Dr. Goldberg further testified that Thomas was able to understand the directions for taking the tests, but that, as disclosed in their clinical interview, Thomas did not know many routine facts or ways to do things that a normal person would know. Dr. Goldberg gave the following examples: when they discussed how one would go about ordering a meal in a restaurant, Thomas did not mention looking at a menu, and when they discussed how to get on a bus, he did not mention checking the route of the bus and having correct change. He also relied upon the fact that Thomas was the "butt of practical jokes" by his friends.
When asked if his diagnosis of brain damage was any different than a simple diagnosis of mental retardation, Dr. Goldberg answered, "Well, I think in this case there may be a fine distinction in that ... his mental retardation, is due to brain damage, per se, not due to complete lack of education, complete lack of environmental stimulation, complete lack of cultural experience." (Rule 32 R. 29.) Dr. Goldberg further explained that he did not know the cause of Thomas's brain damage and that, in his opinion, Thomas has been mentally retarded his entire life. He was also of the opinion that Thomas was not purposefully doing poorly on the tests. He explained, "Mr. Thomas made errors very typical of brain-damaged individuals and those are called poseurative errors where he made the same mistakes over and over." (Rule 32 R. 29.) Finally, he testified that, with the exception of two (the California Verbal Learning Test and the design cancellation task), all of the neuropsychological tests he administered to Thomas were available in 1985 and they were more sensitive in determining brain damage than a standard IQ test.
[16] Dr. Weinberger also testified that, in addition to Thomas's mental retardation, some of the objective signs of brain damage or maldevelopment were motor signs such as tics, great difficulty in tapping a rhythm, ambidexterity, and abnormal, involuntary eye movement, the latter of which is seen very often after congenital birth injury and cannot possibly be faked. He explained that "[t]hese signs and mental retardation are both caused by something, but the mental retardation does not cause these signs. These are in addition to mental retardation." (Rule 32 R. 57.)

Weinberger further diagnosed Thomas as having chronic tic disorder, which is a form of Tourette's Syndrome, and by history, poly substance abuse, probably dysthymic disorder, i.e. periods of depression, and an impulse control disorder.
"Q. [Thomas's Counsel:] ... What is [the impulse control] disorder?
"A. Impulse control disorder, the classic example of impulse control disorder, is somebody who can't stop gambling or somebody who is a cleptomaniac. But there are variance of those things. And Mr. Thomas, he has had a pattern of a variety of spur of the moment impulsive destructive behaviors from thefts to the tattooing that he did of himself, which, as he described it, was very impulsive and spur of the moment, and the numerous suicide gestures that seemed to have been from one moment's change in mood to another. These could be viewed as a difficulty in controlling impulses and a recurrent pattern of this.
"Q. Is there a relationship between the mental retardation and the impulse control disorder?
"A. There could be.... People who are mentally retarded and have brain damage have a fixed short fuse that they were fixed with from early in the development of their brain.
". . . .
"Q.... [D]oes an impulse control disorder impair one's ability to control an impulse or an urge?
"A. I don't know that one can say that it categorically does that across the span of all impulses, but the definition of an impulse control disorder is somebody who has a pattern of recurrent impulsive behaviors.
"Q. And does mental retardation have an effect on impulse control disorders?
"A. It can.
"Q. What about alcohol? Could that have an effect also?
"A. It often does."
(Rule 32 R. 58-59.)
On cross-examination, Weinberger admitted that it is possible for symptoms of Tourette's Syndrome and impulse control disorder to be faked and that a poor score on an IQ test could be falsely achieved. He further admitted that Thomas's tics and some of his abnormal movements could have been caused by drug abuse, but not his ambidexterity and probably not his ocular motor problem. He also stated that from his assessment of Thomas's adaptive function, he found that Thomas functioned at the level of a 12-year-old, but that he considered Thomas's IQ to be about 70. He admitted that if it were one point higher, Thomas would not by the strictest criteria be considered mentally retarded.
On re-direct, Weinberger explained,
"What I was impressed with was actually how hard Mr. Thomas tried to look good, and there were many opportunities in the neurological examination for him to fake symptoms, which he did not take advantage of.... As from the neurological tests there's a particular pattern that people who really have brain dysfunction show. He showed those patterns. There are other patterns that are shown by people who fake. He didn't show those patterns."
(Rule 32 R. 77-78.) He further stated that tics are "just a strange thing to fake" (Rule 32 R. 78) and that he could not have faked the eye movement problem and his difficulty with the "ribbon test."
[17] In 1981, John Hinkley was charged with attempting to assassinate President Ronald Reagan. He was later acquitted after asserting an insanity defense.
[18] This one sentence in Thomas's brief refers this court to 27 issues, 3 of which have a total of 44 subparts, found in Thomas's amended petition. However, many of the underlying substantive issues are argued elsewhere in Thomas's brief. In our attempt to garner any supporting argument to these claims, we have resorted to those other parts of Thomas's brief. The labelling of the following list of contentions to which trial counsel allegedly should have objected corresponds with the labelling in Thomas's petition.
[19] Cited pages R. 99-101 contain the question to the entire panel whether any one has a fixed opinion against the death penalty. Veniremembers S.J., B.H., M.W., and J.A.M. responded. Cited pages R. 225-26 are the individual voir dire of B.J.B. who, through his answers, revealed that in his opinion someone who is mentally ill and convicted of an awful crime should be put in an asylum; that he had a good friend who is mentally retarded; that one who is mentally retarded should not be held to the same standards as normal people; and that he has not had any experience, personal or otherwise, with psychiatrists or psychologists. On these pages, nothing was asked, and the veniremember did not mention anything, about his views concerning the death penalty. Cited pages R. 592-94 are a transcription of the individual Witherspoon voir dire of M.W. Cited pages R. 666-67 are the transcription of the prosecutor's Witherspoon challenges for cause of S.J., J.A.M., and M.W., and the trial court's granting of those challenges.
[20] The mitigating circumstances that Thomas argues are pertinent are: that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," § 13A-5-51(2); that "[t]he defendant acted under extreme duress or under the substantial domination of another person," § 13A-5-51(5); and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," § 13A-5-51(6).
[21] In addressing this issue, we have not considered the application of § 12-21-13, which provides that physical evidence is not precluded from a jury because of a break in the chain of custody. This statute became effective August 7, 1995.
[22] Thomas, in Issue XIX of his brief to this court, asserts a very general argument:

"The prosecutor engaged in misconduct in the examination of witnesses throughout the trial, by, inter alia, leading his witnesses on direct examination, asking irrelevant questions of State witnesses in an effort to further inflame the passions of the jury, asking questions on re-direct examination which exceeded the scope of cross-examination, commenting on witnesses' testimony, highlighting and repeating witnesses' answers to improper questions, and adducing inadmissible and highly prejudicial evidence."
(Brief, p. 71.) We will not validate such a general argument. However, we will address the specific examples he cites in support.
[23] Thomas directs his argument of improper prosecutorial argument to the prosecutor's entire argument and lists specific comments as examples of the allegedly replete impropriety. We do not address general conclusions. Thus, we limit our review to the specific examples.

We further note that, in contesting numerous comments by the prosecutor, Rule 32 appellate counsel cites one case. Moreover, he merely lists the comments and/or subjects of the prosecutor's arguments without offering legal rationale for condemning them.
[24] This statement was made in the following context:

"Well, what do we know about what this thug did on the night of the murder? We know that he went to work.... Sonny Hitson said he was a good worker and he was able to do what he told him to do. If he was one of the biggest potheads in the world, which he certainly seems to claim to be, Mr. Hitson certainly didn't appear to know about it. He said he was a good worker and did what you told him to. It doesn't sound like the kind of worker that smoked 17 or 20 joints of marijuana at work...." (R. 1831.)
[25] The attorney general did not address this issue in its brief to the Supreme Court.
[26] Thomas testified that on the day preceding the capital murder, as he did every morning, he smoked marijuana while he was waiting for his car to warm up so he could go to work; that he smoked at work all day with a coworker who was sharing a quarter bag with him that provided them with 15 to 20 joints; that he smoked a joint on his way home from work between 5:00 and 6:00 p.m. and stopped along the way and bought a case of beer; that he did not know how he made it home because he "was wasted"; that he was going to bed because he was tired and "messed up," but friends asked him to go to a party; that on the way to the party, he drank beer; that at the party, he bought half of a $10 bag of marijuana and smoked it; that as he was leaving the party between midnight and 1:00 a.m., someone gave him some undiluted whiskey and he "turned it up and knocked the bottom of it"; and that he was drunk when he left the party.

On cross-examination, Thomas stated that he was passed out in his car when the officer approached as he sat in his car at the crime scene, that he was "way out of it." He declared, "I don't feel guilty about this because I know I hadn't done nothing but drunk [sic].... I'm sorry it happened." When asked if his lawyer was correct in saying that Thomas does not know whether he committed the crimes, he replied, "If I did do it, I sure don't remember doing it. I don't know if I did or didn't. I don't believe I could do nothing like that.... I never did do it.... I know I didn't."
Defense witness Dr. William Pennington, who drew a blood sample from Thomas in the hospital emergency room about 8:15 a.m. on December 15, testified that Thomas did not appear to be aware of what was going on or where he was; that Thomas appeared "to be mentally out of it"; that Thomas did not "seem to be able to respond well to questions"; that Thomas seemed sedated; and that Thomas appeared to be intoxicated, but he did not know if Thomas had been drinking. On cross-examination, Dr. Pennington testified that the sedated effect could have been caused from Thomas's consumption of alcohol and marijuana the evening before; that Thomas knew him and talked to him; and that he was with Thomas for only three or four minutes.
Defense witness Marshall Pylant, the host of the party that Thomas attended before the crimes, testified that while at the party Thomas drank beer and smoked marijuana; that "a little bit" before Thomas left, he drank a little more than half a pint of whiskey straight; and that when Thomas left between 12:30 and 1:00 a.m., he was so drunk that Pylant tried to get him to spend the night, but he insisted that he had to go home to go to bed so he could go to work the next day.
Defense witness Leland Haggermaker, a party guest, testified that Thomas drank whiskey and smoked two or three joints of marijuana with everyone there.
The prosecutor also noted the evidence of Thomas's intoxication. In his opening statement, the prosecutor stated that between 7:00 p.m. and midnight, Thomas and two friends drank seven or eight beers, consumed two pints of whiskey, and smoked three joints of marijuana; that two state witnesses would testify that Thomas "got drunk or that he was intoxicated or that he was high," (R. 715); that another witness would testify that she saw Thomas driving extremely slowly; that another witness would testify that when she saw Thomas walking across the Middle School parking lot to the victim's front yard at approximately 11:45 p.m., he appeared to be intoxicated; and that when the police approached Thomas at 2:45 a.m. as he sat in his car across the street from the crime scene, he smelled of alcohol.
Officer Mitchell, who was one of the first officers at the scene, testified that he smelled the odor of alcohol around Thomas; that he placed Thomas under arrest at the scene for public intoxication; that he considered Thomas to be "borderline" intoxicated; that, on a scale of 1 to 10, with 10 being most intoxicated, he considered Thomas to be 8; and that Thomas was ultimately convicted in city court of public intoxication. Officer Presnell, who was also one of the first to arrive at the scene, testified that Thomas appeared to be intoxicated but was not "totally out of it"; that he smelled the odor of alcohol on Thomas's breath; that Thomas's speech was "uncoordinated and slurry"; but that Thomas did not stumble or stagger. Officer Whitt testified that although Thomas smelled of alcohol and appeared to be intoxicated, Thomas could walk and talk; that when put in a jail cell, Thomas appeared to know where he was and to know that the officer was a police officer; and that Thomas exhibited normal behavior for someone intoxicated. Officer Dempsey also testified that Thomas appeared to be intoxicated, but Thomas recognized him immediately. Officer Clark testified that when he photographed Thomas "way after daylight" on the day of the crimes, Thomas was still intoxicated. Chief Faulk testified that, when he saw Thomas at the jail around 6:00 a.m. on the day of the crimes, Thomas "probably was under the influence." (R. 1378.) In Thomas's statements to law enforcement after his arrest, which were introduced in the state's case-in-chief, Thomas stated that at the party prior to the crimes, he consumed beer and whiskey and smoked marijuana.
State witness Addie Siniard testified that, at the party, she observed Thomas drinking beer and whiskey and smoking marijuana and that Thomas was intoxicated to the point that he was staggering when he left the party around midnight to 12:30 a.m. Another state witness, who was at the party, Kathy Guess, testified that Thomas was drinking beer and whiskey and smoking marijuana; that he was "very intoxicated" when he left; that she and the host tried to persuade Thomas to spend the night because they were afraid that he would "get a ticket"; and that, in her estimation, he left between midnight and 1:00 a.m.
Finally, the trial court, in its findings of fact in its sentencing order, specifically found that Thomas was intoxicated when he was arrested. (C.R. 295.)
[27] In Crosslin v. State, 446 So.2d 675 (Ala.Cr. App.1983), a death penalty case, the appellant pleaded not guilty by reason of insanity, pursued the defense of insanity at trial, testified that he could remember only the events immediately before and immediately after the crime, and testified that he had been "into drugs pretty heavy" for several days preceding the murders. Id. at 681. The evidence showed that around the time of the murders, the appellant "appeared to be high," and was "messed up," "pretty looped," and "kind of high," and that he had been drinking beer, smoking marijuana, and taking Placidyl and "one or two Quaaludes." Id. However, the trial court did not give a jury instruction on manslaughter.

In holding that the trial court committed reversible error in refusing to charge the jury on the lesser included offense of manslaughter, the court stated:
"Appellant's basic argument in support of his contention that a manslaughter instruction should have been given is that he was so intoxicated at the time of the commission of the offense that a jury question was presented as to whether he was capable of forming the specific intent necessary for conviction under Ala.Code § 13A-5-31(a)(10) (Supp.1977) or § 13A-6-2(a)(1) (Supp.1977). The only portion of the trial court's oral charge which deals with intoxication reads as follows:
"`Intoxication, other than involuntary intoxication, is not a defense to a criminal charge, but may be considered by the jury if relevant on the question of whether the fact of intoxication negates an element of the offense charged, such as intent, but not the element of recklessness.'
"As can be seen, this charge is completely silent on what course the jury should pursue if they were to find that appellant was intoxicated to such degree he was incapable of forming the specific intent necessary for the commission of the capital offense of murder.
"... [A]ppellant contends that the trial court should have coupled its charge on the effects of intoxication with a charge on manslaughter. There has been uniform acceptance of the following statement as to effects of voluntary intoxication:
"`Voluntary drunkenness neither excuses or palliates crime. But in murder cases evidence of drunkenness of such degree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negate the premeditation and deliberation essential to murder in the first degree, or reduce the crime to murder in the second degree.' (Emphasis added.) ...
"It is true that the degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to `insanity.' Maddox v. State, 31 Ala.App. 332, 334, 17 So.2d 283, 285 (1944). Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Gautney v. State, 284 Ala. 82, 222 So.2d 175 (1969); Walker v. State, 91 Ala. 76, 9 So. 87 (1891). Partial intoxication will not avail to disprove the specific intent; the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrongstupefaction of the reasoning faculty. Green v. State, 342 So.2d 419 (Ala.Cr.App.1977).
"However, it is equally clear that the degree of intoxication exhibited by an accused, such as to reduce murder to manslaughter, even where the evidence is in sharp conflict, is for the jury to decide. Helms [v. State, 254 Ala. 14, 47 So.2d 276, 281 (1950)]; Chatham v. State, 92 Ala. 47, 9 So. 607 (1891); Maddox, supra. In Chatham, supra, a larceny case where there was some testimony that the accused was drunk at the time of the commission of the offense, and in which the accused testified `he did not remember anything which occurred,' the Supreme Court wrote the following:
"`When the offense consists of an act committed with a particular intent, when a specific intent is of the essence of the crime,drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent. ... "Although drunkenness, in point of law, constitutes no excuse or justification for crime, still, when the nature and essence of a crime is made by law to depend upon the peculiar state and condition of the criminal's mind at the time, and with reference to the act done, drunkenness, as a matter of fact, affecting such state and condition of the mind, is a proper subject for consideration and inquiry by the jury. The question in such cases is, what is the mental status?" The decided weight of authority sustains the doctrine that evidence of the condition of the accused, though caused by voluntary drunkenness, is receivable, and may be considered by the jury in determining the question of intent. (Citations omitted.) Charges as to this doctrine should, when necessary, be accompanied by such explanatory instructions as will prevent its misapplication by juries.... There being some testimony tending to show that defendant was drunk, he had a right to have the jury pass upon its credibility and sufficiency to prove that he was so drunk as to be incapable of forming the specific intent to steal....' (Emphasis added.) 9 So. at 607, 608.
"The standard to be applied in this state is that in a capital case the jury must be instructed on each lesser-included offense which has `any basis in the evidence.' Beck v. State, 396 So.2d at 658 (Ala.1980); Ex parte Kyzer, 399 So.2d 330 (Ala.1981). A lesser-included offense instruction should be given if `there is any reasonable theory from the evidence which would support the position.' Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); Chavers v. State, 361 So.2d 1106 (1978); Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973). Our decisions are to the effect that `Every prisoner at the bar is entitled to have charges given, which, without being misleading, correctly stated the law of his case, and are supported by any evidence, however weak, insufficient, or doubtful in credibility.' (Emphasis added.) Gibson v. State, 89 Ala. 121, 8 So. 98 (1890). See also Burns v. State, 229 Ala. 68, 155 So. 561 (1934).
"No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a `reasonable theory from the evidence which would support the position.'"
446 So.2d 681-82.
[28] The pertinent testimony was as follows:

"Q. What happened after you went to bed?
"A. Well, I went to sleep.... Between 1:30 and 2:00 I heard a door slam.
"Q. What door was it?
"A. It was my front door.... I called out, and I said, `Kenneth, is that you coming home, son?' Ever who it was mumbled, `Uh-huh,' but I couldn't tell who it was at that time. So ever who it was went to the bathroom, and they stayed in there about 10 or 15 minutes, and they came out.
"Q. Did you hear any water running?
"A. Nothing except the commode flushed.
"Q. So they came out, and what happened?
"A. They went in the back bedroom. I got up and went to the kitchen and got me a drink of water. I went back to bed, and the next thing I knew I heard sirens. I got back up. About 2:00 I seen those lights up there flashing. I went into Billy's bedroom. I asked him, `Son, what happened up there?' He said
"MR. FRY: I object to what was said.
"THE COURT: Sustained."
(R. 1514-15.)
[29] The testimony was as follows:

"A. [Billy] got up at 6:30 the next morning.
"Q. Where did he go?
"A. He went up to the place where that happened.
"Q. Did he come on back?
"A. Yes, sir, he came back to the house.
"Q. What happened?
"A. He told me
"MR. FRY: I object, Your Honor, to what he told.
"THE COURT: Sustained.
"A. Well, Mr. Fry doesn't want you to tell what he said, but you can tell what he did. Tell the jury what he did when he came in.
"Q. Well, when he came back to the house, he came in the front door. He walked to the kitchen and turned around. He came back in the living room. He fell down beside my gas heater on the living room floor. He went to patting his hands on the floor. He said"
(R. 1515-16.)
[30] Ms. Carter testified as follows:

"A: [Billy] asked me if I thought Kenneth was guilty. I told him, `No.' He told me that he had killed her, Mrs. McLemore. He said that before he would let Kenny take the electric chair, he would tell the truth.
". . . .
"Q. Did Billy Ray ever tell you again he was the one that had killed Mrs. McLemore?
"A. No. He said Kenneth was innocent and the truth would come out before he would be convicted."
"Q. Has Billy Ray ever bragged about attacking or murdering other women?
"MR. FRY: I'm going to object to any more hearsay. I've heard all the hearsay I feel like I can take.
"THE COURT: As to other cases, I sustain it."
(R. 1943, 1950.)
[31] The following occurred during the witness's testimony:

"Q. Is there anything else you would like to share with the jury about Kenneth Thomas that might be helpful?
"A. No, I have nothing else other than hearsay.
"Q. Well, what's that hearsay?
"MR. FRY: I'm going to object to that, Your Honor.
"THE COURT: Well, what is it that you are wanting to tell us?
". . . .
"THE WITNESS: The feelings I had toward his brother and things that I heard that his brother told me.
"THE COURT: Is there something about Kenneth? ...
"THE WITNESS: It's not about Kenneth.
"THE COURT: Well, if it's about Kenneth, you can tell us, but otherwise, I'll sustain the objection."
(R. 1972-73.)
[32] The trial court's sentencing order, in pertinent part, states:

"The Court having considered whether there are any mitigating circumstances not enumerated by statute which are shown by the evidence to exist in this case, the Court finds, therefore, that the evidence does not support any finding that there are any mitigating circumstances in this case not enumerated by statute."
(C.R. 299.)
[33] In Issue V of his brief to the Alabama Supreme Court, Thomas contended that the trial court erred by not considering this mitigation evidence and thereby in examining in a cursory manner the mitigating circumstances of § 13A-5-51(1) ("[t]he defendant has no significant history of prior criminal activity"); § 13A-5-51(2) ("[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"); § 13A-5-51(5) ("[t]he defendant acted under extreme duress or under the substantial domination of another person"); § 13A-5-51(6) ("[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"); and § 13A-5-51(7) ("[t]he age of the defendant at the time of the crime").
[34] In the guilt phase, this witness's surname is spelled "Shemp." In the Rule 32 transcript, she spelled it for the court reporter as "S-c-h-i-m-p-f."
[35] This testimony is contrary to the testimony Ms. Schimpf subsequently gave in the Rule 32 proceedings.